

SEALED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

USMS SCREENED

JOHN KARVELAS,

*Plaintiff,*

vs

TUFTS SHARED SERVICES, INC. d/b/a
TUFTS MEDICAL CENTER, INC., and
Leslie Lussier individually
Theresa Hudson Jinks individually
Albert **Fantasia individually**

*Defendants.*

CIVIL ACTION N0 #1:18cv 11260-
LTS*

**Amended Complaint**

**JURY TRIAL DEMANDED**

U.S. DISTRICT COURT
DISTRICT OF MASS.

2019 APR 25   AM 11: 16

FILED
IN CLERKS OFFICE

## COMPLAINT

Plaintiff– John Karvelas  hereby files this complaint  for slander defamation

harassment, bullying, Hippa violation on my medical record. Retaliation,

Wrongful Termination, Intimidation, Intimidation of a Witness, Failure to report

Serious reportable events, Wrongful Incarceration, Discrimination,Stalking.

## INTRODUCTORY STATEMENT

1.      Plaintiff– John Karvelas brings this action, alleging that the Defendants have

violated laws related to mandatory reporting and submitting claims for such events

## JURISDICTION & VENUE

2.      This Court has jurisdiction over this action under the Federal FCA,

31 U.S.C. §§ 3732(a), and 28 U.S.C. §§ 1331 and 1345 and has pendent jurisdiction over

the Massachusetts FCA state law claims pursuant to 28 U.S.C. § 1367. Also  under 105

CMR 130.332(c) 105 CMR 140.308 (c)  and (MGL. C. 149,s 187) and (MGL c 305 of the

acts of 2008. The Defendants can be found in, reside in and transact business in this

judicial district and acts proscribed by the Federal FCA and Massachusetts FCA have

been committed by the Defendants in this judicial district.

3.     To Plaintiff–Relator's knowledge, jurisdiction over this action is not barred

by 31 U.S.C. § 3730(e) or Mass. Gen. Laws Ch. 12, § 5G: there is no civil suit or

administrative proceeding involving the allegations and transactions herein to which

the United States or the Commonwealth of Massachusetts is a party; there has been no

"public disclosure" of these allegations or transactions; and Plaintiff–Relator is the

"original source" of the information on which these allegations are based—Relator has

voluntarily disclosed to the United States and Commonwealth of Massachusetts the

information on which allegations or transactions in a claim are based before filing this

complaint and has knowledge that is independent of and materially adds to any

publicly disclosed allegations or transactions. Furthermore, the fact that many

thousands of claims presented to government healthcare programs (including Medicare

and Medicaid) were inaccurate in the manner described in this Complaint is a material

fact, which, if known to the United States and the Commonwealth of Massachusetts,

would have caused those claims to be denied.

4.     Venue is appropriate as to the Defendants since the Defendants can be

found in, resides in and transact business in this judicial district and acts proscribed by

the Federal FCA and Massachusetts FCA have been committed by the Defendants in

this judicial district. Therefore, within the meaning of 28 U.S.C. §§ 1391(b) and (c) and

2

31 U.S.C. § 3732(a), venue is proper.

PARTIES

5.      Plaintiff- John Karvelas is an individual with a principal place of residence in Massachusetts. He brings this lawsuit as a way to correct a terrible wrong and let the public know what truly happened to the Patients. Plaintiff worked at TUFTS Medical Center as a full time respiratory therapist from December 2005 through November 2016.

6.      Defendant TUFTS Shared Services, Inc. d/b/a TUFTS Medical Center, Inc. ("TMC") is a nonprofit corporation organized and existing under the laws of the Commonwealth of Massachusetts providing medical care to the public with a principal office at 171 Harrison Avenue, Boston, MA 02111.

FEDERAL AND STATE HEALTH INSURANCE PROGRAMS

7.      The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* ("Medicare"), is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The program is overseen by the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"). Medicare was designed to be a health insurance program and to provide for, among other things, the payment of hospital services, medical services and certain medications for persons over sixty-five (65) years of age and others who qualify under the terms and conditions of the Medicare Program. Payments made under the Medicare Program include payment for services which are reasonable and medically necessary for the diagnosis or

3

treatment of an illness or injury.

8.      The Medicaid Program, Title XIX of the Social Security Act,

42 U.S.C. §§ 1396-1396v ("Medicaid"), is a Health Insurance Program administered by

the Government of the United States and the various individual States and is funded by

State and Federal taxpayer revenue. Medicaid was designed to assist participating

states in providing, among other things, hospital and medical services and prescription

drugs to financially needy individuals who qualify for Medicaid.

9.      The Civilian Health and Medical Program of the Uniformed Services

("CHAMPUS," now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, and the Civilian

Health and Medical Program of the Veterans Administration ("CHAMPUS VA"),

38 U.S.C. § 613, provide benefits for health care services furnished by civilian providers,

physicians, and suppliers to members of the Uniformed Services and to spouses and

children of active duty, retired and deceased members. The program is administered by

the Department of Defense and funded by the Federal Government. CHAMPUS pays

for, among other items and services, tests and procedures and prescription drugs for its

beneficiaries.

10.      The Federal Employees Health Benefits Program ("FEHBP") provides

health care benefits for qualified federal employees and their dependents. It pays for,

among other items and services, tests and procedures and prescription drugs for its

beneficiaries.

## THE MASSACHUSETTS HEALTH SAFETY NET

11.      The Massachusetts Health Safety Net, created by Chapter 58 of the Acts of

2006, makes payments to hospitals and community health centers for health care services provided to low-income Massachusetts residents who are uninsured or underinsured.

12.     Massachusetts residents who are uninsured or underinsured and have incomes up to 150% of the Federal Poverty Level (FPL) may qualify for Health Safety Net primary or secondary coverage. For residents with incomes above 150% and up to 300% of the FPL, the Health Safety Net may provide partial primary or secondary coverage, which includes a sliding scale deductible based on income. Low income residents who are enrolled in MassHealth, ConnectorCare, Medicare, or other insurance can qualify for Health Safety Net secondary for certain services not covered by their primary insurance. The Health Safety Net pays acute hospitals and community health centers based on claims, which are adjudicated to verify that the patient qualifies and the services are eligible for payment. Health Safety Net payment rates for most services are based on Medicare payment principles. An estimated 285,000 individuals benefited from Health Safety Net payments in 2016.

13.     The Health Safety Net is not insurance. It is a payor of last resort that provides access to essential health care services for low-income uninsured and underinsured Massachusetts residents and reimburses acute care hospitals and community health centers for allowable services provided to this population. The sources of funding for the Health Safety Net include assessment on acute hospitals' private sector charges, surcharge on payments by HMOs, insurers, third party administrators, and individuals, and offset funding for uncompensated care from the

Medical Assistance Trust Fund. Like the Commonwealth Care Trust Fund, the Health Safety Net Trust Fund receives transfers of revenue from public funds of the Commonwealth, which can be made through a line-item appropriation.

14.     For 2016, the Health Safety Net made $231 million in payments to hospitals in Massachusetts, including TMC.

15.      Together, the programs described in paragraphs 9 through 17 shall be referred to as "Government Health Care Programs."

16.      Government Health Care Programs account for approximately 60% of TMC's revenue, a higher percentage than at many other hospitals.

## FEDERAL ANTI-KICKBACK LAWS

17.      The Medicare and Medicaid Patient Protection Act, also known as "the Anti-Kickback Statute," 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions corrupt medical decision-making and can result in the provision of goods and services that are more expensive and/or medically unnecessary or even harmful to a vulnerable patient population. To protect the integrity of Government Health Care Programs, Congress enacted a prohibition against the payment of kickbacks in any form. The Anti-Kickback Statute was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful . . . and which contribute appreciably to the cost of the Medicare and Medicaid programs." H.R. Rep. No. 92-231, 92d Cong., 1st Sess. 108 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5093.

18.     In 1977, Congress amended the Anti-Kickback Statute to prohibit receiving or paying "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony with a penalty of $25,000 and/or five years in jail. *See* Medicare and Medicaid Anti-Fraud and Abuse Amendments of 1977, Pub. L. No. 95-142, 91 Stat. 1175 (1977), *codified as amended at* 42 U.S.C. §§ 1320a-7b(b)(1)(A) and (B) (1994). In doing so, Congress noted that the purpose of the Anti-Kickback Statute was to combat fraud and abuse in medical settings that "cheat[] taxpayers who must ultimately bear the financial burden of misuse of funds . . . [that] divert[] from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services . . . [and that] erode[] the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs." *See* H.R. Rep. No. 95–393, pt. 2, at 37, *reprinted in* 1977 U.S.C.C.A.N. 3039, 3047.

19.     Through the amendments Congress sought to "give a clear, loud signal to the thieves and the crooks and the abusers that we [Congress] mean to call a halt to their exploitation of the public and the public purse." 123 Cong. Rec. S31767 (daily ed. Sept 30, 1997) (statement of Sen. Talmadge).

20.     In 1987, Congress again strengthened the Anti-Kickback Statute to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

21.     The Anti-Kickback Statute prohibits any person or entity from knowingly and willfully offering to pay or paying any remuneration to another person to induce that person to purchase, order, or recommend any good, service, or item for which payment may be made in whole or in part by a Government Health Care Program, which includes any state health program funded in part by the federal government. 42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

22.     The Anti-Kickback Statute provides, in pertinent part:

> (b) Illegal remunerations
>
> * * *
>
> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>
>> To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or
>>
>> To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>>
>> Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

23.     A transaction may violate the Anti-Kickback Statute even when a payor's unlawful intent is not its exclusive intent. It is enough that "*any one purpose* of the remuneration may be to induce or reward the referral or recommendation of business

payable in whole or in part by a Federal health care program." OIG Compliance
Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731 (May 3, 2003)
(emphasis added). In other words, even "a lawful purpose will not legitimize a
payment that also has an unlawful purpose."

24.     In addition to criminal penalties, a violation of the Anti-Kickback Statute
can also subject the perpetrator to exclusion from participation in Government Health
Care Programs (42 U.S.C. § 1320a-7(b)(7)), civil monetary penalties of $50,000 per
violation (42 U.S.C. § 1320a-7a(a)(7)), and three times the amount of remuneration paid,
regardless of whether any part of the remuneration is for a legitimate purpose,
42 U.S.C. § 1320a-7a(a).

25.     The Anti-Kickback Statute not only prohibits outright bribes and rebate
schemes, but also prohibits any payment, gift, or other remuneration by a company to a
physician or other person which has as one of its purposes the inducement of the
physician to use the company's products or the inducement of the physician to
influence or recommend the use of the product.

26.     Compliance with the Anti-Kickback Statute is a precondition to
participation as a health care provider under Government Health Care Programs,
including Medicare. Moreover, compliance with the Anti-Kickback Statute is a *condition
of payment* for any claims for which Medicare reimbursement is sought. Every provider
who enters into a contract with Medicare specifically acknowledges in its provider
contract that the provider understands "that payment of a claim by Medicare is
conditioned upon the claim and the underlying transaction complying with such laws,

regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider]'s compliance with all applicable conditions of participation in Medicare."

27.     Medicare claims for reimbursement of any goods or services that were the subject of a kickback constitute false claims. *See* False Claims Act discussion, *infra*. This is because compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under Government Health Care Programs, including Medicare. Moreover, compliance with the Anti-Kickback Statute is a condition of payment for any goods or services reimbursed by Medicare, including medical devices and related medical procedures using those devices.

28.     Furthermore, the Anti-Kickback Statute was amended, effective March 23, 2010, to expressly provide that: "In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." Consequently, any kickbacks paid on or after March 23, 2010, that caused reimbursement claims to be presented to the government for payment would result in actionable false claims regardless of the provisions of any provider agreement.

## FEDERAL FALSE CLAIMS ACT

29.     The Federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment a violation of law for which the affected government

party may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $10,781.40 and $21,562.80.

30.     The Federal FCA, 31 U.S.C. § 3729(a)(2), makes "knowingly" making, using, or causing to be used or made a false record or statement to get a false or fraudulent claim paid or approved by the United States a violation of law for which the affected government party may recover three times the amount of the damages the government sustains and civil monetary penalties.

31.     The Federal FCA, 31 U.S.C. § 3729(a)(3), makes any person who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the affected government party sustains and a civil monetary penalties.

32.     The Federal FCA, 31 U.S.C. § 3729(b), defines "knowing" or "knowingly" to mean that a person, with respect to relevant information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

33.     The Federal FCA, 31 U.S.C. § 3729(c), defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to the government, its representative, contractor, grantee, or other person if the government party in question (*i.e.*, the United States) provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is

requested or demanded.

## MASSACHUSETTS FALSE CLAIMS ACT

34.     The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(1)

("Massachusetts FCA"), makes "knowingly" presenting or causing to be presented to

Massachusetts any false or fraudulent claim for payment, a violation of law for which

the Commonwealth may recover three times the amount of the damages the

government sustains and a civil monetary penalty of between $5,500 and $11,000 per

claim.

35.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5B(2), makes

"knowingly" making, using, or causing to be used or made a false record or statement

to get a false or fraudulent claim paid or approved by Massachusetts, a violation of law

for which the Commonwealth may recover three times the amount of the damages the

government sustains and a civil monetary penalty of between $5,500 and $11,000 per

claim.

36.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5B(3), makes any person

who conspires to defraud Massachusetts by getting a false or fraudulent claim allowed

or paid, liable for three times the amount of the damages the affected government party

sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

37.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5A, defines "knowing"

or "knowingly" to mean that a person, with respect to relevant information: (1) has

actual knowledge of the information; (2) acts in deliberate ignorance of the truth or

falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the

information, and no proof of specific intent to defraud is required.

38.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5A, defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to the government, its representative, contractor, grantee, or other person if the government party in question (*i.e.* the Commonwealth of Massachusetts) provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

## FACTUAL ALLEGATIONS

### A.   BILLING IRREGULARITIES

#### 1.   Duplicative Billing

39.     The Respiratory Care Department at TMC maintains billings records such as the "Daily Transaction Audit Report" (the "Report"). The Report, which is printed every day, shows what services are billed for patients in the department.  For more than a decade during Plaintiff's tenure Leslie Lussier, the Director of Respiratory Care, would review the Report every day and was aware that there were multiple fraudulent bills produced.  For example, ventilator therapy for adult patients should be billed at two rates: $794 for the initial 24-hour period (using service code 56402114) and $471 per day for "second and subsequent days" (using service code 56402128). Similarly, the first day using a high-flow nasal cannula is billed at $587 (service code 56401768), with subsequent days billed at $270 (service code 56401776), and the initial 24-hour period for nitric oxide therapy is billed at $7,619 (service code 56402888), then subsequent

*hours* are billed at $190 each (service code 56402870).

40.     It is never appropriate to bill both "first day" and "subsequent day"

charges *on the same day*. But that is exactly what TMC has done, on numerous

occasions. TMC also billed same-day charges for therapies or services that could not

have been used for or provided to any given patient on the same day.

41.     By coincidence in July 2012, Plaintiff's next-door neighbor, hereinafter

referred to as *FA* (who at the time was 66 years old) was rushed to TMC for multiple

arterial bypass surgery. From conversations with *FA*, a Medicare recipient, Relator

learned that *FA* was on a ventilator for a week. However, when TMC billed Medicare

for the provision of nitric oxide services at $7,600 for the first day (as is proper) but

then also separately billed the government for each hour of that first day, *i.e.* an

additional $4,560 (24 times the hourly rate of $190).

42.     However, this was no isolated incident, but one of thousands of deliberate

over-billings.  A review of just a few days of billing in February 2017 reveals multiple

instances of fraudulent billing:

     **(a)     January 22, 2017**

        For patient AF, TMC billed five "asthma pathway"
charges (56402250) at $450 each, on January 22, 2017, and then
a sixth on January 23, 2017.

     **(b)     February 8, 2017**

        For patient *PC*, TMC billed for adult High Frequency
Oscillatory Ventilation ("HFOV") first-day (service code
56401598) at $795, and an adult subsequent-day ventilator
charge (56402128) at $471, *on the same day*.

For patient *JG*, TMC billed *thirty* internal transport charges (service code 56402829) *on one day* for a total charge of $14,250. These internal transport charges are for moving a patient around inside the hospital for example a patient might be moved on a portable breathing machine between the ICU to the CT Scan machine. A patient might be moved once or twice in a day but it is inconceivable that a patient would undergo 30 chargeable internal transports in a single day.

**(c)    February 9, 2017**

For patient *ST*, TMC billed *twelve* adult subsequent-day ventilator charges (56402128) at $471 each, *on the same day* for a total charge of $5,652.

For patient *LB*, TMC billed an adult first-day high flow cannula charge (56401768) at $587, an adult first-day ventilator charge (56402110) at $795, *and* an adult B1PAP[26] first-day charge (56402802) at $344 even though these three modes of treatment are no complimentary but alternatives.

For patient *GS*, TMC billed *two* adult first-day ventilator charges (56402110) at $795 each.

**(d)    February 13, 2017**

For patient *SG*, TMC billed an adult nitric oxide first-day charge (56402888) at $7,619 *and* a nitric oxide one-unit-per-hour charge (56402870) at $190 on the same day.

For patient *GF*, TMC billed an adult nitric oxide first-day charge (56402888) at $7,619 *and* a nitric oxide one-unit-per-hour charge (56402870) at $190 on the same day, *and* billed for two adult subsequent-day ventilator charges (56402128) and one adult HFOV subsequent day charge (56402799) at $471 each, on the following day, February 14, 2017.

For patient *RC*, TMC billed an adult first-day ventilator charge (56402110) *on each of two consecutive days* – February 13 and 14, 2017 – at $795 each.

**(e)    February 14, 2017**

For patient *AMH*, TMC billed *two* adult subsequent-day ventilator charges (56402128) at $471 each, on the same day.

For patient *WS*, TMC billed two adult subsequent-day ventilator charges (56402128) at $471 each, on the same day.

For patient JC, TMC billed an adult first-day ventilator charge (56402110), at $795, *and* an adult subsequent-day ventilator day charge (56402128) at $471, both on the same day.

**(f)   February 21, 2017**

For patient *BGA*, TMC billed two neonatal Nasal Intermittent Positive Pressure Ventilation ("NIPPV") subsequent day charges (56401661) at $471 each.

For patient *BBJ*, TMC billed two pediatric/neonatal subsequent day Continuous Positive Airway Pressure ("CPAP") charges (56402365) at $344 each.

For patient *WP*, TMC billed two Heated Trachestomy Collars ("HTC") first-day charges (56402063) at $417 each.

For patient *SYL*, TMC billed two adult BIPAP first-day charges (56402802) at $344 each.

**(g)   February 22, 2017**

For patient *BP*, TMC billed *three* adult BIPAP first-day charges (56402802) at $344 each.

**(h)   February 23, 2017**

For patient *AS*, TMC billed two adult subsequent-day ventilator day charges (56402128) at $471 each.

For patient *JR*, TMC billed two adult first-day ventilator charges (56402110) at $795 each.

**2.   Billing for Services Not Provided**

43.   The following are examples, all on February 9, 2017, of cases where there was billing for services not provided:

    (i)   In respect of patient BP, a patient admitted with a diagnosis of cardiogenic shock NEMC billed for the application of continuous positive airway pressure ("CPAP"). However, on review of the Daily Non-

Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask;

(ii)     In respect of patient ME, a patient admitted with a diagnosis of COPD exacerbation NEMC billed for the application of non-invasive bi-level positive airway pressure ("NIV BPAP"). However, on review of the Daily Non-Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask;

(iii)    In respect of patient WC, a patient admitted with a diagnosis of acute respiratory distress, NEMC billed for the application NIV BPAP. However, on review of the Daily Non-Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask;

(iv)    In respect of patient PB, a patient admitted with a diagnosis of a perforated lung, NEMC billed for non-invasive ventilation. However on review of the Daily Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask;

(v)     In respect of patient CE, a patient admitted for the intubation of a balloon pump, NEMC billed for invasive ventilation. However on review of the Daily Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask;

(vi)    In respect of patient RL, a patient admitted with a diagnosis of aortic stenosis, NEMC billed for invasive ventilation. However, on review of the Daily Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask.

### 3.   Unbundling of Services

44.    During Plaintiff  tenure, TMC utilized a multi-specialty in-house "rapid response" team to deal with medical emergencies for patients of the Hospital.  Each use of the rapid response team should generate a single bill for approximately $2,000. However, Plaintiff is aware that TMC billed separately for the participation of a Respiratory Therapist on the team.

45.    Many of the patients for whom such fraudulent charges were generated were/are beneficiaries of Federal or State Programs, and these fraudulent charges were either billed directly to those Programs or incorporated into the Hospital's annual cost reports. Thus, the Governments have paid many of these fraudulent claims.

### 4.   Billing for Services Ineligible for Reimbursement Because They Were Not Provided by Licensed Respiratory Therapists as Required by Medicare Rules

46.    In order to be eligible for reimbursement by Medicare, respiratory therapy services must be fully documented in the medical records. The documentation must clearly indicate that the services rendered were reasonable and medically necessary and required the skills of a licensed respiratory therapist.

47.    Prior to March 2018, nurses at TMC who were not licensed respiraitory therapists routinely administered breathing treatments to hospitalized patients via the

Pyxis Medstation system.

48.     In those cases, because licensed respiratory therapists did not administer

the treatments, claims for reimbursement were ineligible for reimbursement.  But if the

services had in fact been performed by respiratory therapists, reimbursement would

have been available. Accordingly, each time such treatments were administered, a

billing opportunity was lost because nurses are not able to separately bill for such

services.

49.     To recapture the lost billing opportunity, respiratory therapists routinely

submitted false, after-the-fact bills claiming that they — licensed respiratory therapists

not nurses — had administered the breathing treatments even though this was not true.

Each of these treatments cost $190 per administration.

50.     In March 2018, Leslie Lussier announced to respiratory therapists during a

"morning huddle" that nurses would no longer administer breathing treatments out of

the Pyxis Medstation system. This announcement was an admission that TMC had been

fraudulently billing for treatments that had not been provided by respiratory therapists,

in violation of Medicare coverage rules.

### 5.   Upcoding or Bundling of Services to Increase Reimbursement

51.     Traditionally, physicians at TMC and other hospitals relied on a central lab

for testing patient electrolyte values. While this testing is highly accurate and relatively

inexpensive, there is a waiting period for the results up to an hour, and physicians often

desire more immediate information for their clinical decisions.

52.     In or around April 2014, TMC announced that its neonatal intensive care

unit (NICU) had implemented a blood gas program. The new program allows staff to measure blood glucose or arterial blood gases and analyze tiny blood sample at the bedside, with nearly instantaneous results using a point-of-care arterial blood gas analyzer. This is an expensive piece of equipment that tests for the amounts of arterial gases, such as oxygen and carbon dioxide, but is also capable of reporting concentrations of lactate, hemoglobin, hematocrit, and several electrolytes.

53.     At the instruction of Donna Kelly, Assistant Director of Respiratory Care, one of the two departments that is responsible for implementation of the program, hospital staff are charging for more extensive panels than are ordered or are medically necessary.  Typically, physicians have the most frequent and urgent need for an electrolyte panel, which is one of the least expensive tests. However, despite the lack of medical necessity, staff were ordered to run for running a more expensive test that included electrolytes but also include items that were neither ordered nor medically necessary. These additional results were discarded. Because the more expensive test was done as a matter of routine, and was not ordered or medically necessary, TMC's charges to Medicare and MassHealth were inflated.

**B.     UNLAWFUL KICKBACKS BY TMC TO DEFENDANT EASCARE**

54.     TMC is an acute care hospital licensed to provide "medical control" to ambulance services. "Medical control" is defined to mean:

> the clinical oversight by a qualified physician to all
> components of the EMS system, including, without limitation,
> the Statewide Treatment Protocols, medical direction, training
> of and authorization to practice for EMS personnel, quality
> assurance and continuous quality improvement.

105 CMR 170.300.

55.     For more than a decade TMC has contracted with Eascare, LLC, to provide

pre-hospital advanced life support services pursuant to an agreement (the "Affiliation

Agreement") dated February 11, 2009 and renewed through November 15, 2017.

56.     The current Affiliation Agreement was signed by Therese Hudson-Jinks,

RN, MSN, Senior Vice President of Patient Care Services at TMC.

57.     The Affiliation Agreement provided that, *inter alia:*

> Hospital shall replenish medications and controlled substances
> ("Drugs"), to the extent such drugs are available for
> replenishing, utilized by [EasCare] Staff in rendering services
> to patients transferred to Hospital. Hospital shall charge
> [EasCare] for Drugs in accordance with its then current cost[s].
> ... At all times, the parties shall comply with all applicable state
> and federal healthcare payment and coverage rules and
> regulations.

58.     Federal regulations provide that such an ambulance-replenishing

arrangement will *not* be considered a violation of the Anti-Kickback Statute ("AKS") so

long as, *inter alia:*

- The "drugs or medical supplies (including linens) [were]
  *used by the ambulance provider ... in connection with the
  transport of a patient* by ambulance to the hospital";

- "the ambulance that is replenished [is] used to provide
  emergency ambulance services [at least] an average of
  three times per week, as measured over a reasonable
  period of time";

- the arrangement does "not take into account the volume
  or value of any referrals or business otherwise generated
  between the parties for which payment may be made in
  whole or in part under any Federal health care program
  (other than the referral of the particular patient to whom

the replenished drugs and medical supplies were furnished)"; and

- the hospital "replenish[es] medical supplies or drugs on an equal basis for all ambulance providers" that bring patients to the hospital.

C.F.R. §§ 1001.952(v)(1), (2)(iii), and (3)(i)(A) (emphasis added).

59.     On its face, the Affiliation Agreement between TMC and EasCare qualifies for the "safe harbor" provided by these regulations. However, in practice Defendants did not comply with these regulations — or even with the terms of the Affiliation Agreement itself.  For example, TMC "replenished," on a weekly basis, medicines that had *not* been "used ... in connection with the transport of a patient," including medicines that had *expired* while stocked onboard Brewsters ambulances.

60.     Every Monday or Tuesday Plaintiff personally witnessed Eascare technicians delivering trays of expired drugs to the hospital pharmacy. The trays would contain approximately 100 vials of expired medicines such as Epinephrine, Atropine, Sodium Bicarbinate, Toradol and Narcan. Plaintiff  estimates each tray would have a replacement value of around $10,000. Plaintiff also personally witnessed many occasions when the Hospital "replenished" medications and respiratory-care supplies (*e.g.,* nasal cannulas) for an EasCare ambulance after a run, even when no such EasCare medications or supplies could have been "*used ... in connection with the transport of a patient*" because the Respiratory Therapist who had been on that ambulance run *had used medications and supplies that he had brought with him. Eascare was exchanging drugs for Brewster ambulance who administers these drugs. Brewster owns Eascare. Safe harbor would*

22

*then not apply.*

61.     The illegal "replenishments" were additional, extra-contractual, undisclosed kickbacks paid by TMC to EasCare in exchange for its agreement to bring patients to TMC instead of taking them to other hospitals.

62.     Moreover, under threat of disciplinary action, Therese ("Terry") Hudson-finks (then Vice-President of Nursing Services), Leslie Lussier (then Director of Respiratory Care), Donna Kelly (then Assistant Director of Respiratory Care), required a Respiratory Therapist to accompany every EasCare ambulance run involving a child patient, even though there was always a nurse present on the run and the presence of a Respiratory Therapist was medically unnecessary.

63.     Many of the runs on which TMC billed for the unnecessary presence of a Respiratory Therapist, and/or for which TMC personnel authorized fraudulent billing by EasCare, were for beneficiaries of Federal or State Programs, and these fraudulent charges were either billed directly to those Programs or incorporated into the Hospital's annual cost reports. In other words, the Governments have paid many of these fraudulent claims.

64.     TMC managers and supervisors were well aware of these problems, and were alerted to them by Plaintiff on more than one occasion. Nevertheless, they did nothing to fix the problems. Many of the patients for whom fraudulent bills were thus generated were beneficiaries of Federal or State Programs, and these fraudulent charges were either billed directly to those Programs or incorporated into the Hospital's annual cost reports. Thus, the Governments have paid many of these fraudulent claims.

C.   RETALIATION

65.      On or about October 14, 2016, Plaintiff Karvelas raised concerns about the

billing of subsequent-day ventilator charges on the same day as the initial charge, as

well as other billing concerns, to the individual responsible for the Hospital's electronic

billing system. Karvelas showed him examples from the Daily Transaction Audit

Reports, and the individual agreed that they indicated double billing; however, to

Karvelas's knowledge, nothing was done to correct the problem.

66.      Then, on or about October 28, 2016, Karvelas raised these and other

concerns involving patient safety issues with Leslie Lussier and Donna Kelly, the

Director and Assistant Director of Respiratory Care, respectively, following the report

of the Department's overnight shift to the day shift. Lussier and Kelly yelled at him, and

Karvelas left.

67.      Karvelas had raised numerous other issues with Lussier and Kelly, and with

their superiors, on several previous occasions. Because of his persistence in identifying

and reporting inappropriate practices at TMC that jeopardized patient safety—most of

which Lussier and Kelly were complicit in covering up.—Karvelas's supervisors began to

see him as a "troublemaker," and began to look for ways to terminate his employment.

68.      Karvelas was terminated on November 16, 2016, because of his efforts to

expose and reform Tuft's fraudulent practices.

69.      But the retaliation from Lussier, in particular, did not stop when Karvelas

was terminated. Since then, acting in her capacity as Director of Respiratory Care, she

has defamed him to Hospital staff, and has intentionally and maliciously made false

negative comments to prospective employers who have called for references.

70.     Before and after his termination, Karvelas was subjected to repeated acts of harassment, discrimination, and intimidation, including being threatened with a gun. If I did not keep my mouth shut about falsifying of charts, Patient abandonment, Serious Reportable Events, Wrongful Death, Medical errors Medical mistakes,  Patient abandonment,.Double Billing, Patient Neglect and abuse.

71.     Karvelas has had to endure hundreds phone calls from current and former employees of TMC at all hours of the day and was stalked by a private investigator, who was hired by the Defendants.

72.      The Defendants have subjected him to multiple HIPAA violations in retaliation for his reporting of billing concerns. Falsely accused of Drinking on the job in 2012 and 2015. Which he demanded to be immediately be tested and was proven clean and returned to work.On November 11th2016 They have falsely accused the plaintiff taking extended breaks, smoking in the locker room, sleeping on the job when lussier paged him to please come to the department from the Neuro ICU

73.     Defendants maliciously prosecuted him, caused him to spend two nights in jail for a crime he did not commit, also in retaliation for his reporting of billing concerns and patient safety issues.  As a result of this retaliation, Karvelas has suffered not only the loss of his job at TMC and the loss of other prospective jobs; he has also suffered adverse health effects, including significant emotional distress

74.     As a result of Lussier's intentional and malicious interference with his prospective employment relationships, Karvelas—a *42-year veteran* of respiratory care—

was unable to find a local job in his field.

75.     The pretextual nature of Karvelas's termination is made clear by the fact that numerous employees who Defendants know have engaged in fraudulent billing, who have backdated and falsified billing records, who have shown up late, slept on the job, been intoxicated on duty, left the hospital while on shift, or have violated the hospital's rule against firearm possession, have not been fired.

76.     Indeed, TMC considers an employee known to routinely sleep during her shift to be one of the most productive employees, even though her apparent productivity is an obvious byproduct of false billing. This particular employee's penchant for sleeping at work is so well known that her nickname is the name of a prescription sleep medication.

77.     Moreover, Leslie Lussier had discussed with other employees "when she was going to get rid of Karvelas" and that she was "working on it" well in advance of the circumstances that supposedly constituted the grounds to terminate him. This was a few weeks after the plaintiff was interviewed by the DEA and spilled the beans.

Plaintiff went to OIG in September 2016 and it clearly states that as a whistleblower and informant to the OIG who has made reports that it is criminal to hereby threaten, harass, or hereby intimidate anyone that has reported to the OIG.

## LEGAL CLAIMS FOR RELIEF

### First CAUSE OF ACTION
*FCA Retaliation*
31 U.S.C. § 3730(h)

78.    Plaintiff repeats and realleges each of the allegations set forth in paragraphs NNNN as if fully set forth herein.

79.    As set forth in detail above, TMC threatened, harassed and otherwise discriminated against Plaintiff because of his lawful acts involving a potential violation(s) of the False Claims Act by his employer, TMC. By these actions, TMC violated the False Claims Act, 31 U.S.C. § 3730(h) and (M.G.L. c. 149,s 187) and violation (MGL c 305 of the  acts 2008).  The law  prohibits hospital from charging for these events or seeking reimbursement for SRE related services.

80.    TMC retaliated against Plaintiff, and ultimately fired him, because he refused to engage in practices that led to the presentation of false claims to the United States. Any other ground for dismissing or disciplining Relator was pretextual. Accordingly, TMC discharged, harassed, and discriminated against Relator on account of conduct protected by 31 U.S.C. § 3130(h) and (M.G.L. 149, s. 187) and TMC violations of MGL c 305 of the cats of 2008 (MGL 149 s 187) Prohibits healthcare facilities from terminating, refusing to hire or otherwise retaliating against a healthcare provider who opposes a practice that he or she reasonably **believes a risk to public health** Such conduct constitutes retaliatory conduct in violation of said statute.

81.    Plaintiff has been damaged as a direct result of these illegal actions. He has

suffered economic harm, loss of income and future earnings, and emotional injury.

## SECOND CAUSE OF ACTION
*Massachusetts FCA Retaliation*
M.G.L. Ch. 12 § 5J and (MGL 149,s 187) (MGL c 305 of the acts of 2008)

82.     Plaintiff repeats and realleges each of the allegations set forth in paragraphs NNN as if fully set forth herein.

83.     As set forth in detail above, TMC threatened, harassed and otherwise discriminated against Plaintiff because of his lawful acts involving a potential violation(s) of the False Claims Act by his employer, TMC. By these actions, TMC violated the Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12 § 5J and also (MGL 149, s 187) and also TMC violations of MGL chapter 305 of the acts of 2008.

84.     TMC retaliated against the Plaintiff, and ultimately fired him, because he refused to engage in practices that led to the presentation of false claims to the United States. Any other ground for dismissing or disciplining Plaintiff was pretextual. Accordingly, TMC discharged, harassed, and discriminated against Plaintiff on account of conduct protected by M.G.L. Ch. 12 § 5J. and (M.G.L 149, s 187) and TMC violations of MGL c 305 of the acts 2008 . Such conduct constitutes retaliatory conduct in violation of said statute.

85.     Plaintiff has been damaged as a direct result of these illegal actions. He has suffered economic harm, loss of income and future earnings, and emotional injury.

## THIRD CAUSE OF ACTION
*Wrongful Termination in Violation of Public Policy*

86.     Plaintiff repeats and realleges the allegations set forth paragraphs NNN as

if fully set forth herein.

87.    TMC has wrongfully terminated Plaintiff 's employment in retaliation for engaging in activity required by the law and/or for refusing to what the law forbids all in violation of public policy. Plaintiff brought many instances of serious reportable events to the attention of the hospitals administration. There response was it went through root cause analysis but failed to address  to report those instances they also failed to take corrective measures. But yet billed for those admissions.

Examples of such May 22nd 2014  7 y/o boy Caleb Arel murdered in the hospital not reported but yet billed. I reported this to DPH September 2016 this was protected activity under my license.

80 y/o women committed suicide room 423 not reported dph but yet billed

A patient received lasix instead of flolan has a major MI ends up on a ventilator.This  was not reported but yet billed.

42 y/o male with lvad respiratory arrested then cardiac arrested no cpr for 15 minutes because cardiology did not answer their pages and when they finally did cpr was started and patient was revived but it was to little to late he was brain dead. The patient ended up on ECMO for a week and but yet was billed 177,000.  The hospital administration did not report or tell the family but yet was billed for entire admission. We as practitioners were beside ourselves that had happened the gentleman was Brain Dead

I spoke up very loudly about these instances and the hospital wanted to silence me. The hospital compliance manual states if you see something then say something.

Plaintiff went to DPH September 2016 and the OIG in October 2016 I met with DEA April 2016 and told all. This was protected activity. I am obligated under my license to report.

Plaintiff used open door policy and reported internally to risk management, compliance officer, Legal counsel, Vp Nursing, VP of Human resources, His Manager, his Assistant Manager, also Supervisors of Nursing, Nursing, Security, AOC administrator on Call, but to no avail no corrective action was taken. see attached CMS Investigation 2012 through February 2018. There were things that went unreported, families were not notified of medical errors medical mistakes and also evidence withheld from Boston Homicide and ADA Dave Deacons. CMS and DPH were not notified which is mandated by Law. Finally the nurses at TMC went out on Strike in July 2017 because of unsafe work environment.

88.     TMC's conduct has caused damage to Plaintiff in the form of, inter alia, lost salary, lost benefits and emotional distress.

## FOURTH CAUSE OF ACTION
*Retaliatory Actions against Health Care Providers*
M.G.L. Ch. 149 § 187

89.     Plaintiff repeats and realleges the allegations set forth in paragraphs  as if fully set forth herein.

90.     Plaintiff is licensed health care provider pursuant to M.G.L. Ch. 149 § 187(a).

91.     TMC has taken retaliatory action against Plaintiff in violation of M.G.L. Ch. 149 § 187(b).

92.     TMC's conduct has caused damage to Plaintiff in the form of, *inter alia*, lost salary, lost benefits and emotional distress.

## FIFTH CAUSE OF ACTION
*Breach of Implied Covenant of Good Faith and Fair Dealing*

93.     Plaintiff repeats and realleges the allegations set forth in paragraphs NNN as if fully set forth herein.

94.     Every contract contains an implied term of good faith and fair dealing between the parties.

95.     Plaintiff reported what he reasonably believed to be unlawful activity to his supervisor at TMC. In response TMC retaliated against Plaintiff for reporting such activity and thereby breached the implied term of good faith and fair dealing.

96.     TMC's conduct has caused damage to Plaintiff in the form of, inter alia, lost salary, lost benefits and emotional distress.

WHEREFORE, Relator, on behalf of the United States of America and the Commonwealth of Massachusetts, requests that this Court:

> (a) Enter judgment holding Defendants liable for civil penalties of $21,562.80 for each violation of the False Claims Act;
>
> (b) Enter judgment holding Defendants liable for civil penalties of $11,000 for each violation of the Massachusetts False Claims Act;
>
> (c) Enter a judgment against Defendants for three times the amount of damages sustained by the United States because of their acts;

(d) Enter a judgment against Defendants for three times the amount of damages sustained by the Commonwealth of Massachusetts because of their acts;

(e) Award the Plaintiff the maximum percentage of the proceeds of the action in accordance with MGL c 149s 187 c and violations of MGL c 305 of the acts of 2008.

(f) Award the Plaintiff his costs and reasonable attorney's fees for prosecuting this action;

(g) With respect to M.G.L. (149 s 187) (b), and violations of MGL c 305 of the acts of 2008  enter judgment against Defendants awarding Plaintiff all available damages and relief including, without limitation, two times the amount of back pay he would have earned but for the retaliation, with interest on that award; compensation for all special damages he sustained as a result of harassment and termination; threats, slander,bullying, Defamation intimidation Hippa violation of his medical Record  and costs and reasonable attorneys' fees for prosecuting his retaliation claims;

(h) With respect to M.G.L. Ch. 149 § 187(b), reinstate the Plaintiff to the same position held before the retaliatory action, or to an equivalent position; (3) reinstate full fringe benefits and seniority rights to the Relator; (4) compensate the Plaintiff for three times the lost wages, benefits and other remuneration, and interest thereon; and (5) order

payment to the Plaintiff by the TMC of Plaintiff's reasonable costs, and attorneys' fees.

(i)  Enter judgment against Defendants awarding Relator all contractual damages;

(j)  Enter judgment against Defendants awarding Plaintiff damages for emotional distress;

(k)  Enter judgment against Defendants compensating Plaintiff for lost wages, benefits and other remuneration, and interest thereon; and

(l)  Order Defendants to pay Plaintiff reasonable litigation costs, reasonable expert witness fees and reasonable attorneys' fees; and

(m) Enter such other relief which the Court finds just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Respectfully submitted

Dated: April 20th, 2019

John Karvelas
132 collins st
Danvers Mass 01923
978-304-0634