[53] *See* 2019 W.Va. Laws S.B. 318 (2019 Regular Session).

[54] *See id.* at § 9-7-6.[ii]

*CIVIL ACTION*
*# 1:18CV 11260.LTS*

*AMENDED*   **Complaint**

Plaintiff– John Karvelas hereby files this complaint for Retaliation and Discrimination for reporting

internally and externally to TMC Managers, Risk Management, Legal Counsel, TMC Compliance

Officer, CNO VP of Nursing, VP of Hr, and CEO. Plaintiff even reported to  DEA and DOJ in April 2016

that there serious reportable events taking place and that claims were being submitted for such which was

not allowable.. TMC was not in Compliance with Participation of standards and Regulations and State

laws  and falsely submitted claims and Submitted claims as a result. TMC gained false accreditation from

JACHO in February 2017 for not Reporting Sentinel events SRE's that had taken prior to the survey.

JACHO accreditation is a prerequisite to be authorized to submit claims to CMS. But that is exactly what

TMC did. Therefore all claims submitted were false. TMC submitted claims based on prior Diagnosis's

on patients from prior admissions. TMC falsely certified that a anesthesiologist Certified that they made a

face to face assessment. See CMS investigation.

It should be duly noted that TMC never notified CMS or Credited CMS for False claims submitted for

Reimbursement nor did they report SRE's and submitted claims for such.  Never did TMC own up to

wrong doing. TMC Counsel states that these were Bald Accusations this is not True. TMC states that

relator is a At will employee this again not the fact, Relator received annual appraisals and received raises

and received raises as a result and benefits for over 11 years. The only time a employee can be terminated

is when after 3 warnings and on fourth warning can be terminated for just cause. Therefore Relator had a

contract. Emphasis added. Relator reported on November 9,2016 and went to Compliance November 10,

2016 as he had done prior about a serious medication error and had gone to the attending physician and notified him of this event and how false claims were submitted for such. Relator lost his job the next day.

Relator met with HR on November 16, 2016 and CNO Jinks January 21, 2016 and VP HR of TMC each time Relator was asked what do I want relator stated he wants people held accountable.

Relator has handed in disclosure statement provided to the US attorney which clearly spells out what was happening to the Patients. TMC even in their first statement state these were bald accusations. TMC fails to address and take  corrective measures and report.

TMC states that they did not know what was going on as far as Relator reporting internally and externally this is false. They state that they did not know who Relator had been threatened with a gun if he did not keep his mouth shut. This again is false DEA DOJ, TMC Compliance, Risk Management, legal Counsel and Security were all present in April 2016. TMc submitted claims that were not Face to Face when their employees were sleeping and then back dated and timed as if they had. This was also fantasia had left the hospital for 5 hours then did the same when he returned. False  Claims were submitted for such.

TMC provided care to Medicare patients that was so substandard and in such a Manner and also provided by a non licensed Pharmacist who was not eligible to provide care and submit claims for such. TMC submitted claims for thousands of patients from 12/31/14 to 2/7/17 this also included compounded drugs that pharmacist dispensed. If the Government had known would have never paid those Claims. Plaintiff had reported numerous instances of Serious reportable Events that claims submitted and were not allowable and that  were not Reported and is Mandatory to Report under CMS and DPH Regulations and not billable but that is exactly what was taking place at TMC and claims submitted for such this was from 2012 to November 2018. Thus had the Government known would have never paid those Claims. Plaintiff was reporting to HR and Compliance November 2016 and also a Doctor whose patient had a Serious Medication error on November 9, 2016 and claims submitted by Relator but it was after midnight and because the

charges relator had been submitted and could not be credited, when reporting, this was less than

68 hours post reporting who that doctor had gone to Risk Management and again this was

reiterated when meeting with CNO VP of Nursing Jinks January 21, 2017 and VP of HR Sean

Sullivan on February 22, 2017. This was during the Appeal Process. . On each occasion Plaintiff

spoke up that this was not allowable and was Retaliated and Discriminated against as a Licensed

Practitioner in the State of Massachusetts which Plaintiff is mandated to do so under his License

about what wrong doing that was going on and the cover up that had ensued and Submitted

claims  to CMS and Mass Health and HMO sponsored HMO's and Free Care Pool  at TMC.

TMC took the attitude see no evil; hear no evil speak no evil. Don't ask don't tell Plaintiff

endured 5 years of false accusations made about Plaintiff for speaking up,, he was even being

threatened with a gun by coworker Fantasia who was bringing a gun in the hospital,  if he did not

keep his mouth shut about Falsifying of Patient Records, Patient Abandonment and Neglect and

Abuse and claims submitted for such. TMC States they did not know who this involved. This is

not the case Relator spilled the beans about everything on April 2016 to DEA DOJ. This was for

speaking up loudly internally about was happening at TMC, this was Protected Activity and

Conduct. This also included the nurses, nursing supervisors and nurse educator, Compliance and

risk management, TMC legal counsel and Doctors and Managers of Respiratory after each of the

following incidents occurred and Plaintiff was falsely accused of drinking on the job and

demanded to be tested and found clean and returned to work this was after the patient died due to

wrong contrast given by a doctor and also a child was also Murdered at TMC May 22, 2014. This

was Munchausen by Proxy and evidence was with held to BPD and ADA Dave Deacons and not

reported to DPH or CMS but yet Claims submitted for reimbursement. This had involved a

patient Caleb Arel. When meeting with DEA in April 2016. When plaintiff divulged this incident

and many other incidents, then two months later a text message read from Fantasia to Manager

Lussier 2 months later after Plaintiff met with DEA DOJ after Plaintiff reported falsifying of

Patient records, Murder of a child and false claims being submitted, he also reported patient

Abandonment Neglect and abuse, and something wrong with the pharmacy medications, and also being threaten with a gun if he did not keep his mouth shut about everything that was going on at TMC. Present at this meeting was TMC security who has the power to Arrest, TMC Legal Counsel, Risk Management, 2 DEA agents Jed Nitzberg being one, Compliance was also present .Plaintiff stated that TMC was not in Compliance with Conditions of Participation with CMS or Mass Health, or Medicare sponsored HMO's. Relator got hurt on the job in 2015 as a result of a patient not being properly medicated as a result of a pharmacist preparing drugs that were diluted and hurt his shoulder and was seen in the emergency room twice and was under the care of a physician as a result. This patient weighed over 350 pounds Relator held him down on the Cath Scan Table prevented him from falling off the table and extubating himself anesthesia was paged stat arrived with their black bag with drugs and refused to medicate the patient. The test was aborted, the patient was returned to MICU Relator went to the emergency room and was treated for his injury not once but twice. That patient was medicated with enough drugs that would have put a horse down but did not as a result of that patients premade bags of drugs being prepared by a non licensed pharmacist that was not authorized to care for Medicare patients. Realtor, Nurses and Doctors filled out incident   reports related to this matter.

By TMC withholding evidence from BPD could be construed by the Court as Accessory after the Fact or Obstruction of Justice or even Aiding and Abetting. After Relator reported 2 months later a text message read when you going to get rid of Jack from Fantasia to Lussier Manager her response was I am working on it, this will take time. This was pretextual in nature. This was on or about June 2016 2 months after Plaintiff disclosed to the DEA DOJ what was happening and False Claims submitted and failure to report and Murder on the night the drugs went missing and something was wrong in the Pharmacy and Failure to Report SRE's. This clearly shows Retaliation and Discriminating against the plaintiff for Reporting and treated the Plaintiff

differently than any other employee for reporting. This was witnessed by Jack Roche who has provided a notarized affidavit to the Plaintiff.

Jack Roche in October 2014 took the billing sheets off the computer and handed them to then Manager Curro who stated to Roche that those billing sheets were highly confidential and the Last step before claims were to be submitted for reimbursement. This is contrary to Counsels assertions.

The hospital news letter from 2009 states that a respiratory therapist will always go out on transports in the Nicu and that a respiratory therapist will go out only when needed on the Picu transports.

This changed in 2011 when announced at a town meeting held in wolf auditorium this was stated by CNO Jinks as a result of Obama care being implemented and that TMC had to generate revenue. At this time jinks came up with the idea of having the pulmonary function lab take equipment to the physician's outpatient clinic in the Biewind building and perform flow volume loops on those DR's outpatient's these averaged 30 patients a day and was a kick back to those physicians to gain referrals.

TMC even came up with creating a sham real-estate company and leased out space to physicians at below market value. Those physicians in turn would claim that rent as a tax right off as a result of paying rent for that office space to TMC a nonprofit. This in reality meant the physicians were getting their office space for free. This was in return for patient referrals this was a kick back.

TMC even opened a off shore Cayman bank account to hide money. This stated in their cost reports.

A internal confidential email came out in may 2011 from the then Nurse manager of the Nicu. That the night shift female respiratory therapist were not assessing their patients, checking on their patients for hours on end and were sleeping at night providing substandard care falsifying patient records and submitting claims for such. TMC policy states that if care is provided not within regularatory standards is not appealable.

On November 11, 2016 Relator was doing his job documenting at the patient's bedside on a work station on wheels he had provided his treatments, this was while his coworkers slept in the basement then later back dated and submitted claims for such. His manager stated under Oath she gave a warning to BC a female for watching movies on her IPAD. BC does not own a IPAD and was given a warning for sleeping on the job and falsifying patient records. The manager also found KF and LH aka Lunesta sleeping down in the basement rather than providing patient care and later documented down in the basement or up in the PICU office or NICU office and then submitted claims as if they had in fact provided care while they slept.

## INTRODUCTORY STATEMENT

1.      Plaintiff– John Karvelas brings this action, alleging that the Defendants have violated laws related to Mandatory Reporting and Submitting Claims for such events, also double billing, Kick Backs, False Accreditation, False Certification, False Cost Reports, not being in Compliance with the Conditions of Participation of Medicare. TMC submitted claims for substandard care and had the government known would never have paid those claims.

## JURISDICTION & VENUE

2.      This Court has jurisdiction over this action under the Federal FCA, 31 U.S.C. §§ 3732(a), and 28 U.S.C. §§ 1331 and 1345 and has pendent jurisdiction over the Massachusetts FCA state law claims pursuant to 28 U.S.C. § 1367. Also  under 105 CMR 130.332(c) 105 CMR 140.308 (c)  and (MGL. C. 149,s 187) and (MGL c 305 of the acts of 2008. The Defendants can be found in, reside in and transact business in this judicial district and acts proscribed by the Federal FCA and Massachusetts FCA have been committed by the Defendants in this judicial district.

3.      To Plaintiff–Relator's knowledge, jurisdiction over this action is not barred by 31 U.S.C. § 3730(e) or Mass. Gen. Laws Ch. 12, § 5G: there is no civil suit or administrative proceeding involving the allegations and transactions herein to which the United States or the Commonwealth of Massachusetts is a party; there has been no "public disclosure" of these allegations or transactions; and Plaintiff–Relator

is the "original source" of the information on which these allegations are based—Relator has voluntarily

disclosed to the United States and Commonwealth of Massachusetts the information on which allegations

or transactions in a claim are based before filing this complaint and has knowledge that is independent of

and materially adds to any publicly disclosed allegations or transactions. Furthermore, the fact that many

thousands of claims presented to government healthcare programs (including Medicare and Medicaid)

were inaccurate in the manner described in this Complaint is a material fact, which, if known to the

United States and the Commonwealth of Massachusetts, would have caused those claims to be denied.

4.      Venue is appropriate as to the Defendants since the Defendants can be found in, resides in

and transact business in this judicial district and acts proscribed by the Federal FCA and Massachusetts

FCA have been committed by the Defendants in this judicial district. Therefore, within the meaning of 28

U.S.C. §§ 1391(b) and (c) and 31 U.S.C. § 3732(a), venue is proper.

PARTIES

5.      Plaintiff- John Karvelas is an individual with a principal place of residence in

Massachusetts. He brings this lawsuit as a way to correct a terrible wrong and let the public know what

truly happened to the Patients. Plaintiff worked at TUFTS Medical Center as a full time respiratory

therapist from December 2005 through November 2016.

6.      Defendant TUFTS Shared Services, Inc. d/b/a TUFTS Medical Center, Inc. ("TMC") is a

nonprofit corporation organized and existing under the laws of the Commonwealth of Massachusetts

providing medical care to the public with a principal office at 171 Harrison Avenue, Boston, MA 02111.

FEDERAL AND STATE HEALTH INSURANCE PROGRAMS

7.      The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*.

("Medicare"), is a Health Insurance Program administered by the Government of the United States that is

funded by taxpayer revenue. The program is overseen by the United States Department of Health and

Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"). Medicare

was designed to be a health insurance program and to provide for, among other things, the payment of

52

partial primary or secondary coverage, which includes a sliding scale deductible based on income. Low income residents who are enrolled in MassHealth, ConnectorCare, Medicare, or other insurance can qualify for Health Safety Net secondary for certain services not covered by their primary insurance. The Health Safety Net pays acute hospitals and community health centers based on claims, which are adjudicated to verify that the patient qualifies and the services are eligible for payment. Health Safety Net payment rates for most services are based on Medicare payment principles. An estimated 285,000 individuals benefited from Health Safety Net payments in 2016.

13.    The Health Safety Net is not insurance. It is a payor of last resort that provides access to essential health care services for low-income uninsured and underinsured Massachusetts residents and reimburses acute care hospitals and community health centers for allowable services provided to this population. The sources of funding for the Health Safety Net include assessment on acute hospitals' private sector charges, surcharge on payments by HMOs, insurers, third party administrators, and individuals, and offset funding for uncompensated care from the Medical Assistance Trust Fund. Like the Commonwealth Care Trust Fund, the Health Safety Net Trust Fund receives transfers of revenue from public funds of the Commonwealth, which can be made through a line-item appropriation.

14.    For 2016, the Health Safety Net made $231 million in payments to hospitals in Massachusetts, including TMC.

15..    Together, the programs described in paragraphs 9 through 17 shall be referred to as "Government Health Care Programs."

16.    Government Health Care Programs account for approximately 60% of TMC's revenue, a higher percentage than at many other hospitals.

## FEDERAL ANTI-KICKBACK LAWS

17.    The Medicare and Medicaid Patient Protection Act, also known as "the Anti-Kickback Statute," 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that the remuneration and gifts given to those who can influence health care decisions corrupt medical decision-making and can result in the provision of goods and services that are more expensive and/or medically unnecessary or even

harmful to a vulnerable patient population. To protect the integrity of Government Health Care Programs, Congress enacted a prohibition against the payment of kickbacks in any form. The Anti-Kickback Statute was enacted in 1972 "to provide penalties for certain practices which have long been regarded by professional organizations as unethical, as well as unlawful and which contribute appreciably to the cost of the Medicare and Medicaid programs." H.R. Rep. No. 92-231, 92d Cong., 1st Sess. 108 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5093.

18.     In 1977, Congress amended the Anti-Kickback Statute to prohibit receiving or paying "any remuneration" to induce referrals and increased the crime's severity from a misdemeanor to a felony with a penalty of $25,000 and/or five years in jail. *See* Medicare and Medicaid Anti-Fraud and Abuse Amendments of 1977, Pub. L. No. 95-142, 91 Stat. 1175 (1977), *codified as amended at* 42 U.S.C. §§ 1320a-7b(b)(1)(A) and (B) (1994). In doing so, Congress noted that the purpose of the Anti-Kickback Statute was to combat fraud and abuse in medical settings that "cheat[] taxpayers who must ultimately bear the financial burden of misuse of funds . . . [that] divert[] from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services . . . [and that] erode[] the financial stability of those state and local governments whose budgets are already overextended and who must commit an ever-increasing portion of their financial resources to fulfill the obligations of their medical assistance programs." *See* H.R. Rep. No. 95–393, pt. 2, at 37, *reprinted in* 1977 U.S.C.C.A.N. 3039, 3047.

19.     Through the amendments Congress sought to "give a clear, loud signal to the thieves and the crooks and the abusers that we [Congress] mean to call a halt to their exploitation of the public and the public purse." 123 Cong. Rec. S31767 (daily ed. Sept 30, 1997) (statement of Sen. Talmadge).

20.     In 1987, Congress again strengthened the Anti-Kickback Statute to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

21.     The Anti-Kickback Statute prohibits any person or entity from knowingly and willfully

offering to pay or paying any remuneration to another person to induce that person to purchase, order, or

recommend any good, service, or item for which payment may be made in whole or in part by a

Government Health Care Program, which includes any state health program funded in part by the federal

government. 42 U.S.C. §§ 1320a-7b(b), 1320a-7b(f).

22.    The Anti-Kickback Statute provides, in pertinent part:

> (b) Illegal remunerations
>
> * * *
>
> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>
> To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under Federal health care program, or
>
> To purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

23.    A transaction may violate the Anti-Kickback Statute even when a payor's unlawful intent is

not its exclusive intent. It is enough that "*any one purpose* of the remuneration may be to induce or

reward the referral or recommendation of business payable in whole or in part by a Federal health care

program." OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731

(May 3, 2003) (emphasis added). In other words, even "a lawful purpose will not legitimize a payment

that also has an unlawful purpose."

24.    In addition to criminal penalties, a violation of the Anti-Kickback Statute can also subject

the perpetrator to exclusion from participation in Government Health Care Programs (42 U.S.C. § 1320a-

7(b)(7)), civil monetary penalties of $50,000 per violation (42 U.S.C. § 1320a-7a(a)(7)), and three times

the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate

purpose, 42 U.S.C. § 1320a-7a(a).

25.     The Anti-Kickback Statute not only prohibits outright bribes and rebate schemes, but also prohibits any payment, gift, or other remuneration by a company to a physician or other person which has as one of its purposes the inducement of the physician to use the company's products or the inducement of the physician to influence or recommend the use of the product.

26.     Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under Government Health Care Programs, including Medicare. Moreover, compliance with the Anti-Kickback Statute is a *condition of payment* for any claims for which Medicare reimbursement is sought. Every provider who enters into a contract with Medicare specifically acknowledges in its provider contract that the provider understands "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider]'s compliance with all applicable conditions of participation in Medicare."

27.     Medicare claims for reimbursement of any goods or services that were the subject of a kickback constitute false claims. *See* False Claims Act discussion, *infra*. This is because compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under Government Health Care Programs, including Medicare. Moreover, compliance with the Anti-Kickback Statute is a condition of payment for any goods or services reimbursed by Medicare, including medical devices and related medical procedures using those devices.

28.     Furthermore, the Anti-Kickback Statute was amended, effective March 23, 2010, to expressly provide that: "In addition to the penalties provided for in this section or section 1320a-7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." Consequently, any kickbacks paid on or after March 23, 2010, that caused reimbursement claims to be presented to the government for payment would result in actionable false claims regardless of the provisions of any provider agreement.

## FEDERAL FALSE CLAIMS ACT

29.     The Federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment a violation of law for which the affected government party may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $10,781.40 and $21,562.80.

30.     The Federal FCA, 31 U.S.C. § 3729(a)(2), makes "knowingly" making, using, or causing to be used or made a false record or statement to get a false or fraudulent claim paid or approved by the United States a violation of law for which the affected government party may recover three times the amount of the damages the government sustains and civil monetary penalties.

31.     The Federal FCA, 31 U.S.C. § 3729(a)(3), makes any person who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the affected government party sustains and a civil monetary penalties.

32.     The Federal FCA, 31 U.S.C. § 3729(b), defines "knowing" or "knowingly" to mean that a person, with respect to relevant information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

33.     The Federal FCA, 31 U.S.C. § 3729(c), defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to the government, its representative, contractor, grantee, or other person if the government party in question (*i.e.*, the United States) provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

## MASSACHUSETTS FALSE CLAIMS ACT

34.     The Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5B(1) ("Massachusetts FCA"), makes "knowingly" presenting or causing to be presented to Massachusetts any false or fraudulent claim for payment, a violation of law for which the Commonwealth may recover three times

the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

35.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5B(2), makes "knowingly" making, using, or causing to be used or made a false record or statement to get a false or fraudulent claim paid or approved by Massachusetts, a violation of law for which the Commonwealth may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

36.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5B(3), makes any person who conspires to defraud Massachusetts by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the affected government party sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

37.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5A, defines "knowing" or "knowingly" to mean that a person, with respect to relevant information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

38.     The Massachusetts FCA, Mass. Gen. Laws Ch. 12, § 5A, defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to the government, its representative, contractor, grantee, or other person if the government party in question (*i.e.* the Commonwealth of Massachusetts) provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

## FACTUAL ALLEGATIONS

### A.     BILLING IRREGULARITIES

#### 18.  Duplicative Billing

39.     The Respiratory Care Department at TMC maintains billings records such as the "Daily

Transaction Audit Report" (the "Report"). The Report, which is printed every day, shows what services are billed for patients in the department. For more than a decade during Plaintiff's tenure Leslie Lussier, the Director of Respiratory Care, would review the Report every day and was aware that there were multiple fraudulent bills produced. For example, ventilator therapy for adult patients should be billed at two rates: $794 for the initial 24-hour period (using service code 56402114) and $471 per day for "second and subsequent days" (using service code 56402128). Similarly, the first day using a high-flow nasal cannula is billed at $587 (service code 56401768), with subsequent days billed at $270 (service code 56401776), and the initial 24-hour period for nitric oxide therapy is billed at $7,619 (service code 56402888), then subsequent *hours* are billed at $190 each (service code 56402870).

40.     It is never appropriate to bill both "first day" and "subsequent day" charges *on the same day.* But that is exactly what TMC has done, on numerous occasions. TMC also billed same-day charges for therapies or services that could not have been used for or provided to any given patient on the same day.

41.     By coincidence in July 2012, Plaintiff's next-door neighbor, hereinafter referred to as *FA* (who at the time was 66 years old) was rushed to TMC for multiple arterial bypass surgery. From conversations with *FA*, a Medicare recipient, Relator learned that *FA* was on a ventilator for a week. However, when TMC billed Medicare for the provision of nitric oxide services at $7,600 for the first day (as is proper) but then also separately billed the government for each hour of that first day, *i.e.* an additional $4,560 (24 times the hourly rate of $190).

42.     However, this was no isolated incident, but one of thousands of deliberate over-billings. A review of just a few days of billing in February 2017 reveals multiple instances of fraudulent billing:

(a)     **January 22, 2017 Relator met VP CNO Terry Hudson Jinks day prior telling all.**

For patient AF, TMC billed five "asthma pathway" charges (56402250) at $450 each, on January 22, 2017, and then a sixth on January 23, 2017.

**(b)    February 8, 2017**

For patient *PC*, TMC billed for adult High Frequency Oscillatory Ventilation ("HFOV") first-day (service code 56401598) at $795, and an adult subsequent-day ventilator charge (56402128) at $471, *on the same day. HFOV was not used on the Adult side of TMC.*

For patient *JG*, TMC billed *thirty* internal transport charges (service code 56402829) *on one day* for a total charge of $14,250. These internal transport charges are for moving a patient around inside the hospital for example a patient might be moved on a portable breathing machine between the ICU to the CT Scan machine. A patient might be moved once or twice in a day but it is inconceivable that a patient would undergo 30 chargeable internal transports in a single day.

**(c)    February 9, 2017**

For patient *ST*, TMC billed *twelve* adult subsequent-day ventilator charges (56402128) at $471 each, *on the same day* for a total charge of $5,652.

For patient *LB*, TMC billed an adult first-day high flow cannula charge (56401768) at $587, an adult first-day ventilator charge (56402110) at $795, *and* an adult B1PAP[26] first-day charge (56402802) at $344 even though these three modes of treatment are no complimentary but alternatives.

For patient *GS*, TMC billed *two* adult first-day ventilator charges (56402110) at $795 each.

**(d)    February 13, 2017**

For patient *SG*, TMC billed an adult nitric oxide first-day charge (56402888) at $7,619 *and* a nitric oxide one-unit-per-hour charge (56402870) at $190 on the same day.

For patient *GF*, TMC billed an adult nitric oxide first-day charge (56402888) at $7,619 *and* a nitric oxide one-unit-per-hour charge (56402870) at $190 on the same day, *and* billed for two adult subsequent-day ventilator charges (56402128) and one adult HFOV subsequent day charge (56402799) at $471 each, on the following day, February 14, 2017. Nitric oxide is billed as a specialty drug.

For patient *RC*, TMC billed an adult first-day ventilator charge (56402110) *on each of two consecutive days*—February 13 and 14, 2017— at $795 each.

**(e)    February 14, 2017**

For patient *AMH*, TMC billed *two* adult subsequent-day ventilator charges (56402128) at $471 each, on the same day.

For patient *WS*, TMC billed two adult subsequent-day ventilator charges (56402128) at $471 each, on the same day.

For patient JC, TMC billed an adult first-day ventilator charge (56402110), at $795, *and* an adult subsequent-day ventilator day charge (56402128) at $471, both on the same day.

**(f)     February 21, 2017**

For patient *BGA*, TMC billed two neonatal Nasal Intermittent Positive Pressure Ventilation ("NIPPV") subsequent day charges (56401661) at $471 each.

For patient *BBJ*, TMC billed two pediatric/neonatal subsequent day Continuous Positive Airway Pressure ("CPAP") charges (56402365) at $344 each. The nicu is not covered under DRG.

For patient *WP*, TMC billed two Heated Trachestomy Collars ("HTC") first-day charges (56402063) at $417 each.

For patient *SYL*, TMC billed two adult BIPAP first-day charges (56402802) at $344 each.

**(g)     February 22, 2017 The day relator met VP HR and told all. It is ironic or fate is when CMS Report Dated 2/7/17 that a pharmacist is not a pharmacist**

For patient *BP*, TMC billed *three* adult BIPAP first-day charges (56402802) at $344 each.  This was the day I met VP Sean Sullivan

**(h)     February 23, 2017**

For patient *AS*, TMC billed two adult subsequent-day ventilator day charges (56402128) at $471 each.

For patient *JR*, TMC billed two adult first-day ventilator charges (56402110) at $795 each.

**19.   Billing for Services Not Provided**

43.     The following are examples, all on February 9, 2017, of cases where there was billing for services not provided:

(i)     In respect of patient BP, a patient admitted with a diagnosis of cardiogenic shock NEMC billed for the application of continuous positive airway pressure ("CPAP"). However, on review of the Daily Non-Invasive Ventilator Census, no values

are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask;

(ii) In respect of patient ME, a patient admitted with a diagnosis of COPD exacerbation NEMC billed for the application of non-invasive bi-level positive airway pressure ("NIV BPAP"). However, on review of the Daily Non-Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask;

(iii) In respect of patient WC, a patient admitted with a diagnosis of acute respiratory distress, NEMC billed for the application NIV BPAP. However, on review of the Daily Non-Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask;

(iv) In respect of patient PB, a patient admitted with a diagnosis of a perforated lung, NEMC billed for non-invasive ventilation. However on review of the Daily Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask;

(v) In respect of patient CE, a patient admitted for the intubation of a balloon pump, NEMC billed for invasive ventilation. However on review of the Daily Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask;

(vi) In respect of patient RL, a patient admitted with a diagnosis of aortic stenosis, NEMC billed for invasive ventilation. However, on review of the Daily Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask.

## 20.  Unbundling of Services

44.     During Plaintiff tenure, TMC utilized a multi-specialty in-house "rapid response" team to deal with medical emergencies for patients of the Hospital.  Each use of the rapid response team should

generate a single bill for approximately $2,000. However, Plaintiff is aware that TMC billed separately for the participation of a Respiratory Therapist on the team.

45.      Many of the patients for whom such fraudulent charges were generated were/are beneficiaries of Federal or State Programs, and these fraudulent charges were either billed directly to those Programs or incorporated into the Hospital's annual cost reports. Thus, the Governments have paid many of these fraudulent claims.

### 21. Billing for Services Ineligible for Reimbursement Because They Were Not Provided by Licensed Respiratory Therapists as Required by Medicare Rules

46.      In order to be eligible for reimbursement by Medicare, respiratory therapy services must be fully documented in the medical records. The documentation must clearly indicate that the services rendered were reasonable and medically necessary and required the skills of a licensed respiratory therapist.

47.      Prior to March 2018, nurses at TMC who were not licensed respiraitory therapists routinely administered breathing treatments to hospitalized patients via the Pyxis Medstation system.

48.      In those cases, because licensed respiratory therapists did not administer the treatments, claims for reimbursement were ineligible for reimbursement.  But if the services had in fact been performed by respiratory therapists, reimbursement would have been available. Accordingly, each time such treatments were administered, a billing opportunity was lost because nurses are not able to separately bill for such services.

49.      To recapture the lost billing opportunity, respiratory therapists routinely submitted false, after-the-fact bills claiming that they—licensed respiratory therapists not nurses—had administered the breathing treatments even though this was not true. Each of these treatments cost $190 per administration.

50.      In March 2018, Leslie Lussier announced to respiratory therapists during a "morning huddle" that nurses would no longer administer breathing treatments out of the Pyxis Medstation system. This announcement was an admission that TMC had been fraudulently billing for treatments that had not been provided by respiratory therapists, in violation of Medicare coverage rules.

### 22. Upcoding or Bundling of Services to Increase Reimbursement

51.     Traditionally, physicians at TMC and other hospitals relied on a central lab for testing

patient electrolyte values. While this testing is highly accurate and relatively inexpensive, there is a

waiting period for the results up to an hour, and physicians often desire more immediate information for

their clinical decisions.

52.     In or around April 2014, TMC announced that its neonatal intensive care unit (NICU) had

implemented a blood gas program. The new program allows staff to measure blood glucose or arterial

blood gases and analyze tiny blood sample at the bedside, with nearly instantaneous results using a point-

of-care arterial blood gas analyzer. This is an expensive piece of equipment that tests for the amounts of

arterial gases, such as oxygen and carbon dioxide, but is also capable of reporting concentrations of

lactate, hemoglobin, hematocrit, and several electrolytes. Upcoding was also claims submitted for SRE's

that were upcoded to Cardiac Arrest.

53.     At the instruction of Donna Kelly, Assistant Director of Respiratory Care, one of the two

departments that is responsible for implementation of the program, hospital staff are charging for more

extensive panels than are ordered or are medically necessary.  Typically, physicians have the most

frequent and urgent need for an electrolyte panel, which is one of the least expensive tests. However,

despite the lack of medical necessity, staff were ordered to run for running a more expensive test that

included electrolytes but also include items that were neither ordered nor medically necessary. These

additional results were discarded. Because the more expensive test was done as a matter of routine, and

was not ordered or medically necessary, TMC's charges to Medicare and MassHealth were inflated.

### B.     UNLAWFUL KICKBACKS BY TMC TO DEFENDANT EASCARE

54.     TMC is an acute care hospital licensed to provide "medical control" to ambulance services.

"Medical control" is defined to mean:

> the clinical oversight by a qualified physician to all components of the EMS
> system, including, without limitation, the Statewide Treatment Protocols,
> medical direction, training of and authorization to practice for EMS
> personnel, quality assurance and continuous quality improvement.

105 CMR 170.300.

55.     For more than a decade TMC has contracted with Eascare, LLC, to provide pre-hospital

advanced life support services pursuant to an agreement (the "Affiliation Agreement") dated February 11,

2009 and renewed through November 15, 2017.

56.     The current Affiliation Agreement was signed by Therese Hudson-Jinks, RN, MSN, Senior

Vice President of Patient Care Services at TMC.

57.     The Affiliation Agreement provided that, *inter alia:*

> Hospital shall replenish medications and controlled substances ("Drugs"), to
> the extent such drugs are available for replenishing, utilized by [EasCare]
> Staff in rendering services to patients transferred to Hospital. Hospital shall
> charge [EasCare] for Drugs in accordance with its then current cost[s]. ... At
> all times, the parties shall comply with all applicable state and federal
> healthcare payment and coverage rules and regulations.

58.     Federal regulations provide that such an ambulance-replenishing arrangement will *not* be

considered a violation of the Anti-Kickback Statute ("AKS") so long as, *inter alia:*

- The "drugs or medical supplies (including linens) [were] *used by the
  ambulance provider ... in connection with the transport of a patient*
  by ambulance to the hospital";

- "the ambulance that is replenished [is] used to provide emergency
  ambulance services [at least] an average of three times per week, as
  measured over a reasonable period of time";

- the arrangement does "not take into account the volume or value of
  any referrals or business otherwise generated between the parties for
  which payment may be made in whole or in part under any Federal
  health care program (other than the referral of the particular patient to
  whom the replenished drugs and medical supplies were furnished)";
  and

- the hospital "replenish[es] medical supplies or drugs on an equal basis
  for all ambulance providers" that bring patients to the hospital.

C.F.R. §§ 1001.952(v)(1), (2)(iii), and (3)(i)(A) (emphasis added).

59.     On its face, the Affiliation Agreement between TMC and EasCare qualifies for the "safe

harbor" provided by these regulations. However, in practice Defendants did not comply with these

regulations — or even with the terms of the Affiliation Agreement itself.  For example, TMC

"replenished," on a weekly basis, medicines that had *not* been "used ... in connection with the transport of a patient to TMC," including medicines that had been administered while stocked onboard Brewsters ambulances.

60.     Every Monday or Tuesday Plaintiff personally witnessed Eascare technicians delivering trays of expired and used drugs to the hospital pharmacy. The trays would contain approximately 100 vials of expired medicines such as Epinephrine, Atropine, Sodium Bicarbinate, Toradol and Narcan and Albuterol. Plaintiff estimates each tray would have a replacement value of around $10,000. Plaintiff also personally witnessed many occasions when the Hospital "replenished" medications and respiratory-care supplies (*e.g.*, nasal cannulas) for an EasCare ambulance after a run, even when no such EasCare medications or supplies could have been "*used* ... in connection with the transport of a patient" because the Respiratory Therapist who had been on that ambulance run *had used medications and supplies that he had brought with him. Eascare was exchanging drugs for Brewster ambulance who administers these drugs. Brewster owns Eascare. Safe harbor would then not apply. TMC never replenished drugs to Boston EMS, Fallon, Armstrong, Atlantic, and surrounding Ambulance services that brought patients to TMC.*

61.     The illegal "replenishments" were additional, extra-contractual, undisclosed kickbacks paid by TMC to EasCare in exchange for its agreement to bring patients to TMC instead of taking them to other hospitals. This was for rapid discharges and to gain a rapid admission as a result. Therefore was allowed to submit claims as a result.

62.     Moreover, under threat of disciplinary action, Therese ("Terry") Hudson-finks (then Vice-President of Nursing Services), Leslie Lussier (then Director of Respiratory Care), Donna Kelly (then Assistant Director of Respiratory Care), required a Respiratory Therapist to accompany every EasCare ambulance run involving a child patient, even though there was always a nurse present on the run and the presence of a Respiratory Therapist was medically unnecessary.

63.     Many of the runs on which TMC billed for the unnecessary presence of a Respiratory Therapist, and/or for which TMC personnel authorized fraudulent billing by EasCare, were for beneficiaries of Federal or State Programs, and these fraudulent charges were either billed directly to

those Programs or incorporated into the Hospital's annual cost reports. In other words, the Governments

have paid many of these fraudulent claims. These were billed as emergent when in reality they were non –

emergent. This was authorized by the nurse who Relator had gone out on transport with she had no

authority to do so. This was also a kick back by TMC in return, to keep ambulances park outside TMC

could rapidly discharge patients and gain rapid admissions.

64.     TMC managers and supervisors were well aware of these problems, and were alerted to

them by Plaintiff and coworkers on more than one occasion. Nevertheless, they did nothing to fix the

problems. Many of the patients for whom fraudulent bills were thus generated were beneficiaries of

Federal or State Programs, and these fraudulent charges were either billed directly to those Programs or

incorporated into the Hospital's annual cost reports. Thus, the Governments have paid many of these

fraudulent claims. The Nurse who Relator went out on transport with would sign and authorize that

Eascare submit claims for Emergent transports which in fact was non emergent.  That nurse had no

authority to do so and that document should have been signed by a Doctor, Nurse Practitioner, or Dentist,

See Eacare Audit Mass Health. Emphasis added.

C.     RETALIATION

65.     On 1/20/12 Plaintiff complained that a patient had coded as a result of a surgical Resident

had not answered their pages for 5 hours and that the Patient had Cardiac Arrested and was revived

then admitted to the SICU and billed for a ventilator initial day and ICU charges and medications

and Claims submitted for the entire Admission. This was not allowed under CMS and DPH Rules

for Mandatory reporting under SRE and not Billable.  Emphasis Added. This patient was upcoded

from skin graft to cardiac arrest which gains a higher rate of reimbursement. When complaining

about this incident to anyone that would listen including nursing Supervisors. Plaintiff was then

falsely accused of drinking on the job and demanded to be tested was proven clean and returned to

work.

66.　　　December 6, 2013 a patient received the wrong contrast coded and died the next day this was a serious medication error and billing was not allowed and not reported to DPH or CMS and claims were submitted for the entire admission. Plaintiff helped his coworker with this patient. This patient was on a ventilator was billed for initial ventilator charge and was brought to CT Scan and was charged $2500 for a Cath Scan and entire SICU charges this was not allowable under a SRE. She was also upcoded from spinal catheter for becloven pump to cardiac arrest and anoxic brain injury. This patient's name was Donna Carcenaro. Plaintiff complained to supervisor Kelly this was wrong.

67.　　　May 22, 2014 a 7 y/o boy Caleb Arel was found unresponsive on Floating 7 pedi floor. His mother was with him. The Male nurse and plaintiff ran with the child to the PICU. When arriving the boy cardiac arrested. The mother was laughing as we coded her son. We as practitioners found this very odd. We had a feeling something was wrong with this picture. The boys labs were not reportable when they were ran in the Lab. Electrolytes were not reportable and his arterial Blood PH was not reportable also. The hospital drew a toxic screen on the boy. We able to revive him placed on a ventilator and numerous vent changes were made on his ventilator and charges submitted by the plaintiff including Code Blue cardiac arrest. Plaintiff and the Nurse reviewed the child chart and it stated that there was nothing wrong with this child and it was all psychological. The boy was having continuous EEG's performed at the time on floating 7 and there is a camera on that machine. The mother was viewed on that video by the nurse and the plaintiff and that she was injecting her son 7 times on camera and 2 other times she turned the camera away. We did not know what she was injecting at that time. Plaintiff stated to the mother that she might want to call her husband at 3 am to let him know that his son cardiac arrested. She stated they he was working in the morning and she would call him in the afternoon. BPD was then called in.

That morning Plaintiff was questioned about what had happened and he stated that he was emotionally drained and did not want to talk about it. Plaintiff went home when arriving began to

69

hysterically cry and his wife wanted to know what had happened at work. He stated that he could not talk about it was so bad. In his heart, he knew the boys mother had tried to kill her son. On May 22, 2014 that night when arriving to work he later at 8 pm went to check on his coworker Jack Roche to see if he needed a hand in the PICU. At that time when arriving a cardiac baby had arrived from the OR and at same time Caleb coded again and died the doctor as a last ditch effort gave Methylene Blue IV unknown to plaintiff to counter Toxins. TMC held a debriefing that morning involving this child situation. The nurse and plaintiff were not included in the debriefing Risk Manger Legal counsel for TMC Carol Coakley was directly involved in this matter. Plaintiff and the nurse who found the child finally saw the Pediatrician Carlos in early August 2016. We asked him what really happened to Caleb that night and why we were not included in the debriefing since we were the ones that found the child. He stated that the Childs Toxic Screen came back 300 times Bromide in his system non capitable with life. When finding this out Plaintiff wrote what had happened and sent a complaint to DPH in early September 2016. But claims had already been submitted for reimbursement on May 22, 2014. TMC up coded from change in mental status to Cardiac arrest. Respiratory entered charges for initial day vent $475 parameter changes 50 each change, suctioning at $75 each instance and Code Blue Cardiac Arrest times 2 at $2000.

68.      Early April 2016 plaintiff was called in to be interviewed by DEA and DOJ about drug diversion involving a nurse in the PICU. DEA agent Jed Nitzberg and a female agent flashed badges at plaintiff stated who they were and stated that if the plaintiff lied once he would go to Jail. Plaintiff stated he would not lie for anybody. He was asked if he knew what happened to drugs that went missing on the night of May 22, 2014. Plaintiff stated at this meeting was Katie of Hospital Security, Risk Management and TMC legal counsel. Question about the Meds that went missing he stated that he knew nothing about it. He then stated that it involved Tiffany RN. I stated no way I think I am a good judge of character, I do not believe it. I never noticed anything odd about Tiffany. He stated that the Pyxis station was unplugged. I stated that isn't that 220 wiring I would not know how to

begin to unplug 220 wiring he then stated that the door was pried open. He asked me who I knew who could do something like that. He was then asked if I ever went in the med room and it dirty would clean it up I then stated no would not it is not my job. He then asked me if a nurse ever asked me to put a box on the shelf in the med room. I stated no why. He then stated that the meds were stolen May 22, 2014 and reappeared September 2014. I said wait a minute, your telling me that hypothetically speaking I know you, you know me, I go to your house and I am going to steal your car, you see me I see you I steal your car then bring it back so you won't press charges I stated that is messed up. He asked me if I knew anybody that was smart enough to break into the Pyxis system, I stated yes Al Fantasia. I stated how Al threatened me with a gun if I did not keep my mouth shut about what was going on in and around the Hospital. I stated to DEA how Fantasia was leaving driving home from TMC for his Dogs in Freetown  abandoning his patient then returning and then back dating and billing as if he was there. Plaintiff stated that there more far more incidents taking place at TMC. Plaintiff also stated that there was something wrong with the pharmacy because drugs were not touching patients and how there were SRE taking place and not being reported. This was Protected activity and conduct under the FCA 31 USC. § 3730 (h) and (M.G.L. c. 149,s 187) and MGL c 305 of the acts of 2008. Plaintiff did not hide what taking place and what he was speaking up about at TMC. Emphasis added.

70.on or about the fall of 2015 a 80 y/o Russian women commits suicide on North 4 room 423  puts a plastic bag over her head and suffocates herself and dies. This was not reported to CMS or DPH, BPD was called in, to investigate. Plaintiff had to sign a piece of paper that he was in the room. Also present was Priscilla Beck of respiratory and Sean Critical care tech. it was determined that in fact the women committed suicide and claims submitted from cardiac arrest from Shortness of breath and CMS and DPH were not notified which is mandated under law. Plaintiff was very out spoken about this when it had happened.

71.Lussier manager of ECMO Program at TMC before she took over as manager of respiratory first pediatric ECMO experiment a 17 y/o boy dies due to accidently being decanulated and dies. TMC allowed claims to be submitted for this patients admission cardiac arrest and was not reported to DPH or CMS. Plaintiff brought this the attention of then manger Joe Curro who went immediately went to Risk management about this situation. But yet claims were allowed even though this fell under a SRE which is not Billable ECMO cost $170,000 a week.

72. June 2016 a Text was shown to Jack Roche by Al Fantasia  that consisted of Al texting Manager Lussier of Respiratory that stated that when you going to get rid of Jack her response was it is going to take time I am working on it this shows pretextual intent and Retaliation and Discriminating for reporting. to  the DEA DOJ. Also shows reporting internally. That TMC knew as a result of karvelas's reporting. TMC was on Notice.

73. On or about July 2016 a Patient Sean Sullivan is brought out in a wheel chair he had a left leg prosthesis. He was dumped into the street like a pile of dirt in a wheel Barrel  by security guard Mathew Stewart who was also a EMT for Eascare. He then threw Seans prosthesis at him. Plaintiff tried to help the patient up but Sean was pissed that he had been assaulted in this manner. This was not reported by TMC and Mathew was terminated for this offence of assault of a patient. This was investigated by SGT George Gauthier of Security. This incident was not reported to DPH or CMS or the Board of Licensure or BPD but claims submitted for such by TMC. Assault is a SRE not Billable.

74. August 2016 Lussier Manager of Respiratory is involved in a investigation of a patient that received aerosol Lasix instead of Flolan. This was a Serious Medication Error and the patient who had open heart surgery had a Heart attack and ended on a vent for a week and claims submitted for the entire Admission and not reported to CMS or DPH.

75. Early September 2016 plaintiff reports to DPH about what was going on at TMC and the failure to report and claims submitted for such..

76. On or about October 14, 2016, Plaintiff Karvelas raised concerns about the billing of subsequent-day ventilator charges on the same day as the initial charge, as well as other billing concerns, to the individual responsible for the Hospital's electronic billing system. Karvelas showed him examples from the Daily Transaction Audit Reports, and the individual agreed that they indicated double billing; however, to Karvelas's knowledge, nothing was done to correct the problem.

77. Then on or about October 24 2016 a 42 y/o male bed 2 CCU with a LVAD. Who had a thyroid Biopsy, he occluded his airway due to swelling respiratory arrested then cardiac arrested. Plaintiffs coworker Thespina Giancoulus who later resigned over this matter was breathing for the patient via bag mask ventilation. The patient's abdomen was getting bigger and bigger as a result of his swollen airway and air going into his belly. This then impeded the flow from his LVAD he had no blood flow to his brain. No CPR was performed as a result of Cardiology not answering their pages for 15 minutes and it was TMC policy not to do CPR on LVAD patients at that time. When Cardiology finally answered their pages 15 minutes later when Plaintiff answered the phone cardiology when informed that the patient coded had no flow from LVAD and no CPR performed

78. Then, on or about October 28, 2016, Karvelas raised these and other concerns involving patient safety issues also the Double Billing and falsifying of Patient records by his coworkers with Leslie Lussier and Donna Kelly, the Director and Assistant Director of Respiratory Care, respectively, following the report of the Department's overnight shift to the day shift. Lussier and Kelly yelled at him, and Karvelas left.

79.     Karvelas had raised numerous other issues with Lussier and Kelly, and with their superiors, on several previous occasions. Because of his persistence in identifying and reporting inappropriate practices at TMC that jeopardized patient safety and billing for such which spoke up about  most of which Lussier and Kelly and Jinks were complicit in covering up. Karvelas's supervisors began to see him as a

"troublemaker," and began to look for ways to terminate his employment. This was to silence him.

80.     Karvelas was terminated on November 16, 2016, because of his efforts to expose and reform Tuft's fraudulent practices on November 9, 2016 and was escorted November 11, 2016. He did not meet with Lussier and HR until November 16, 2016. He then appealed his termination. Relator met with compliance on November 10, 2016 and spoke with her on November 16, 2016 prior to meeting with Hr and Lussier.

81.     But the retaliation from Lussier, in particular, did not stop when Karvelas was terminated. Since then, acting in her capacity as Director of Respiratory Care, she has defamed him to Hospital staff, and has intentionally and maliciously made false negative comments to prospective employers who have called for references.

82.     Before and after his termination, Karvelas was subjected to repeated acts of harassment, discrimination, and intimidation, including being threatened with a gun. If I did not keep my mouth shut about falsifying of charts, Patient abandonment, Serious Reportable Events, Wrongful Death, Medical errors Medical mistakes,  Patient abandonment,. Double Billing, Patient Neglect and abuse.

83.     Karvelas has had to endure hundreds phone calls from current and former employees of TMC at all hours of the day and was stalked by a private investigator, who was hired by the Defendants.

84.     The Defendants have subjected him to multiple HIPAA violations in retaliation for his reporting of billing concerns. Realtor was falsely accused of Drinking on the job in 2012 and 2015. Which he demanded to be immediately be tested and was proven clean and returned to work. On November 11th2016.They have TMC  falsely accused the plaintiff taking extended breaks, smoking in the locker room, sleeping on the job when Lussier paged him to please come to the department from the Neuro ICU.

85.     Defendants maliciously prosecuted him, caused him to spend two nights in jail for a crime he did not commit, also in retaliation for his reporting of billing concerns and patient safety issues.  As a result of this retaliation, Karvelas has suffered not only the loss of his job at TMC and the loss of other prospective jobs; he has also suffered adverse health effects, including significant emotional distress

86.     As a result of Lussier's and TMC intentional and malicious interference with his prospective employment relationships, Karvelas—a *42-year veteran* of respiratory care—was unable to find a local job in his field.

87.     The pretextual nature of Karvelas's termination is made clear by the fact that numerous employees of TMC, who Defendants know have engaged in fraudulent billing, who have backdated and falsified billing records, who have shown up late, slept on the job, been intoxicated on duty, left the hospital while on shift, or have violated the hospital's rule against firearm possession, have not been fired. They also have submitted claims for substandard care and failed to report which is mandatory.

88.     Indeed, TMC considers an employee known to routinely sleep during her shift to be one of the most productive employees, even though her apparent productivity is an obvious byproduct of false billing. This particular employee's penchant for sleeping at work is so well known that her nickname is the name of a prescription sleep medication.

89.     Moreover, Leslie Lussier had discussed with other employees "when she was going to get rid of Karvelas" and that she was "working on it" well in advance of the circumstances that supposedly constituted the grounds to terminate him. This was a few weeks after the plaintiff was interviewed by the DEA and spilled the beans in April 2016.

90. Plaintiff went to CMS 2012, DPH, DEA, DOJ, April 2016 , DPH September 2016 and OIG October 2016 and it clearly states that as a Whistleblower and informant to the OIG who has made reports that it is criminal to hereby threaten, harass, or hereby intimidate anyone that has reported to the OIG.

Fantasia threatens Relator at MSRC Meeting in Taunton October 2018

TUFTS MEDICAL CENTER ->

- Report No. 25845

| | 800 WASHINGTON STREET BOSTON, MA | |
|---|---|---|
| TUFTS MEDICAL CENTER | 02111 | Sept. 18, 2018 |

**VIOLATION:** *PATIENT RIGHTS*                                    **Tag No:** A0115

The Hospital was out of compliance for the Condition of Participation for Patient Rights.

Findings included:

The Hospital failed to ensure for one (Patient #1) of 14 sampled patients that the Hospital provided care in a safe setting.

Refer to TAG: A-0144.

The Hospital failed for one (Patient #14) of 14 sampled patients to report an allegation that, on 1/10/18, Clinical Care Technician #3 inserted a finger in Patient #14's anus.

Refer to TAG: A-0145.

**VIOLATION:** *PATIENT RIGHTS: CARE IN SAFE SETTING*              **Tag No:** A0144

Based on observations. records review and interview the Hospital failed to ensure for one (Patient #1) of 14 sampled patients that the Hospital provided care in a safe setting when an emergency department patient was assaulted by staff.

Findings included:

Patient #1's emergency department record, dated 8/15/17, indicated that on this date around midnight,

Patient #1 entered the Emergency Department and was evaluated for pain due to a wound received several days earlier.

The Surveyors interviewed the Director of Security and the Interim Chief Nursing Officer at 5:20 P.M. on 9/12/18. The Director of Security and the Interim Chief Nursing Officer provided a CD video recording to the Surveyors, which included a recording of hospital security staff, a Nurse (identified as Nurse #1), and an ambulance staff member interacting with Patient #1 as he/she is leaving the hospital via the ambulance bay.

The Surveyors, the Director of Security and the Interim Chief Nursing Officer viewed the video, which is time stamped starting at 1:48:46 A.M. on 8/16/17 and ending at 1:57:34 on 8/16/17.

The approximate two-minute video shows an individual (Nurse #1) walking outside of the ambulance bay crossing the street and placing Patient #1's sneakers on the sidewalk and Patient #1 following him from several feet back wearing what appears to be just socks. Patient #1 can then be seen running away from the ambulance bay, with Nurse #1 running in pursuit close behind him/her, while two Security Guards and one Boston Emergency Medical Services (EMS) employee walk from the ambulance bay towards the direction of Patient #1 and Nurse #1. Patient #1 is then seen on the video falling to the ground, rolling onto his/her back, and putting his/her hands up in a defensive motion. While Patient #1 is laying on his/her back on the ground, Nurse #1 is seen crouching over Patient #1, grabbing Patient #1's hands, and kneeling on Patient #1. Nurse #1 is seen placing his left knee on Patient #1's abdomen and his right knee on Patient #1's head and remained kneeling on Patient #1's abdomen and head as the two Security Guards and the Boston EMS employee arrive. The two Security Guards and Nurse #1 are observed to lift Patient #1 to a standing position and once Patient #1 was standing, Nurse #1 immediately lets go of Patient #1 and walked back to the ambulance bay followed by the two Security Guards.

There is no indication that Patient #1 was examined for potential injuries as a result of the fall or from Nurse #1 kneeling on his/her abdomen and head.

Patient #1's hospital records indicated that at no time was Patient #1 returned to the Emergency Department for an evaluation and there is no indication that there were attempts to arrange for an alternate hospital to evaluate Patient #1.

The video indicated that, after hospital staff walk away from Patient #1, he/she is on the sidewalk and one of the Security Guards is seen to bend over, pick up one of Patient #1's sneakers and throw it out of camera range. The video time jumps/skips for five seconds and then shows Patient #1 walking towards the ambulance bay and the same Security Guard bending down, picking up Patient #1's second sneaker and throwing it away from Patient #1 where it landed in the street.

After viewing the video, the Director of Security and the Interim Chief Nursing Officer told Surveyors they were unable to identify or provide the Surveyors with the name of Patient #1 or the Security Guards involved in the incident.

The Surveyor interviewed Patient #1 at 7:00 P.M. on 9/12/18. Patient #1 said that he/she came to the Emergency Department in the late evening of 8/15/17 around midnight. Patient #1 said that his/her chief complaint was pain from a wound received several days earlier. Patient #1 said he/she was displeased with his/her care and was told to leave by staff. Patient #1 said that Nurse #1 told him to "Get the f--- out of here", or words to that effect, and Security made him/her leave. Patient #1 said that he/she left through the ambulance bay doors but wanted to stay. Patient #1 said that Nurse #1 took his/her sneakers and put them outside which upset him/her. Patient #1 said that he/she, Nurse #1 and the two Security Guards were

all yelling at each other. Patient #1 said that they wanted him/her to leave and he/she wanted to stay.

Patient #1 said that he/she then walked across the street wearing only socks and picked up his/her sneakers (previously left there by Nurse #1) and threw them towards Nurse #1 and the Security Guards. Patient #1 said that Nurse #1 then chased him/her across the street and he/she fell while running from Nurse #1. Patient #1 said he/she ran because he/she thought Nurse #1 would hurt him/her. Patient #1 said that after he/she fell to the ground, Nurse #1 knelt on his/her chest and said "Don't come back.", or words to that effect. Patient #1 said they then lifted him/her up onto his/her feet and again said "Don't come back." or words to that effect. Patient #1 said that Security then threw his/her sneakers so he/she would have to walk to go get them.

Patient #1 said that no one checked him/her for injuries and that at no time did Nurse #1 or the Security Guards offer him/her to be seen in the Emergency Department, Patient #1 said that he/she was never interviewed or contacted by the Hospital about this incident.

The Surveyors interviewed Nurse #1 at 2:05 P.M. on 9/13/18. Nurse #1 said that, during his shift on 8/16/17, he was assigned to care for Patient #1. Nurse #1 said that Patient #1 was discharged and would not leave or put on his/her sneakers. Nurse #1 said that he could not recall why Patient #1 refused to leave. Nurse #1 said that eventually Patient #1 left the Emergency Department but left his/her belongings inside. Nurse #1 said he took Patient #1's belongings and left the Emergency Department to give them to Patient #1. Nurse #1 said that he put his sneakers next to Patient #1 at the ambulance bay. Nurse #1 said that at that time Patient #1 threw his/her sneakers at Nurse#1. Nurse #1 said that Patient #1 then walked into the street and Nurse #1 walked towards him/her because Nurse #1 was concerned that Patient #1 was in the street. Nurse #1 said that Patient #1 then turned and fell and he ran over to him/her to make sure he/she was okay. Nurse #1 said that he asked Patient #1 if he/she was okay and wanted to be seen in the

Emergency Department (ED) and at that point Patient #1 said that he/she had a knife. Nurse #1 said that he then left Patient #1 and went back into the ED.

Nurse #1's account of the interaction is not consistent with Patient #1's account and is not consistent with the video recording of the incident.

Nurse #1 said that he did not call a safety code (Code Purple), alert his co-workers or call the police. Nurse #1 said he went back to work. Nurse #1 said that the next evening he wrote an incident report. Nurse #1 said that as a result of this incident he was spoken to by his manager and went to three or four meetings with the Employee Assistance Program. Nurse #1 said he was never placed on leave of duty.

**VIOLATION:** *PATIENT RIGHTS: FREE FROM ABUSE/HARASSMENT*     **Tag No:** A0145

**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**

Based on observations, records review and interview the Hospital failed to ensure for two (Patient #1 & Patient #14) out of 14 sampled patients that care was free from all forms of abuse and harassment.

- Patient #1, the Hospital failed to provide care free from all forms of abuse and harassment when an emergency department patient had his/her shoes placed outside the Hospital on the sidewalk requiring Patient #1 to leave the hospital in stocking feet to retrieve the shoes; had his/her shoes thrown in his/her direction by a Security Staff member; and, when he/she was then assaulted by a staff member, later identified as Nurse #1.

- The Hospital failed to complete a thorough investigation of the incident involving Patient #1 and

interactions with three Hospital staff and an ambulance company staff member.

- Patient #14, the Hospital failed to complete a thorough investigation and appropriately report an allegation that a staff member inserted his finger into Patient #14's anus.

Findings included:

Patient #1's emergency department record, dated 8/15/17, indicated that on this date around midnight, Patient #1 entered the Emergency Department and was evaluated for pain due to a wound received several days earlier.

An electronic mail document, dated 8/17/17, indicated the Clinical Nurse Director of Emergency Services forwarded an email to the Director of Employee Relations at 7:09 A.M. on 8/17/17. Included with the email was an attachment that was sent to her at 11:48 P.M. on 8/16/17 from Nurse #1. The email indicated that Nurse #1 provided the Clinical Nurse Director of the Emergency Department information in the email regarding an interaction between Nurse #1 and Patient #1 where Nurse #1 indicated that Patient #1 started to run away from him and fell to the ground. Nurse #1 indicated that he did not want to leave him/her lying in the street so he continued to run to him/her. Nurse #1 indicated that Patient #1 muttered about having a knife so he restrained Patient #1's arms. Nurse #1 indicated that two Security Guards were there to assist Nurse #1 and the three individuals helped Patient #1 to stand up. Nurse #1 indicated that Patient #1 refused to come back inside for an exam.

The Surveyors interviewed the Director of Security and the Interim Chief Nursing Officer at 5:20 P.M. on 9/12/18. The Director of Security and the Interim Chief Nursing Officer provided a CD video recording to the Surveyors, which included a recording of hospital Security Staff, a Nurse (identified as Nurse #1), and

81

an ambulance staff member interacting with Patient #1 as he/she is leaving the hospital via the ambulance bay.

The Surveyors, the Director of Security and the Interim Chief Nursing Officer viewed the video, which is time stamped starting at 1:48:46 A.M. on 8/16/17 and ending at 1:57:34 on 8/16/17.

The approximate two-minute video shows an individual (Nurse #1) walking outside of the ambulance bay crossing the street and placing Patient #1's sneakers on the sidewalk and Patient #1 following him from several feet back wearing what appears to be just socks. Patient #1 can then be seen running away from the ambulance bay, with Nurse #1 running in pursuit close behind him/her, while two Security Guards and one Boston Emergency Medical Services (EMS) employee walk from the ambulance bay towards the direction of Patient #1 and Nurse #1. Patient #1 is then seen on the video falling to the ground, rolling onto his/her back, and putting his/her hands up in a defensive motion. While Patient #1 is laying on his/her back on the ground, Nurse #1 is seen crouching over Patient #1, grabbing Patient #1's hands, and kneeling on Patient #1. Nurse #1 is seen placing his left knee on Patient #1's abdomen and his right knee on Patient #1's head and remained kneeling on Patient #1's abdomen and head as the two Security Guards and the Boston EMS employee arrive. The two Security Guards and Nurse #1 are observed to lift Patient #1 to a standing position and, once Patient #1 was standing, Nurse #1 immediately lets go of Patient #1 and walks back to the ambulance bay followed by the two Security Guards.

There is no indication that Patient #1 was examined for potential injuries as a result of the fall or from Nurse #1 kneeling on his/her abdomen and head.

Patient #1's hospital records did not indicate that Patient #1 returned to the Emergency Department for an evaluation and there is no indication that there were attempts to arrange for an alternate hospital to

evaluate Patient #1.

The video indicated that after the hospital staff walked away from Patient #1, he/she is on the sidewalk and one of the Security Guards is seen to bend over, pick up one of Patient #1's sneakers, and throw it out of camera range. The video time jumps/skips for five seconds and the shows Patient #1 walking towards the ambulance bay and the same Security Guard bending down, picking up Patient #1's second sneaker and throwing it away from Patient #1 where it landed in the street.

After viewing the video, the Director of Security and the Interim Chief Nursing Officer told Surveyors they were unable to identify or provide the Surveyors with the name of Patient #1 or the Security Guards involved in the incident.

The Surveyor interviewed Patient #1 at 7:00 P.M. on 9/12/18. Patient #1 said that he/she came to the Emergency Department in the late evening of 8/15/17 around midnight. Patient #1 said that his/her chief complaint was pain from a wound received several days earlier. Patient #1 said he/she was displeased with his/her care and was told to leave by staff. Patient #1 said that Nurse #1 told him to "Get the fuck out of here", or words to that effect, and Security made him/her leave. Patient #1 said that he/she left through the ambulance bay doors but wanted to stay. Patient #1 said that Nurse #1 took his/her sneakers and put them outside which upset him/her. Patient #1 said that he/she, Nurse #1 and the two Security Guards were all yelling at each other. Patient #1 said that they wanted him/her to leave and he/she wanted to stay.

Patient #1 said that he/she then walked across the street wearing only socks and picked up his/her sneakers (previously left there by Nurse #1) and threw them towards Nurse #1 and the Security Guards. Patient #1 said that Nurse #1 then chased him/her across the street and he/she fell while running from Nurse #1. Patient #1 said he/she ran because he/she thought Nurse #1 would hurt him/her. Patient #1 said that after he/she fell to the ground, Nurse #1 knelt on his/her chest and said "Don't come back", or words

to that effect. Patient #1 said they then lifted him/her up onto his/her feet and again said "Don't come back", or words to that effect. Patient #1 said that Security then threw his/her sneakers so he/she would have to walk to go get them.

Patient #1 said that no one checked him/her for injuries and at no time did Nurse #1 or the Security Guards offer him/her to be seen in the Emergency Department. Patient #1 said that he/she was never interviewed or contacted by the Hospital about this incident.

The Surveyors interviewed Nurse #1 at 2:05 P.M. on 9/13/18. Nurse #1 said that, during his shift on 8/16/17, he was assigned to care for Patient #1. Nurse #1 said that Patient #1 was discharged and would not leave or put on his/her sneakers. Nurse #1 said that he could not recall why Patient #1 refused to leave. Nurse #1 said that eventually Patient #1 left the Emergency Department but left his/her belongings inside. Nurse #1 said he took Patient #1's belongings and left the Emergency Department to give them to Patient #1. Nurse #1 said that he put his/her sneakers next to Patient # 1 at the ambulance bay. Nurse #1 said that at that time Patient #1 threw his/her sneakers at Nurse #1. Nurse #1 said that Patient #1 then walked into the street and Nurse #1 walked towards him/her because Nurse #1 was concerned that Patient #1 was in the street. Nurse #1 said that Patient #1 then turned and fell and he ran over to him/hr to make sure he/she was okay. Nurse #1 said that he asked Patient #1 if he/she was okay and wanted to be seen in the Emergency Department (ED) and at that point Patient #1 said that he/she had a knife. Nurse #1 said that he then left Patient #1 and went back into the ED.

Nurse #1's account of the interaction is not consistent with Patient #1's account and is not consistent with the video recording of the incident.

Nurse #1 said that he did not call a safety code (Code Purple), alert his co-workers, or call the police. Nurse #1 said he went back to work. Nurse #1 said that the next evening he wrote an incident report. Nurse #1 said that as a result of this incident he was spoken to by his manager and went to three or four meetings with the Employee Assistance Program. Nurse #1 said he was never placed on leave of duty.

2. For Patient #14, the Hospital failed to follow their policy and report an allegation that, on 1/10/18,

84

Clinical Care Technician (CCT) #3 inserted a finger into Patient #14's anus.

The Hospital's Sexual Assault Clinical Practice Guideline, effective December 2015, indicated that rape is defined as the natural or unnatural intercourse by force against a person's will. The Guideline indicated that natural or unnatural intercourse includes penetration of the genital area or anus by penis, finger, tongue or object. The Guideline indicated that the physician was required to report rapes and sexual assaults to the police in the town where the rape or sexual assault occurred. The Guideline indicated that clinicians were mandated to report any suspicion of sexual abuse of the elderly or persons with disabilities per the Elder Abuses Protocols.

The Hospital's Suspected Elder Abuse/Neglect Hospital Wide Policy, effective July 2015, indicated that hospital mandated reporters who have reasonable cause to believe that a person aged 60 or over was suffering from abuse must report the allegation to the appropriate department or designated agency. The Policy indicated that if the elder was a nursing home resident the report should be filed with the Department of Public Health.

Patient #14's hospital record indicated he/she was over [AGE] and resided in a nursing home.

The Safety Event Entry Form, dated 1/10/18 at 4:00 A.M., indicated Patient #14 complained to a nurse that CCT #3 stuck his finger in his/her anus. The Safety Event Entry indicated Risk Manager #1 was contacted and would follow up.

The Surveyor interviewed Risk Manager #1 at 12:00 P.M. on 9/13/18. Risk Manager #1 said that she investigated Patient #1's allegation with the Director of Employee and Labor Relations. The Risk Manager #1 interviewed CCT#3 who denied the allegation. Risk Manager #1 said that she interviewed Patient #14 and Patient #14 said that CCT #3 stuck his finger up his/her anus and he/she squeezed it out. The Surveyor asked Risk Manager #1 whether she reported Patient #14's allegation to the Department of Public Health. Risk Manager #1 said that she did not because after the review by risk management the allegation was unsubstantiated.

**VIOLATION:** *QAPI*                                    **Tag No:** A0263

The Hospital was out of compliance for the Condition of Participation for Quality Assessment & Performance Improvement (QAPI).

**Findings include**:

The Hospital failed to ensure for one (Patient #1) of 14 sampled patients that QAPI activities completed a comprehensive review of an incident which involved a staff member assaulting Patient #1.

Refer to TAG: A-0273.

**VIOLATION:** *PROGRAM SCOPE, PROGRAM DATA*            **Tag No:** A0273

Based on records reviewed and interviews, the Hospital failed to complete a comprehensive review of an incident which involved a staff member assaulting a patient. On 8/16/17, an emergency department patient had his/her shoes placed outside the Hospital on the sidewalk by a staff member requiring Patient #1 to leave the Hospital in stocking feet to retrieve the shoes; had his/her shoes thrown in his/her direction by a security staff member; and he/she was assaulted by a staff member, later identified as Nurse #1. - The Hospital failed to complete a thorough investigation of the incident involving Patient #1 and interactions with three Hospital staff and an ambulance company staff member.

Although Nurse #1 provided information to a Hospital staff member regarding his interactions with Patient #1 on 8/16/17, his account of the interaction was not consistent with video recording, which were readily available for review. There is not indication that Hospital leadership responded to the inconsistencies or took thorough corrective action in response to Nurse #1's assault/physical altercation with Patient #1.

- Although the video indicated Nurse #1, two security staff members, and one ambulance company staff member were involved, the Hospital staff did not provide any information to Surveyors to indicate that

the Security or ambulance staff were interviewed as part of the investigation; Hospital staff informed

Surveyors that they did not know the identities of the staff members (except Nurse #1) seen on the video.

There is no indication the Hospital took any corrective action with a Security Staff member seen throwing

Patient #1's shoes into the street.

- The incident was not reported to the Department of Public Health and was not investigated by the

Hospital's Quality Department or Risk Management as required by the Hospital's policies and procedures.

**Findings included**:

An electronic mail document, dated 8/17/17, indicated the Clinical Nurse Director of Emergency Services

forwarded an email to the Director of Employee Relations at 7:09 A.M. on 8/17/17, which indicated she

that she was worried about Nurse #1 and his treatment of patients. Included with the email was an

attached an email that was sent to her at 11:48 P.M. on 8/16/17 from Nurse #1. The email indicated that

there was an interaction between Nurse #1 and Patient #1 where Nurse #1 indicated that Patient #1 started

to run away from him and fell to the ground. Nurse #1 indicated that he did not want to leave him/her

lying in the street so he continued to run to him/her. Nurse #1 indicated that Patient #1 muttered about

having a knife so he restrained Patient #1's arms. Nurse #1 indicated that two Security Guards were there

to assist Nurse #1 and the three individuals helped Patient #1 to stand up. Nurse #1 indicated that Patient

#1 refused to come back inside for an exam. The email account is not consistent with the information

contained in the video.

The Surveyors interviewed the Director of Security and the Interim Chief Nursing Officer at 5:20 P.M. on

9/12/18. The Surveyors, the Director of Security and the Interim Chief Nursing Officer viewed the video

which is time stamped starting at 1:48:46 A.M. on 8/16/17 and ending at 1:57:34 on 8/16/17. The video

shows interactions with Patient #1, two security staff, and one ambulance staff member. The video shows

where an emergency department patient (Patient #1) had his/her shoes placed outside the hospital on the

sidewalk by a staff member requiring Patient #1 to leave the hospital in stocking feet to retrieve the shoes;

had his/her shoes thrown in his/her direction by a security staff member; and he/she was assaulted by a

staff member, later identified as Nurse #1.

The altercation seen on video shows Nurse #1 running toward Patient #1, Patient #1 falling as he/she is seen trying to run away from Nurse #1 in stocking feet. Nurse #1 is seen kneeling on Patient #1's abdomen and head until Patient #1 is assisted to a standing position by all staff involved.

The Surveyors interviewed the Clinical Nurse Director of Emergency Services at 1:53 P.M. on 9/12/18. The Clinical Nurse Director of Emergency Services said that Nurse #1 was disciplined for an altercation with an Emergency Department patient (later identified as Patient #1) in August, 2017. The Clinical Nurse Director of Emergency Services said that Nurse #1 was involved in what was described to Surveyors as a verbal altercation with Patient #1 during his/her discharge. The Clinical Nurse Director of Emergency Services said that the incident was on video and that Patient #1 threw his/her sneaker at Nurse #1 and struck him in the leg and Nurse #1 responded by lunging at Patient #1 and Patient #1 fell to the ground. The Clinical Nurse Director of Emergency Services said that Patient #1 was not injured and refused further medical treatment. The account of the Clinical Nurse Director of the Emergency Department is not consistent with the information obtained from the video.

The Clinical Nurse Director of Emergency Services said that Nurse #1 filed an internal incident report. The Clinical Nurse Director of Emergency Services said she was not involved in the Hospital's

investigation and that it was conducted by the Director of Employee Relations. The Clinical Nurse Director of Emergency Services said that Nurse #1 was not reported to the Board of Registration in Nursing, but did receive a written warning regarding the altercation. The Clinical Nurse Director of Emergency Services said that she didn't recall if Nurse #1 was suspended or disciplined other than receiving a written warning. The Clinical Nurse Director of Emergency Services said that Nurse #1 told her that he was frustrated and burnt out. The Clinical Nurse Director of Emergency Services said that he was referred to the Employee Assistance Program for his anger and frustration issues. The Clinical Nurse Director of Emergency Services said that Nurse #1 was placed on the day shift for a few weeks as a means to decrease his stress. It should be duly noted that Jinks CNO was acting as interim CEO at that

time.

The Document titled, [Hospital Name Removed] Medical Center: Documentation of Action for
Registered Nurses, dated 9/21/17, indicated that Nurse #1 sent the Clinical Nurse Director of Emergency
Services an email later that shift and said that he was feeling very burnt out, tired of being yelled at, spit
at, and hit at work. Nurse #1 states that he did not like who he had become and was less compassionate
and extremely frustrated.

The Surveyors interviewed the Director of Employee Relations at 3:50 P.M. on 9/12/18, The Director of
Employee Relations said that she could not find the investigation conducted about the employee assault
and that it may take one or two days to find.

The Director of Employee Relations initially told Surveyors that she could not recall the Patient's name or
the date the incident occurred. In a subsequent interview on 9/13/18, the Director of Employee Relations
provided more information.

The Hospital was unable to provide any information to indicate that a comprehensive investigation was
completed, which would include interviews from all staff involved.

The Hospital was unable to provide any information to indicate that corrective action plans for all staff
were developed or monitored in response to the incident in an effort to ensure patients were not harassed,
abused, or assaulted by staff.

Nurse #1 continued to work in the emergency department. The Hospital was unable to provide any
detailed information to indicate that Nurse #1's interactions with patients was being monitored.

In a subsequent interview at 12:30 P.M. on 9/13/18, the Director of Employee Relations said that she
performed the investigation of the 8/17/17 incident involving Patient #1 and Nurse #1. The Director of
Employee Relations said that she was notified of the incident by the Clinical Nurse Director of
Emergency Services within a day or two of the incident. The Director of Employee Relations said that she
interviewed the Clinical Director of Emergency Services and read the statement made by Nurse #1 and
the internal report that Nurse #1 filed the next day after the incident. The Director of Employee Relations

said that she then interviewed Nurse #1. The Director of Employee Relations said that there were inconsistencies with Nurse #1's report but due to his ability to perform in the Emergency Department it was decided that his corrective actions would be a written warning and referral to the Employee Assistance Program.

There is no indication that the Director of Employee Services addressed or responded to Nurse #1's inaccurate and inconsistent account of the incident.

The Director of Employee Relations said that she did not give the report to or notify anyone else at the hospital about the investigation. There is no indication that the police were informed or that a report of the physical assault was reported to the Department of Public Health, or that a referral was made to the Board of Registration in Nursing regarding Nurse #1's interaction with Patient #1.

The Director of Employee Relations said she did not involve Risk Management or Quality and did not report her findings to senior management.

The Director of Employee Relations provided email documentation that Nurse #1 attended one meeting with a counselor from the Employee Assistance Program. The Director of Employee Relations provided a one page document from a note book that was handwritten with thirteen bullet points reviewing Nurse #1's actions. Although the Director of Employee Relations interviewed Nurse #1 and reviewed documentation provided by Nurse #1, this did not constitute a complete and thorough investigation regarding the physical assault/abuse and harassment of Patient #1 which occurred on 8/16/17. There was no indication that the Hospital contacted or interviewed Patient #1, the two Security Guards, or the ambulance staff member about the incident.

There was no indication, that follow up corrective action or discipline was provided to all staff on the video.

Refer to A 144 and A 145

**VIOLATION:** *EMERGENCY SERVICES POLICIES*                    **Tag No:** A1104

Based on records reviewed and interviews the Hospital failed to follow their policies and procedures for patients being registered in their Emergency Department through the triage process.

**Findings included**:

Emergency service or emergency department policies must be current and revised as necessary based on the ongoing monitoring conducted by the medical staff and the emergency service or departmental Quality Assessment Performance Improvement (QAPI) activities.

The Surveyors interviewed Clinical Care Technician (CCT) #1 at 12:50 P.M. on 9/12/18. CCT #1 said that when a patient arrives and the triage staff are busy with other patients, a patient is instructed to fill out a piece of paper (blue for adult and green for pediatrics) and place it face down in a basket at the Pre-Triage area. CCT#1 said the piece of paper has the patient's name and chief complaint. CCT#1 said that when they retrieve the paper from the basket, they call the person's name and begin the pre-triage process of obtaining vital signs and registering the patient. CCT #1 said that if they pick up the paper from the basket, call the name on it and no one answers, they hold on to the paper for a little longer and try again. CCT #1 said if no one answers by the end of her shift or a couple hours, the paper is thrown away and the patient information is not registered.

The Surveyors reviewed the document titled "ED Triage Greeter Process Guideline" dated August, 2017. The document indicates that all patients who present to the emergency department requesting a medical screening examination will be logged into the Emergency Department Information System (EDIS) currently in use. The pre-triage greeter is the primary individual responsible for logging a patient into the system. Alternatively, nursing staff may perform this function or a designated individual identified by the Emergency Department Charge Nurse may perform this function. The disposition of each patient in the log will be noted by appropriate staff in compliance with all regulatory bodies. The policy does not mention the envelope at the front desk, who is responsible for it, or what the process is for placing patient information in the envelope.

The Surveyors interviewed CCT #2 at 9:06 A.M. on 9/14/18. CCT #2 said that when she takes the triage

paper from the basket and if no one responds, she places the paper in an envelope located at the front desk. CCT #2 said that the envelope is then given to the Charge Nurse. CCT #2 said that she did not know what the Charge Nurse did with the information or contents of the envelope.

The Surveyors interviewed Charge Nurse #1 at 9:25 A.M. on 9/14/18. Charge Nurse #1 said she did not know anything about the envelope kept at the Triage desk and told Surveyors when interviewed that this was the first she has heard about the envelope. Charge Nurse #1 said she has worked in the Emergency Department for seven years.

The Surveyors interviewed the Emergency Department Clinical Educator at 9:30 A.M. on 9/14/18. The Emergency Department Clinical Educator said that the expectation for the CCT at triage is to enter all patients into the Emergency Department computer system if they filled out a piece of paper with their information on it while in Triage. The Emergency Department Clinical Educator said even if the patient has left the building and was not seen by the Triage Nurse, the patient information is entered into the computer and they are designated as left before being seen. If the patient completes a form, leaves without being seen and the form is illegible, the form is put into an envelope at the desk. The envelope is then collected and reviewed by the Nurse Manager or the Director of Emergency Nursing. The Emergency Department Clinical Educator said that she was not sure what happened to the information in the envelope.

The Surveyors interviewed the Clinical Nurse Director of Emergency Services at 10:00 A.M. on 9/14/18. The Clinical Nurse Director of Emergency Services said that the CCT at the triage desk should put any illegible forms that are filled out at the Triage area in the envelope at the Triage desk. The Clinical Nurse Director of Emergency Services said that she was not sure who collected the envelope that was at the front desk. The Clinical Nurse Director of Emergency Services said that she did not collect the envelope.

The Surveyors interviewed the Lead CCT of the Emergency Department at 10:30 A.M. on 9/14/18. The Lead CCT said that she was now going to be in charge of collecting the envelope at the front desk and she would give it to the Emergency Department Clinical Educator. The Lead CCT of the Emergency

Department said that the envelope use to be collected by an individual who worked in Risk Management but could not remember the person's name as they have not been employed for several months. The Lead CCT of the Emergency Department said that she will now start collecting the envelope from the Triage desk. The Lead CCT of the Emergency Department said she does not know who has the envelopes from the past several months and did not know what was done with the envelopes when they were collected.

iii.

| | | |
|---|---|---|
| **TUFTS MEDICAL CENTER** | **800 WASHINGTON STREET BOSTON, MA 02111** | **Feb. 8, 2018** |

**VIOLATION:** *PATIENT RIGHTS: RESTRAINT OR SECLUSION*                    **Tag No:** A0168

Based on records reviewed and interviews, the Hospital failed for two of ten patients sampled (Patients #9 & #10) to ensure the use of restraint was ordered by a physician or other licensed independent practitioner.

**Findings included**:

The Hospital policy titled, Restraint for Adult and Pediatric Patients, dated 12/18/17, indicated the use of restraint required an order prior to application or in an emergency as soon as possible.

1.) The following regarding Patient #9.

The document titled, History & Physical, dated 7/13/17 at 7:33 P.M. indicated physicians admitted Patient #9 to the Hospital with a plan for cardiac surgery on 7/14/17.

The document titled, Physician's Orders, Documentation for Restraint, Seclusion of the Adult or Pediatric patient in Non-mental Health Settings, dated 7/14/17-7/15/17, indicated the Hospital restrained Patient #9 with wrist restraint of both wrists. The document indicated no documentation of a physician or other licensed independent practitioner order for use of restraint for the care of Patient #9.

The document titled, Restraint & Seclusion Events Reported, dated 1/1/17-1/1/18, indicated Patient #9 as

restrained.

The Surveyor interviewed Risk Manager #1 on 2/17/18 (navigator of the electronic medical record for review). Risk Manager #1 said that Patient #9's medical record did not have an order for restraint.

The Hospital provided no documentation to indicate the use of restraint with the order of a physician or other licensed independent practitioner responsible for the care of Patient #9.

2.) The following regarding Patient #10.

The document titled, Restraint & Seclusion Events Reported, dated 1/1/17-1/1/18, indicated a patient in Labor & Delivery, Patient #10, as restrained, on 11/2/17.

Doctor's Orders, dated 11/2/17 regarding Patient #10, indicated no documentation of a doctor's order for restraint.

Risk Manager #1 said Patient #10's medical record had no documentation as restrained.

The Hospital provided no documentation to indicate the use of restraint with the order of a physician or other licensed independent practitioner responsible for the care Patient 10.

**VIOLATION:** *ADEQUACY OF LABORATORY SERVICES*                    **Tag No:** A0582

Based on records reviewed and interviews the Hospital failed for one of ten sampled patients (Patient #1) to ensure the Blood Bank provided services in accordance with the Hospital's policy regarding verbal orders.

**Findings included:**

The document titled, Supervisory Note, dated 5:14 P.M. on 11/25/17, indicated the Attending Trauma Surgeon accepted a severely injured and unstable patient (Patient #1) for direct transfer from an outside hospital by helicopter to the Hospital Operating Room. The Supervisory Note indicated the Trauma Surgeon activated the Massive Transfusion Protocol.

The Hospital policy titled, Massive Transfusion Protocol, dated 4/2014, indicated the Trauma (the term Trauma was undefined), EM (the abbreviation EM was undefined) or anesthesia physician activated the

Massive Transfusion Protocol for the release of blood from the Blood Bank for life-threatening emergency. The policy indicated the physician communicates the need to activate the Massive Transfusion Protocol to the Charge Nurse.

The document titled, Anesthesia Record, dated from 12:30 P.M. through 1:30 P.M. on 11/25/17 indicated Patient #1 received 8242 milliliters (2.1 gallons) of blood products.

The Hospital policy titled, Patient Care Orders, dated 10/17/17, indicated the Hospital permitted verbal orders in emergent situations and when working under sterile conditions. The Policy indicated the individual receiving the verbal or telephone order was required to write down and "read back" the patient's name, date of birth and the complete order and the individual giving the verbal or telephone order will confirm that the information as correct. The Policy indicated verbal and telephone orders were authenticated by the prescribing practitioner within 24 hours. The Policy indicated verbal and telephone orders would include date, time, and practitioner's signature with printed name, credentials and their beeper or telephone number. The Policy indicated the Hospital permitted verbal and telephone orders to be given to Registered Nurses, Registered Pharmacists, Registered Respiratory Therapists, Registered Dieticians, Registered Physical Therapists and Registered Occupational Therapists. The Policy did not indicate that the Hospital permitted verbal or telephone orders to be given to Blood Bank personnel. The Policy did not indicate a procedure for verbal orders for blood products.

The document titled Massive Transfusion Protocol, Blood Product Release Authorization Form, dated 11/26/17, indicated only the first name person from the Operating Room requested blood. The Massive Transfusion Protocol, Blood Product Release Authorization form did not indicate:

1.) The individual receiving the verbal or telephone order was written down and "read back" the patient's name, and the complete order,

2.) The individual giving the verbal or telephone order will confirm that the information was correct,

3.) The time and practitioner's printed name with credentials with their beeper or telephone number,

4.) The Policy the verbal and telephone order was to be given to Registered Nurses, Registered

Pharmacists, Registered Respiratory Therapists, Registered Dieticians, Registered Physical Therapists and Registered Occupational Therapists, or

5.) The person who received the verbal order, in accordance with Hospital policy.

The document titled, Massive Transfusion Protocol, Blood Product Release Authorization Form indicated that it was approved and current effective 3/10/12. The Hospital provided no documentation to indicate the Hospital revised or updated the Massive Transfusion Protocol, Blood Product Release Authorization form, as consistent with the Policies, Massive Transfusion Protocol Policy and the Patient Care Orders. The email, dated at 1:56 P.M. on 2/16/18, indicated that the Massive Transfusion Protocol form, dated 3/10/12, was the most current edition.

The Surveyor interviewed Vice President #1 and Risk Manager #1 at 8:30 A.M. on 2/8/18. They said that the Massive Transfusion Protocol, Blood Product Release Authorization form, dated 11/26/17, was a verbal order to activate the Massive Transfusion Protocol. They said according to the documentation on this form, the Hospital was unable to identify who requested the activation of the Massive Transfusion Protocol. This was not consistent with the Hospital's Patient Care Orders policy.

iv

## TUFTS MEDICAL CENTER ->

- Report No. 19312

*The information below comes from the statement of deficiencies compiled by health inspectors and provided to AHCJ by the Centers for Medicare and Medicaid Services. It does not include the steps the hospital plans to take to fix the problem, known as a plan of correction. For that information, you should contact the hospital, your state health department or CMS. Accessing the document may require you to file a Freedom of Information Request. Information on doing so is available here.*

| | | |
|---|---|---|
| **TUFTS MEDICAL CENTER** | **800 WASHINGTON STREET BOSTON, MA 02111** | **July 28, 2017** |

**VIOLATION:** *PATIENT SAFETY* **Tag No:** A0286

Based on observations, interviews and records reviewed for two of ten sampled patients (Patients #1 &

#9) the Hospital's Quality Assessment Performance Improvement activities failed to identify that Nursing

Staff were not clamping (closing) intravenous tubing according to manufacturer direction and implement

immediate corrective action(s) after Patient #1's adverse patient event; and failed to report to CMS a

patient death (Patient #9) in restraint.

**Findings included**:

1.) Nurses Note, dated 5/30/17 at 7:19 P.M., indicated Patient #1's adverse event of 5/24/17. The Nurses

Note indicated Patient #1 received an unknown amount of intravenous Fentanyl (powerful narcotic) while

discontinuing the intravenous infusion.

The intravenous tubing packing titled Continuous-Flo Solution Set, undated, indicated directions to close

the regulating clamp until the roller met the bottom frame.

The document titled Infusion System, dated 2015, indicated direction for unloading (discontinuing) an

intravenous infusion was when the roller (regulator) clamp was in the closed position.

The Surveyor interviewed Registered Nurse (RN) #2, at 10:00 A.M. on 7/27/17. RN #2 said that nursing

practice for closing the regulating clamp was not a consistent nursing practice. RN #2 said that some

nurses use the regulating clamp and others use the slide clamp (another clamp connected to the

intravenous tubing).

The Surveyor interviewed and observed, at 10:30 A.M. on 7/27/17, RN #3. RN #3 said nurses

administered intravenous constant infusions of cardiovascular, narcotic, and insulin medications in the

Intensive Care Unit. At 10:30 A.M. on 7/27/17, the Surveyor observed that RN #3 did not close the

regulating clamp until the roller met the bottom frame.

The Surveyor interviewed the Quality and Patient Safety Director at 11:50 A.M. and 1:00 P.M. on

7/26/17. The Quality and Patient Safety Director said the Hospital's internal investigation, dated 6/20/17,

included the finding that the roller (regulating) clamp was not engaged (clamped closed). The Quality and Patient Safety Director said the Hospital was still working on the corrective action plan (one month after Patient #1's adverse patient event and one month after the Hospital discovered that RN #1 did not properly close the regulating clamp). The Quality and Patient Safety Director said that the Nursing Safety Alert (re-education regarding proper closure of intravenous tubing regulating clamp) was not distributed until today, 7/26/17 (the day of the Survey).

The Surveyor interviewed the Quality and Patient Safety Director and Senior Risk Manager #1 at 9:00 A.M. on 7/27/17. The Quality and Patient Safety Director and Senior Risk Manager said that the Hospital's internal investigation did not analyze if Intensive Care Units, Medical Surgical Units, Operating Rooms and the Emergency Department administered intravenous constant infusion medications.

The document titled, Infusion Locations, undated, indicated Intensive Care Units, Medical Surgical Units, Procedural Units (Endoscopy) and Ambulatory Care Units were where patients received intravenous medication infusions.

The Hospital did not provide documentation to indicate that there was reeducation to all areas of the Hospital that administered intravenous constant infusion medications.

The Surveyor interviewed the Quality and Patient Safety Director at 11:50 A.M. on 7/26/17 and 11:15 A.M. on 7/27/17. The Quality and Patient Safety Director said Patient #1's medication adverse patient event did not appear in the Medication Events Report, dated 2/26/17-7/26/17, because the nurse reporting the event did not categorize the event as a medication event and the Hospital reclassified medication events at the closing of the event.

2.) The policy titled, Event Reporting System & Medical Device Reporting, dated 3/1/17, indicated the Hospital reports to the Center for Medicare and Medicaid (CMS) any death while a patient was in restraint or seclusion.

The report titled, Death in Restraints, dated 1/1/17-7/26/17, indicated Patient #9 died while in side rails

and two-point soft wrist restraint.

The document titled, Hospital Restraint Seclusion Death Report Worksheet, dated 4/6/17, indicated Patient #9 died while in side rail and two-point soft wrist restraint. The Hospital Restraint Seclusion Death Report Worksheet indicated that side rails when marked as checked were used as a restraint to restrict the patient's freedom to leave the bed.

The Surveyor interviewed Senior Risk Manager #2, at 11:15 A.M. on 7/27/17. Senior Risk Manager #2 said that the Hospital did not report to CMS Patient #9's death while in restraint.

The Surveyor interviewed the Clinical Nursing Director, at 2:00 P.M. on 7/27/17. The Clinical Nursing Director said that Patient #9's medical record did not contain documentation that Patient #9 was in restraint.

A review of Patient #9's Medical Record did not indicate that Patient #9 died while in restraint.

The Surveyor interviewed Senior Risk Manager #2, at 9:00 A.M. on 7/28/17. Senior Risk Manager #2 said the Hospital sent CMS the report of Patient #9's death in restraint.

v

- 
- [TUFTS MEDICAL CENTER](#) ->
- Report No. 19311.

| | TUFTS MEDICAL CENTER | 800 WASHINGTON STREET BOSTON, MA 02111 | Feb. 4, 2014 | |
|---|---|---|---|---|
| **TUFTS** | | | | **Feb.** |
| **MEDICAL** | VIOLATION: *FACILITIES, SUPPLIES, EQUIPMENT MAINTENANCE* | | Tag No: A0724 | **22,** |
| **CENTER** | | | | **2017** |

Based on observations, staff interviews and review of equipment logs, the Hospital failed to ensure the emergency equipment was maintained at an acceptable level of quality and safety in the Cardiology and Neurology clinics. Findings include:

1. On 1/28/14 at 1:40 P.M., a tour of the Outpatient Cardiology Clinic on 6 South was conducted. During inspection

of the clinic's code cart, the suction machine canister was observed to have a significant coating of dust on the top cover. The suction machine had no suction tubing in place from the suction inlet of the machine to the center suction port of the suction canister. Additionally, review of the code cart checklist revealed that the suction machine was not listed on the checklist for staff to ensure that it functioned properly.

The Director of Clinical Services, who was present during the tour, said on 1/28/14 at 1:45 P.M., that the Hospital would add the suction machines to the code cart checklists so that staff in each of the outpatient clinics would check them regularly to ensure that they functioned properly.

2. On 1/31/14 at 10:45 A.M., a tour of the Outpatient Neurology Clinic on the 12th floor of the Biewend Building was conducted. During inspection of the code cart, it was observed that the suction machine, when turned on by the Clinic Nurse Manager, did not function properly. Review of the code cart checklist revealed that the suction machine was not checked by staff to ensure that it functioned properly. The Clinic Nurse Manager had another staff member immediately call down to the biomedical equipment department to bring a replacement suction machine to the clinic.

Interview with the Director of Clinical Services, who was present at the time, said on 1/31/14 at 11:00 A.M., that the Hospital would add the suction machines to the code cart checklists so that staff in each of the outpatient clinics would check them regularly to ensure that they functioned properly and were available for use in the event of a "code blue" (emergency).

**VIOLATION:** *INFECTION CONTROL OFFICER RESPONSIBILITIES*                    Tag No: A0749

Based on observations of the environment of care, staff interviews, review of the Hospital's policies/procedures, review of the Centers for Disease Control (CDC) and Prevention Infection Control (IC) Standards for Hand Hygiene, review of the Association of periOperative Registered Nurses (AORN) Standards and Recommended Practices, review of the Hospital's Exposure Control Plan, review of Hospital disinfection logs, and review of manufacturer's directions for use (MDFU), the Hospital failed to consistently ensure staff adherence to Infection Control Standards for 2 of 3 Nonsampled Patients (NS #1, NS #2) and 5 Inpatients (#4, #9, #31, #32, #33), from a sample of 49 Inpatients. Findings included:

1. The Hospital failed to ensure that entries into the high level disinfection (HLD) logs were complete, contained accurate temperature readings, and followed MDFU.
HLD is a cleaning process that should destroy all microorganisms, except for bacterial spores, used to reprocess semi-critical items (items that contact mucous membranes or non-intact skin) in the Endoscopy Unit.

Surveyor #5 interviewed Endoscopy Technician (Endo Tech) #1 in the Reprocessing Area at 11:10 A.M. on 1/29/14. Endo Tech #1 said HLD was done using an automated endoscope reprocessor (AER). According to the MDFU, the temperature of the HLD solution must reach a minimum of 25 degrees centigrade in order to be effective in a 5 minute AER cycle. Endo Tech #1 said she took the temperature reading from the AER machine's visual monitor and

entered the results into the HLD log. Review of the HLD log indicated multiple entries of temperatures less than 25 degrees centigrade, which did not meet the minimum temperature to ensure HLD in the AER had occurred.

Surveyor #5 conducted a random sampling of seven log entries that failed to meet the temperature requirements, and correlated the readings with the AER results tape. The readings were found to meet the required temperature parameters. Endo Tech #1 said she entered the temperature manually into the log and was uncertain of the minimum temperatures required for use of the HLD solution.

Despite the AER reaching the minimum temperature as required, the manual log did not consistently reflect an acceptable temperature. Endo Tech #1 said she did not routinely check the tapes to ensure the temperature requirements were met.

2. The Hospital failed to adhere to the policy to prevent Ventilator Associated Pneumonia (VAP) for two of three mechanically ventilated Inpatients (NS #1, NS #2).

According to the Hospital policy titled "Prevention of Ventilator Associated Pneumonia," patients who were mechanically ventilated were to be positioned with the head of the bed at a 30-45 degree angle, unless medically contraindicated. Maintaining the patients' beds at this level assists with prevention of aspiration and encourages full expansion of the lungs.

Observations in the Surgical Intensive Care Unit (SICU), on 2/4/14 at 9:20 A.M., Surveyor #5 observed two inpatients receiving mechanical ventilation. The head of the bed for NS #1 was observed in a 24 degree position and the head of the bed for NS #2 was observed in a 27 degree position.

3. The Hospital failed to consistently adhere to the Hospital's Exposure Control Plan, for transport of medical waste.

The Surveyor interviewed the Supervisor of the Central Processing Department (CPD) at 9:00 A.M. on 1/29/14. The Supervisor said the hospital used large red and white bins to transport body parts. The Supervisor said the transport bins were returned to the CPD for reprocessing. The transport bins lacked any biohazardous labels.

Review of the Hospital's Bloodborne Pathogen Exposure Control Plan indicated biohazardous labels must be affixed on containers/bags that transport blood or body parts or other potentially infective material.

4. The Hospital failed to consistently maintain equipment or the patient's environment at an acceptable level of safety and quality.

Surveyor #5 toured the Surgical Intensive Care Unit (SICU) with the Nurse Manager at 10:08 A.M. on 1/27/14. Surveyor #5 observed Patient Rooms #10 and #5. The Patient Rooms had visibly soiled floors; the areas under the hand-hygiene dispensers had areas of dark discoloration and soiling. In Patient Room #5, the base of the IV pole was visibly soiled with areas of dark debris. The seat of the chair in Room #5 had a long slit in the upholstery so the

chair would not be able to be effectively disinfected between patients.

Surveyor #5 interviewed the Environmental Services Worker (ESW #1) at 10:40 A.M. on 1/27/14. ESW #1 said she was assigned to the SICU 40 hours per week and that the "special project " team conducted a deep cleaning 1-2 times per year.

Surveyor #5 interviewed the Director of Hospitality in the SICU at 10:45 A.M. on 1/27/14, who provided patient satisfaction data, including room cleanliness from the latest quarterly report (ending 11/30/13). However, no responses from the SICU had been returned and included in the data. The Director of Hospitality said the SICU was the next unit scheduled for a deep cleaning.

5. The Hospital failed to monitor a Patient food refrigerator for 11 of 28 days.

Surveyor #5 toured the Pediatric Bone Marrow Transplant (BMT) Unit at 8:25 A.M. on 2/3/14 and interviewed the Nurse Manager (NM). The BMT, NM said the patient rooms were equipped with a room refrigerator. The BMT, NM said the temperature of the refrigerators was monitored daily while the room was occupied. According to the BMT, NM, Room #5 had been occupied continuously since 1/6/14. The Refrigerator Log for Room #5 indicated temperature entries for 11 of the 28 days, 17 days were not recorded.

6. The Hospital failed to provide equipment that could be disinfected between patients.

Surveyor #5 toured the Pediatric Bone Marrow Transplant (BMT) Unit at 8:25 A.M. on 2/3/14 and interviewed the Nurse Manager (NM). The BMT NM said the unit cared for patients up to 21 years of age. The BMT NM said it was a rare instance that a patient would need to be shaved and an that an electric shaver was available for patient use. The BMT patient would not be permitted to use a safety razor because of the risk of bleeding. The BMT NM said the electric shaver would be cleaned with a bleach wipe between patients.

However, review of the MDFU of the electric shaver during the unit tour, indicated the MDFU did not include directions for cleaning. Thus, the electric shaver was not designed for multiple patients' use. Additionally, there was no Hospital policy specific to use of an electric shaver.

7. CDC IC Standards for Hand Hygiene required hand hygiene to be performed prior to and after patient contact, prior to and after contact with the patient's environment, and prior to donning gloves and after glove removal.

For Inpatient #4, observation of medication administration at 10:45 A.M. on 1/27/14, on Unit Proger 5, indicated Registered Nurse (RN) #1 failed to adhere to CDC IC Standards for Hand Hygiene as follows:

-Once in Inpatient #4's room, RN #1 handled the bed controls to adjust the level of the bed and also adjusted the patient's pillow. RN #1 failed to perform hand hygiene before and after the above activities.

-Using a hand-held scanner, RN #1 scanned the bar code on each medication and on the patient's identification bracelet. With now-contaminated hands, RN #1 opened Inpatient #4's oral medication packets and put the medications into a medication cup. RN #1 failed to perform hand hygiene before opening the medications.

-Inpatient #4's nurse call button fell on the floor. RN #1 picked the call button up off the floor and placed it back on Inpatient #4's bed. The RN failed to perform hand hygiene, as required.

-With now-contaminated hands, RN #1 removed a pair of gloves from the clean glove box and donned the gloves. RN #1 failed to perform hand hygiene before donning the gloves, as required. RN #1 then administered the medication Heparin (helps prevent blood clots) by the subcutaneous (sc-below the skin) route, to Inpatient #4.

8. For Inpatient #9, observations on 1/27/14 between 11:25 A.M. and 12:20 P.M., Surveyor #5 and Surveyor #7 observed Inpatient #9's central venous catheter (CVC) being removed and another CVC inserted into Inpatient #9's internal jugular vein.

The Surveyors observed Physician #1 fail to follow acceptable standards of hand hygiene during the removal and re-insertion of Inpatient #9's CVC. The Surveyors observed Physician #1 wash his hands prior to entering Inpatient #9's room. The Surveyors observed Physician #1 change his gloves repeatedly during the procedures; don new gloves, including sterile gloves; frequently obtain clean and sterile supplies from the clean central line supply cart; and remove gloves, which were visibly contaminated with blood. The Surveyors observed that, with the exception of when he first entered Inpatient #9's room, Physician #1 did not perform hand hygiene, in accordance with IC Standards of practice (e.g., prior to each time he accessed the central line supply cart and before each time he donned and after each time he removed gloves).

9. For Inpatient #32, observations in the Pre-operative Holding Area on 1/29/14 at 8:30 A.M., indicated that RN #7 failed to adhere to CDC IC Standards for Hand Hygiene as follows:

After performing hand hygiene and donning clean gloves, RN #7 touched Inpatient #32's over-the-bed table and changed it to a lower height. In preparation to insert an intravenous (IV) line, RN #2 applied a tourniquet to the patients left forearm and placed a clean barrier (Chux) under Inpatient #32's left hand.

RN #7 then opened clean supplies [sterile IV catheter (Angiocath), sterile sponges, Tegaderm, alcohol wipe], held Inpatient #32's left hand, inserted the IV and connected the IV tubing.

RN #7 failed to remove the gloves and perform hand hygiene before and after adjusting the height of the patient's over-the-bed table, before and after touching the patient's skin to apply the tourniquet, and before opening the clean

and sterile IV supplies

RN #7 inserted Inpatient #32's IV with potentially cross-contaminated gloves.

10. For Inpatient #33, observations in Operating Room (OR) #2, at 9:05 A.M. on 1/29/14, indicated that both RN #6 and Physician #10, donned gloves without first performing hand hygiene. RN #6 then failed to perform hand hygiene after removing the gloves.

11. Review of SaniCloth HB disinfectant wipes' MDFU on 1/29/14, indicated that the surface being disinfected must "remain visibly wet for 10 minutes," in order for effective disinfection of that surface to occur.

Observations in OR #2, on 1/29/14 at 9:40 A.M., between surgical cases, indicated that Anesthesia Technician (AT) #1, failed to follow MDFU. AT #1 used only one SaniCloth HB wipe to disinfect the anesthesia machine, anesthesia cart, anesthesia medication administration pump, and heart monitor leads. The above items were ineffectively disinfected as they were only visibly wet for approximately one and not 10 minutes.

12. For Inpatient #31, observations in OR #2 at 9:45 A.M. on 1/29/14, indicated the following:

a. While opening sterile supplies in order to set-up the sterile surgical table, Surgical Technologist (ST) #1 dropped a sterile package of sterile surgical gloves on the floor. ST #1 then picked-up the gloves and placed them on top of another package of sterile gloves and a sterile gown. The OR Clinical Nursing Director immediately took the gloves and gown and threw them in the trash. The OR Clinical Nursing Director confirmed that sterile items dropped on the floor are no longer sterile and that by placing the dropped, now-contaminated gloves on top of other sterile items, contaminated the items. The OR Clinical Nursing Director confirmed that ST #1 should have disposed of the dropped package of gloves.

b. Review of AORN Recommended Practice for Surgical Hand Scrub, using an alcohol-based surgical hand rub steps 8 to 10, subsequent to survey on 2/12/14, read:

"(Step 8). Apply the product to the hands and forearms according to the manufacturer's written instructions.

(Step 9). Repeat the product application process as directed.

(Step 10). Rub thoroughly until completely dry."

For Inpatient #31, observations in OR #2 on 1/29/14 at 10:22 A.M., indicated that after performing the surgical hand scrub with the alcohol-based surgical hand rub product Avagard, Physician #10 entered the room from the scrub area. While waiting to don the sterile gown and gloves, Physician #10 waved both arms in the air to dry the Avagard.

During the observation, the Clinical Nursing Director of the Operating Room said that arms and hands disinfected with Avagard should not be waved in the air to dry the Avagard. The OR Clinical Nursing Director confirmed that waving disinfected arms and hands in the air created air currents that contained dust and other contaminants that served to contaminate the surgically scrubbed hands and arms.

13. Observations in the OR Suite, in the scrub area outside OR #12, on 1/29/14 at 11:15 A.M., indicated that Physicians #11 and #12 had just completed a surgical scrub with Avagard. Both Physicians were standing at the scrub sinks having a conversation while waving their arms and hands in the air to dry. Physicians #11 and #12 did not rub their arms and hands dry, in accordance with AORN Recommended Practice for Surgical Hand Scrub, using an alcohol-based surgical hand rub.

14. Observations in OR #11, on 1/29/14 at 11:20 A.M., indicated that ST #2 waved his hands and arms in the air after completing a surgical scrub with Avagard. ST #2 failed to rub his arms and hands dry, in accordance with AORN Recommended Practice for Surgical Hand Scrub, using an alcohol-based surgical hand rub.

15. Review of the Central Processing Department (CPD) policy titled "Traffic Control" on 1/29/14 read, "Personnel assigned to decontamination may not move into any other CPD areas unless they don a clean precautions gown after removing the decontamination attire. Personnel from any CPD area may not enter decontamination unless they put on a precautions gown."

Observations in the former Day Surgery CPD area on 1/29/14 at 2:15 P.M,. indicated that Central Processing Technologist (CPT) #1 was working in the decontamination side of CPD. After removing the personal protective equipment (PPE-impervious gown, gloves), CPT #1 entered into the clean side of CPD. CPT #1 failed to wear a clean precautions gown over her scrub suit before entering the clean CPD area, as required by Hospital policy.

During the observation, the Director of Clinical Operations said that CPT #1 failed to follow Hospital policy.

Additionally, review of CPT #1's Training and Assessment Listing on 1/29/14, indicated that the CPT had completed "Attire and Traffic Pattern" training on 7/12/13.

16. During interview, in the clean area of the former Day Surgery CPD, on 1/29/14 at 2:15 P.M., CPT #1 said high level disinfection (HLD) was done using an automated endoscope reprocessor (AER). CPT #1 said manufacturer's directions for use (MDFU) required the temperature of the HLD solution to reach a minimum of 25 degrees centigrade in order to be effective, in a 5 minute AER cycle. CPT #1 said she tested the disinfectant (Rapicide OPA/28) to ensure it met an effective strength and the proper temperature, before processing each endoscope. CPT #1 said she documented the results of each test on the Disinfectant Efficacy Monitoring Log.

Review of the Disinfectant Efficacy Monitoring Log, dated from 1/3/14 to 1/29/14, on 1/29/14, indicated the following:

-CPT #1 failed to consistently document the minimum recommended concentration of the Rapicide OPA/28 on the

log. The Disinfectant Efficacy Monitoring Log for 1/3/14 through 1/29/14, indicated pass or fail monitoring. However, the log didn't discern if the AER cycle or the Rapicide OPA/28 sterilant had passed or failed. Therefore, it was unable to be determined if the Rapicide OPA/28 concentration was at a strength to effectively disinfect the endoscopes or if it needed to be replaced.

-CPT #1 failed to document an efficacy result (Pass/Fail) on the Disinfectant Efficacy Monitoring Log for the following days: 1/7/14 at 9:20 A.M.; 1/9/14 at 4:26 P.M.; 1/9/14 at 4:45 P.M.; 1/10/14 at 3:41 P.M.; 1/14/14 at 8:22 P.M.; 1/14/14 at 9:40 A.M.; 1/29/14 at 1:06 P.M.; and 1/29/14 at 1:11 P.M.

-CPT #1 documented both pass and fail on the Disinfectant Efficacy Monitoring Log for the following days: 1/9/14 at 9:00 A.M.; 1/9/14 at 12:10 P.M.; 1/15/14 at 11:20 A.M.; and 1/24/14 at 1:45 P.M. Therefore, it was unable to be determined if the efficacy of the sterilant was a pass or a fail.

**VIOLATION:** *ADMINISTRATION OF DRUGS*                          **Tag No:** A0405

**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**

Based on observations, review of Hospital policies and procedures, medical record reviews, and staff interviews, the Hospital failed to ensure that medications were administered accurately, in accordance with the written orders of the practitioner responsible for the patient's care, in accordance with accepted standards of practice, and in accordance with the Hospital's medication administration policies, for 8 Inpatients (#4, #6, #7, #8, #9, #12, #25, and #49) from a total sample of 49 Inpatients. Findings included:

1. For Inpatient #49, Registered Nurse (RN) #11 was observed preparing Inpatient #49's 9:00 A.M. medications on 1/28/14 at 9:40 A.M., on the North 6 Unit. Included with the Patient's 9:00 A.M. medications was an order for the anticoagulant Heparin 5,000 units subcutaneously (sc), to be given every 12 hours. RN #11 was observed drawing up the Heparin, using a needle and syringe, from a vial of Heparin containing 5,000 units per 1 mL (milliliter). RN #11 drew up the Heparin solution into a 1 ml syringe and handed it to the surveyor to inspect. The syringe, as observed by Surveyor #12, contained only 0.9 ml of Heparin (4,500 units) instead of the ordered dose of 5,000 units/1 ml of the medication. The vial of Heparin was examined by Surveyor #12 and found to have solution remaining in the vial. Surveyor #12 then informed RN #11 that she had not drawn up the entire 5,000 units/ ml of Heparin as ordered, and that she had only 0.9 mls (milliliters) or 4,500 units of Heparin in the syringe.

During interview on 1/28/14 at 9:50 A.M., RN #11 said that she thought she had drawn up the entire vial of Heparin. RN #11 was then observed inserting the needle into the vial of Heparin, drew out the remaining 0.1 ml of medication, and administered 1ml of Heparin 5,000 units/ml to the patient.

2. Review of Hospital -Wide Policy #4006 for Patient Care Orders on 2/4/14, indicated the following: "Range medication orders: these orders are discouraged and should only be written when necessary. Parameters must be included to indicate the appropriate choice of a dose within the prescribed range."

A. For Inpatient #4, a patient with diagnoses that included [DIAGNOSES REDACTED].M. on 1/27/14, on Unit Proger 5, indicated the following:

Review of the physician's orders for Inpatient #4, on 1/27/14 read:

-"Labetolol (lowers blood pressure), 10 to 20 milligrams (mg) IV (intravenously), q (every) 4 hours prn (as needed) for a systolic blood pressure (SBP) greater than 140."

The above order did not identify specific parameters to guide the nurse when to administer 10 mg or 20 mg of Labetolol. During interview at 10:00 A.M. on 1/27/14, the Professional Development Manager said, "Judged on the last dose of Labetolol, the RN would determine if the patient's blood pressure was too low or if the Labetolol didn't have any effect. The nurse would then decide which dose to administer."

-"Dilauded (relieves pain) 0.5 to 1.5 mg, IV, q 2 hours prn for pain, moderate to severe."

The above order did not identify specific dosing parameters to guide the nurse when to administer 0.5 mg., 1.0 mg, or 1.5 mg of Dilaudid. During interview at 10:00 A.M. on 1/27/14, the Professional Development Manager said, "Based on the patient's pain relief after the last dose of Dilaudid, the RN would decide which dose to administer." The Professional Development Manager acknowledged this was not within the nurse's scope of practice.

-Percocet (for pain) had two similar orders: "1 tablet for moderate pain;" "2 tablets for moderate pain, not to exceed 4 grams in 24 hours." Again, the physician did not identify specific parameters to guide the nurse when to administer one tablet or two tablets. Both orders were for "moderate pain."

Review of the Medication Administration Record (MAR) for administration of the pain medication Percocet on 1/27/14, read as follows:

"On 1/24/14 at 9:43 P.M., two tablets administered; on 1/25/14 at 4:25 A.M., two tablets administered; on 1/25/14 at 11:50 A.M., two tablets administered; on 1/25/14 at 7:19 P.M., two tablets administered; on 1/26/14 at 2:48 A.M., two tablets administered; and on 1/26/14 at 10:48 A.M., two tablets administered."

Inpatient #4 was consistently administered two tablets of Percocet, although the order also called for "Percocet one tablet for moderate pain." The Professional Development Manager said that the RN would decide which dose to administer." The Professional Development Manager acknowledged that this was not within the nurse's scope of

practice.

The Professional Development Manager acknowledged that physicians prescribe medication and their doses and nurses administer the medications. Nurses do not prescribe medications and their doses.

Review of The Hospital-wide policy titled "Medication Administration and Safety, #4081" on 1/29/14, read:

"Time Critical Medications are those scheduled medications where early or delayed administration of maintenance doses of greater than 30 minutes before or after the scheduled dose may cause harm or result in substantial suboptimal therapy or pharmacological effect."

"The 30 minute Time Critical administration rule applies to:
-Medications with a dosing schedule more frequently than every 4 hours;
-Antibiotic medications via the IV route;
-Parkinson medications;
-Immunosuppressive (reduce a patient's ability to fight infection) agents;
-Medications that must be administered apart from other medications (e.g., antacids);
-Certain medications that require administration within a specified period of time (e.g., insulin); and
-Short acting opioids (narcotics)."

For Inpatient #4, medical record review on 1/27/14, indicated the following medications were to be administered at 9:00 A.M.:

Xanax (anti-anxiety), 0.5 mg, 9:00 A.M.; Tenormin (heart medication), 100 mg, 9:00 A.M.; Colace (stool softener), one tablet q 12 hours; Pepcid (antacid), one tablet, BID; Folic Acid (Vitamin C), one tablet, 9:00 A.M.; Heparin 5000 units. sc, TID; Ativan (for alcohol withdrawal) 1.5 mg, q 4 hours.

All the above medications were not administered to Inpatient #4 until 10:45 A.M. on 1/27/14. During interview at 11:15 A.M. on 1/27/14, the Professional Development Manager said that medications (except those that met the 30 minute requirement), were to be administered within one hour before or after the scheduled dose.

According to Hospital policy, the Pepcid and Ativan (both on the 30 minute administration list), were administered one hour and 25 minutes late and the remaining medications (Xanax, Colace, Tenormin, Folic Acid, and Heparin), were administered 45 minutes after the one hour limit.

B. For Inpatient #6, a patient with diagnoses that included [DIAGNOSES REDACTED]

-Ampicillin, 3 grams (gm), IV, q 6 hours (12:00 A.M., 6:00 A.M., 12:00 P.M., 6:00 P.M.);
-Heparin 5,000 Units, sc, q 8 hours (12:00 A.M., 8:00 A.M., 4:00 P.M.); and
-KCL (potassium chloride) 10 milliequivalents (meq), IV, q 1 hour for 4 doses (the start date and time was

documented as 1/27/14 at 2:00 A.M.).

Review of the Medication Administration Record on 1/27/14, indicated that the above medications were not administered in accordance with Hospital policy and physician orders, as follows:

-The 6:00 A.M. Ampicillin 3 gm, IV was not administered until 9:15 A.M. on 1/27/14, two hours and 45 minutes late. Hospital policy required IV antibiotics to be administered within 30 minutes, before or after the scheduled dose.

-The 8:00 A.M. Heparin 5000 Units, sc was not administered until 9:15 A.M., 15 minutes late. Hospital policy required medications to be administered within one hour before or after the scheduled dose.

-The following refers to the physician's order for KCL, 10 meq, q 1 hour for 4 doses, to start 1/27/14 at 2:00 A.M. Hospital policy required medications with a dosing schedule more frequently than every 4 hours, to be administered within 30 minutes before or after the scheduled dose.

The 2:00 A.M. dose was not given until 4:18 A.M., one hour and 48 minutes late.
The 3:00 A.M. dose was not given until 4:56 A.M., one hour and 26 minutes late.
The 4:00 A.M. dose was also recorded as being given at 4:56 A.M., the same time as the 3:00 A.M. dose.
The 5:00 A.M. dose was not given until 6:26 A.M., 54 minutes late.

Review of a nurse's note, dated 1/27/14, indicated that the Ampicillin was late being administered because the KCL was being administered through the patient's only IV.

Consultation with the Department's Consultant Pharmacist, subsequent to survey on 2/6/14, indicated that Ampicillin and KCL are compatable medications and could be administered simultaneously.

3. Inpatient #7 was admitted to the Hospital in 1/2014 with diagnoses including abdominal pain, hemicolectomy (bowel resection) and intra-aortic balloon pump (a surgically implanted device that provides artificial heart compressions).

Review of the physician orders revealed that there were 2 different orders for Dilaudid. The orders were as follows:
-Dilaudid 0.5 mg intravenous every 2 hours as needed for pain
-Dilaudid 1 mg intravenous every 2 hours as needed for pain.
The orders for the medication failed to indicate the parameters under which each dose of the medication should be given.

During interview on 1/28/14 at 10:15 A.M., Registered Nurse (RN) #9 confirmed that the two orders were administered as written and further said that it was the nurse's decision which order to follow.

4. Inpatient #8 was admitted to the Hospital in 1/2014, with diagnoses including abdominal abscess and fistula and pelvic ischium osteo[DIAGNOSES REDACTED] (infection of pelvic bone).

Review of the physician orders revealed that there were 2 different orders for Dilaudid. The orders were as follows:
-Dilaudid 2 mg oral tab every 3 hours as needed for pain
-Dilaudid 4 mg oral tab every 3 hours as needed for pain.
The orders for the medication failed to indicate the parameters under which each dose of the medication should be given.

During interview on 1/28/14 at 10:30 A.M., RN #9 confirmed that the two orders were administered as written and further said that it was the nurse's decision which order to follow.

5. For Inpatient #9, observation by Surveyor #5 and Surveyor #7 on 1/27/14 between 11:25 A.M. and 12:20 P.M., revealed Inpatient #9's central venous catheter (CVC) being removed and another CVC inserted into Patient #9's internal jugular vein. Prior to the removal of the catheter, at approximately 11:45 A.M., Surveyor #5 and Surveyor #7 heard Physician #1 verbally order Fentanyl (pain medication) 50 micrograms to be administered to Inpatient #9 and observed RN #2 administer the Fentanyl intravenously, to Inpatient #9.

Review of Inpatient #9's Physicians' Orders, the next day on 1/28/14, indicated there was no order written on 1/27/14 for the bolus of Fentanyl and no documentation of the medication having been administered to Inpatient #9. After surveyor inquiry on 1/28/14, a late entry for the Fentanyl was entered into the electronic medical record.

Surveyor #7 interviewed the Professional Development Manager, the Manager of the Surgical Intensive Care Unit (SICU), and the Director of Informatics at approximately 8:20 A.M., on 1/28/14. The Professional Development Manager, SICU Nurse Manager, and the Director of Nursing Informatics said it was the expectation the staff document all medications administered to patients, and confirmed there was no record of Nurse #2 administering Fentanyl 50 micrograms intravenously to Inpatient #9 on 1/27/14.

6. Inpatient #12 was admitted to the Hospital in 1/2014 with diagnoses including colon inertia (slow metabolism) and re-feeding syndrome (occurs when a previous malnourished patient is fed a high carbohydrate diet).

Review of the physician orders on 1/28/14 read:

"Morphine 1-2 milligrams (mg) IV (intravenously) q (every) 4 hours prn (as needed) for pain for 7 days." The order had a start date of 1/27/14 and a stop date of 2/3/14.

The order for the above medication did not include parameters indicating the appropriate dose within the prescribed range for treating varying levels of pain.

During interview on 1/29/14 at 9:45 A.M., Registered Nurse #13 indicated that it was up to the nurse to decide the dosage of morphine within the prescribed range to treat the patient's pain.

7. For Inpatient #25, medical record review on 1/28/14, indicated the following:

Review of the Medication Administration Record (MAR) on 1/28/14, indicated the patient had two separate orders for Oxycodone (relieves pain) as follows:

"Oxycodone 5 mg (1 tablet) orally, every three hours as needed for pain, and Oxycodone 10 mg (2 tablets) orally, every three hours as needed for pain."

The physician's order did not identify specific dosing parameters to guide the nurse when to administer 1 or 2 tablets of Oxycodone.

**VIOLATION:** *ORGANIZATION OF NURSING SERVICES*                    **Tag No:** A0386

Based on review of two of two credentialing files for Nurses Practicing in the Expanded Role [Certified Registered Nurse Practitioner (CRNP) #1 and Certified Registered Nurse Anesthetist (CRNA) #1], the Hospital failed to ensure that Nursing Administration provided adequate supervision and evaluation of the clinical activities which occurred within the responsibilities of the Nursing Services. Findings include:

1. Standards of Practice as set forth in the Code of Massachusetts Regulations (CMR) that governed the practice of Nurses practicing in the Expanded Role, 244 CMR 4.00, specified that "all nurses practicing in an expanded role shall practice in accordance with written guidelines developed in collaboration with and mutually acceptable to the nurse and the appropriate medical staff and nursing administration staff of the institution employing the nurse."

"A nurse practicing in an institution may not practice in an expanded role until:

a. The Governing Body, including the medical staff and nursing administrative staff, formally review and approve the guidelines under which the nurse proposes to practice; and

111

b. A physician is designated to provide medical direction as is customarily accepted in the specialty area."

2. Review of CRNA #1's and CRNP #1's credentialing files on 2/3/14, indicated approval of each nurse's clinical practices, in writing, from their Supervising Physician, their Department Chair and each nurse. However, there was no evidence of any approval from Nursing Administration for the clinical practices requested by the two Nurse candidates. In addition, there was no evaluation of their clinical activities which also occurs within the responsibilities of the Nursing Services.

3. During an interview with the Chief Nursing Officer (CNO) on 2/3/14 at approximately 2:00 P.M., the CNO said she did not approve the guidelines for the above nurses, who were practicing in the expanded role. The CNO said she was not aware she had to approve the guidelines.

**VIOLATION:** *MEDICAL RECORD SERVICES*                              Tag No: A0450

Based on staff, patient/family interviews, and medical record reviews, the Hospital failed to ensure that all patients medical record entries were complete, dated, timed, and authenticated in written or electronic form, by the person(s) responsible for providing or evaluating the service provided, for 4 (#6, #22, #23, #38), of 49 Inpatients and 1 (#12), of 13 Outpatients. Findings include:

1. For Inpatient #6, medical record review on 1/27/14, indicated that although the Intra-operative Record was signed by Registered Nurse (RN) #14, the date and time of the entry was not documented.

2. For Inpatient #22, medical record review on 1/28/14, indicated that the following consents for Cardiac Catheterization lacked the name of the operating physician or the date and/or time of the patient/family's signature as follows: for 11/29/13, the time of the patient's signature was not documented; for 12/26/13, no time or date of the patient's signature was documented; for 1/3/14, the consent lacked the name of the operating physician; for 1/10/14, no time of the patient/family signature was documented; and for 1/22/14, no time of the patient/family signature was documented.

During interview in the Cardio-Thoracic Intensive Care Unit (CTU), on 1/28/14 at 9:30 A.M., the Clinical Nursing Director confirmed that the above Cardiac Catheterization Consent Forms lacked a place for the time of the patient/family signature to be documented.

3. For Outpatient #12, medical record review on 2/3/14, indicated that the Consent for Cardiac Catheterization lacked the time the patient signed the consent.

4. Review of the Medical Staff Bylaws on 1/29/14 read as follows: "Medical Student notes should be read and constructively critiqued and then co-signed on the same day with a brief addendum. Medical student admission notes as the sole admission note are not acceptable."

During interview at 10:45 A.M. on 1/28/14, Physician #9 said that Hospital policy required Residents to supervise and co-sign all medical students' medical record entries. Physician #9 said that teams, comprised of Attending Physicians, residents, interns and medical students, were developed and that medical students were under the direct supervision of Residents.

5. For Inpatient #23, medical record review on 1/28/14, indicated that medical record entries regarding Inpatient #23's daily progress, written by Medical Student #1, were not co-signed by a Resident, as required by Hospital policy. The entries were made on 1/21/14, 1/22/14, 1/23/14, and 1/24/14.

During interview at 10:45 A.M. on 1/28/14, Physician #9 confirmed that the above medical record entries were not co-signed by a supervising resident, as required.

Additionally, Inpatient #23's surgical consent lacked the time of the patient's signature.

6. For Inpatient #38, observation on 1/29/2014 at 10:22 A.M., revealed that RN #8 inserted a peripherally inserted central catheter (PICC) line (a catheter which is inserted into a vein and ends at the upper chest vein near the heart for the purpose of providing hydration and nutrition).

Review of the medical record indicated that the Informed Consent Form for the PICC Line was dated 1/27/2014 at 5:00 P.M. and authorized another Nurse, RN #12, for the procedure. The consent was signed by the Patient's Mother.

Interview with Inpatient #38's Mother on 1/30/2014 at 2:15 P.M., indicated that RN #8 contacted her by telephone to notify her that another attempt would be made by her to insert the PICC line. During interview, Inpatient #38's Mother said that she consented to the procedure.

Review of the medical record indicated that RN #12 failed to document the failed attempts to insert the PICC line along with relevant clinical information about the procedure.

**VIOLATION:** *CONTENT OF RECORD - INFORMED CONSENT*                    **Tag No:** A0466

Based on review of documentation, interviews and review of Hospital Policy, the facility failed to ensure that staff followed Hospital Policy Guidelines for obtaining telephone consent for the insertion of a Peripherally Inserted Central Catheter [PICC line]. Findings include:

1. For Inpatient #38, observation on 1/29/2014 at 10:22 A.M., revealed that Registered Nurse (RN) #8 inserted a PICC- line (a catheter which is inserted into a vein and ends at the upper chest vein near the heart for the purpose of providing hydration and nutrition).

Review of the medical record indicated that the Informed Consent Form - Consent to insert the PICC Line was dated 1/27/2014 at 5:00 P.M. (two days prior to this procedure) and authorized by another Nurse, RN #12, for the procedure. The consent was signed by the Inpatient 38's Mother.

Interview with Inpatient #38's Mother on 1/30/2014 at 2:15 P.M., indicated that RN #8 contacted her by telephone to notify her that another attempt to insert the PICC line would be made by RN #8. During interview, Inpatient #38's Mother said that she consented to the second procedure. However, RN #8 failed to document the telephone consent, obtain a witness to monitor the conversation, and sign the form.

Review of the Hospital-Wide Policy titled "Informed Consent", part IV, section on Telephone Consent, indicated that "if consent from an individual other than the patient was required and that person was available only by telephone, consent may be obtained by telephone. In the case of telephone consent, a witness must monitor the telephone conversation between physician and the individual authorized to consent on behalf of the patient and sign the form."

Review of the medical record indicated that documentation of the telephone consent was not documented and witnessed, as required by Hospital Policy.

**VIOLATION:** *PATIENT RIGHTS: INFORMED CONSENT*                              Tag No: A0131

Based on record review and staff interview, the Hospital failed to:

a. Activate the health care proxy for 1 of 2 incapacitated Inpatients (#29); and
b. Notify the Probate and Family Court Department of a change in the Rogers Treatment Plan for 1 Inpatient (#2), from a total of 49 inpatients.

Findings include:

1. For Inpatient #29 the Hospital failed to activate the patient's Health Care Proxy. The Health Care Proxy was completed prior to Inpatient #29's admission and a copy was placed in Inpatient #29's medical record.

Inpatient #29 was admitted to the Hospital in 1/2014, with diagnoses including cerebral vascular accident (CVA-stroke) and failure to thrive.

Upon arriving at the Emergency Department, a nurse's note indicated the family had reported that Inpatient #29 did

not recognize them and was experiencing shortness of breath. Inpatient #29 was admitted to the hospital for "further evaluation and workup of this change in mental status, shortness of breath and failure to thrive."

On 1/27/14, the patient's daughter and the physician signed a consent for the insertion of PEG (a percutaneous endoscopic gastrostomy, a tube surgically inserted into the stomach for liquid nourishment), which was to be inserted later that week.

According to documentation in the medical record, Inpatient #29 had not regained his/her ability to make informed health care decisions. The Hospital did not activate the Health Care Proxy as required by Massachusetts State Law.

During interview on 1/29/14 at 9:20 A.M., Registered Nurse #12 said that the Health Care Proxy had not been activated prior to the administration of the PEG tube, although Inpatient #29 had been deemed unable to make informed decisions.

2. For Inpatient #2, the Hospital failed to obtain a copy of the Rogers Monitor Treatment Plan (a court approved treatment order for the use of antipsychotic medications) to ensure that the court approved treatment orders were implemented.

Record review on 1/27/14, indicated that Inpatient #2 was admitted to the Hospital during 12/2013, with a diagnosis of schizophrenia. Further record review indicated that Inpatient #2 had a Legal Guardian with a Rogers Monitor Treatment Plan, which indicated the dosage and dose range of antipsychotic medications which was not in Inpatient #2's medical record.

On 1/27/14 at 11:30 A.M., Registered Nurse #5 said she was unaware Inpatient #2 had a Rogers Treatment Plan and did not know what antipsychotic medications were to be administered to Inpatient #2. After surveyor inquiry, on 1/27/14 at 11:50 A.M., Registered Nurse #5 said the Rogers Treatment Plan, which indicated the dosage and dose range of antipsychotic medications, was not in Inpatient #2's record as required.

Review of current Physicians' Orders on 1/27/14, indicated that Inpatient #2 had orders for Clozapine (antipsychotic medication) 600 milligrams (mg) at bedtime and Risperdal (antipsychotic medication) 4 mg at bedtime.

Review of the 1/27/14 Medication Administration Record (MAR), indicated that Inpatient #2 received Clozapine 600 mg at bedtime and Risperdal 4 mg at bedtime, from 1/24/14 to 1/26/14.

On 1/27/14 at 11:45 A.M., Registered Nurse #15 said Inpatient #2 received Clozapine and Risperdal at bedtime and was unaware that Inpatient #2 had a Rogers Treatment Plan.

115

On 1/27/14 at 2:30 P.M., Unit Manager #4 said he did not know why Inpatient #2's Rogers Treatment Plan was not in the record as required and was unaware of the antipsychotic medications Inpatient #2 could receive under the Rogers Treatment Plan.

After Surveyor #3's inquiry, the Hospital obtained Inpatient #2's Rogers Treatment Plan from the Legal Guardian. On 1/28/14, review of Inpatient #2's recently acquired Rogers Treatment Plan, dated 12/4/13, indicated Inpatient #2 was to receive the antipsychotic medication, Clozapine, with a dosage and dose range of 300 - 600 milligrams a day. The Rogers Treatment Plan did not indicate that Inpatient #2 could receive an alternative and/or any additional antipsychotic medication.

Further review of the 1/2014 MAR, indicated, after Surveyor #3's inquiry, the hospital obtained a physician's order on 1/27/14, to discontinue Risperdal 4 mg at bedtime.

On 1/28/14 at 9:30 A.M., Unit Manager #4 and Registered Nurse #5 said after reading Inpatient #2's Rogers Treatment Plan, Inpatient #2 should not have received the antipsychotic medication Risperdal from 1/24/14 to 1/26/14, because the antipsychotic medication was not indicated in the Rogers Treatment Plan. The only medication Inpatient #2 could receive under the Rogers Treatment Plan was Clozapine. In addition, Unit Manager #4 and Registered Nurse #5 said in order to change the Rogers Treatment Plan and add another antipsychotic medication (Risperdal), the Legal Guardian would have to present the new antipsychotic medication to the Court.

On 1/28/14 at 9:49 A.M., Social Worker #1 said he thought that the medical students working on the psychiatric unit were responsible to obtain the Rogers Treatment Plan from inpatients' Legal Guardians and place the Plan in the inpatients' records. Social Worker #1 also said there was no assigned staff person responsible for obtaining a Rogers Treatment Plan and placing the legal document in the inpatients' records. Social Worker #1 was not aware if Inpatient #2's Legal Guardian was notified of the new antipsychotic medication.

**VIOLATION:** *OPERATIVE REPORT*                                    **Tag No: A0959**

Based on medical record review and interview, the Hospital failed to ensure that all Brief Operative Notes described the techniques, findings, and tissues removed or altered, for 3 (#4, #6 and #30) of 5 surgical Inpatients from 49 Inpatients and 1 surgical Outpatient (#13) of 13 Outpatients reviewed. Findings included:

1. For Inpatients #4 and #6, medical record review on 1/27/14, indicated that the Brief Operative Note lacked the findings and techniques of the inpatients' surgeries, as required.

During interview on 1/27/14 at 10:20 A.M., on Unit Proger 5, the Professional Development Manager confirmed the Brief Operative Notes for Inpatients #4 and #6 lacked documentation of the techniques, findings, and tissues removed or altered. The Professional Development Manager also confirmed that the Hospital's Brief Operative Note

116

Form lacked a category for "Findings," under which operating physicians would document the techniques, findings, and tissues removed or altered.

2. For Inpatient #30, medical record review on 1/29/14, indicated that the Brief Operative Note, failed to document the techniques, findings, and tissues removed or altered, as required.

3. For Outpatient #13, medical record review on 2/3/14, indicated that Brief Operative Note, lacked the techniques and findings of the patient's surgery.

During interview, in the Post Anesthesia Care Unit (PACU), on 2/3/14 at 11:30 A.M., the PACU Manager confirmed that the above Brief Operative Note did not document the techniques, findings, and tissues removed or altered during surgery. The PACU Manager acknowledged that the Hospital's Brief Operative Note Form didn't contain a section titled "Findings" in which physicians would document their findings and the tissue removed or altered.

**VIOLATION:** *OPO AGREEMENT*                                    **Tag No:** A0886

**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**

Based on record review, review of the Hospital's death register and Organ Procurement Organization Policy, and staff interviews, the Hospital failed to ensure that timely notification (within one hour) of a patient's death to the organ bank was conducted consistently for 3 of 3 death records (Inpatients #43, #44, #45) from a total of 49 inpatients reviewed. Findings included:

On 1/29/14 at 1:15 P.M., the Hospital Relations Coordinator from the organ bank was interviewed regarding the Hospital's timely referral rate. The coordinator said that the goal for timely referrals was 100 %. Following a decline in timely referral rates (74% in March 2013 and 74 % in May 2013), the Coordinator said that a training session was provided by the organ bank in August 2013, to clinical staff and anyone involved in death reporting or referral to the organ bank. Review of the training session revealed "All patient deaths need to be reported immediately to the Admitting Office." The training session also educated staff that "The reason for this is that the Hospital was required by federal law to report all patient deaths to the (contracted organ bank) within one (1) hour of death so that they could determine if there was a potential for tissue donation."

The Organ Bank Coordinator (OBC) explained that all deaths were to be reported to the organ bank. She explained that the unit where the patient expired was required to report to the Hospital Admitting Department, and in turn, the Admitting Department was required to notify the organ bank of the patient's death. The coordinator from the organ bank further explained that Unit Coordinators were typically the individuals on the unit who notified the Admitting Department when a patient expired. Because Unit Coordinators didn't work the night shifts, the OBC explained, timely reporting to the Admitting Department was not always achieved. As a result, timely notification to the organ bank often went beyond the one hour timely notification requirement.

1. For Inpatient #44, review of the Death Register on 1/30/14, revealed that Inpatient #44 expired on [DATE] at 4:50 A.M. The Admitting Department listed the time of referral to the organ bank as 6:15 A.M., 25 minutes over the one hour requirement.

2. For Inpatient #45, review of the Death Register on 1/30/14, revealed that Inpatient #45 expired on [DATE] at 5:19 P.M. The Death Register documented that the organ bank was not notified of the patient's death until 7:38 P.M., one hour and 19 minutes over the one hour requirement.

3. For Inpatient # 43, review of the Death Register on 1/30/14, revealed that Inpatient #43 expired on [DATE] at 3:11 P.M. There was no documented evidence in the Death Register that the Hospital Admitting Department notified the organ bank of the patient's death.

Registered Nurse (RN) #12, a Unit Educator, was interviewed on 1/31/14 at 9:10 A.M., regarding the Unit Coordinator Forum that was held on 8/20/13, to educate staff regarding timely notification to the Admitting Department following a patient's death. RN#12 said that the Unit Coordinators were instructed by her that the Admitting Department must be notified of a patient's death within one hour of death. RN#12 also said that she recognized that allowing the Unit Coordinators an hour to report a patient death to the Admitting Department might delay timely notification to the organ bank.

The Q.M. (Quality Management) RN was interviewed on 1/30/14 at 3:30 P.M., regarding the Hospital's Organ Procurement Organization policies. The Q.M. RN said that she recognized that the Hospital was not compliant with their policy that required timely notification to the organ bank within one hour of death. She said that she would address this through the Hospital's Quality Management Department.

The Hospital failed to ensure that timely notification, within one hour of death, was carried out per the requirement and the Hospital's Organ Procurement Organization Policy.

**VIOLATION:** *MEDICAL STAFF*                                    **Tag No:** A0338

Based on observation, record review and interviews the Hospital failed to have an organized Medical Staff that was responsible for the quality of medical care provided to one Inpatient (#1) in a total sample of 49 inpatients, that resulted in a significant decline in Inpatient #1's neurological status. Findings include:

1. The Hospital was found to be in Immediate Jeopardy from 1/6/14 to 1/24/14, related to the conditions of Patient Rights and Medical Staff. The Hospital failed to ensure staff followed policies and procedures regarding proper patient positioning for central line removal. As a result, Inpatient #1 suffered an air embolism (air entry into the bloodstream), cardiac arrest, and subsequent severe neurologic compromise (brain damage).

2. Review of the Central Venous Catheter (CVC) Policy and Procedure on 1/24/14, clearly defined the number of central line insertions (fifteen) that must be monitored by a supervising physician. However, the policy did not specify the number of observations or oversights required for the removal of a central line by Interns (PGY1-post grad year one out of medical school) and Residents (PGY2 and beyond).

3. During interview on 1/24/14 at 11:10 A.M., the Medical Director of the Medical Intensive Care Unit (MICU) and the Chief Medical Officer said that the current training for removal of a central line for Interns and Residents was incorporated into the basic course for central line insertion. However, the training did not include any hands-on training in the Simulation Lab for central line removal.

4. The Hospital's Corrective Action Plan (CAP) regarding the training and procedure for central line removal was not fully implemented at the time of the Complaint Survey on 1/24/14. The parts of the CAP not fully implemented included:
a. Facility-wide re-education for hospital clinicians on Reducing the Risk of Air Embolism Associated with a CVC.
b. Updating of the Hospital's Central Line Insertion Training Program to incorporate the central line removal segment into a hands-on experience and incorporate CVC removal questions into a written test.
c. Utilizing the Simulation Lab for removal training for first year medical residents.
d. Implementing the central line removal competency sign-off similar to the insertion competency.

**VIOLATION:** *NURSING CARE PLAN*                                    Tag No: A0396

**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**

Based on record review, staff interview, and review of Hospital policy, the Hospital failed to ensure the care plan was current for 1 Outpatient (#11) in a total sample of 13 Outpatients and 1 Inpatient (#6) in a total sample of 49 Inpatients.

1. For Outpatient #11, the Hospital failed to ensure Outpatient #11's mental health treatment care plan was updated and current.

Record review on 1/30/14, indicated that Outpatient #11 had been receiving outpatient mental health services since 2005. Review of the outpatient mental health treatment care plans indicated that Outpatient #11's last care plan was dated 8/12/12.

According to the outpatient mental health progress notes, Outpatient #11 was last seen at the outpatient mental health service on 9/19/13. Further review of the progress notes indicated that Outpatient #11 was moving to another state. Outpatient #11's mental health treatment care plan was not updated or reviewed since 8/12/12.

On 1/30/14 at 11:00 A.M., Outpatient Therapist #1 said he had failed to update and revise Outpatient #11's mental

health treatment care plan since 8/12/12. Outpatient Therapist #1 said it was the Hospital's policy to review
treatment plans every quarter and once a year and he could not explain why he did not update Outpatient #11's
mental health treatment care plan.

2. For Inpatient #6, the Hospital failed to ensure that the patient's problem list was updated and current.

Medical record review on 1/27/14, indicated that Inpatient #6 was admitted on [DATE] for surgery that included an
abdominal hysterectomy (removal of uterus) and removal of the left ovary and tube.

Review of Inpatient #6's problem list, (the basis of a patient's care plan), on 1/27/14, indicated the following
problems, all dated 11/29/13:

-Obstructive [DIAGNOSES REDACTED] (obstructive jaundice - a condition in which there is blockage of the flow of
bile from the liver. This results in an overflow of bile and its by-products
into the blood. Bile contains bilirubin. Bilirubin is yellow, and gives the characteristic yellow appearance of jaundice
in the skin, eyes, and mucous membranes);
- Ascites (accumulation of fluid in the abdominal cavity);
- Postmenopausal bleeding;
-Congestive heart failure (heart failure causing an accumulation of fluid in the lungs);
- Nutritional deficiency (unspecified); and
- Anemia (low red blood cell count).

During interview on 1/27/14 at 5:00 P.M., the Professional Development Manager said that the problem list was that
of the patient's previous admission and had not been updated this admission, as required. Also, the problem of
uterine bleeding was no longer current, as Inpatient #6 had a total hysterectomy and a left ovary and tube removal
on 1/22/14, the day of this hospital admission.

**VIOLATION:** *INFORMED CONSENT*                              Tag No: A0955

Based on medical record review, and patient and staff interviews the Hospital failed to obtain a properly executed
consent for 2 (#22, #23) of 49 Inpatients and 1 (#12) of 13 Outpatients undergoing invasive procedures. Findings
included:

1. For Inpatient #23, the Hospital failed to ensure the patient received a fully informed consent, in order for the
patient to make an informed decision regarding his/her 1/26/14 surgery.

(A well informed consent process would include discussion that physicians, other than the operating practitioner, including but not limited to residents, would be performing important tasks related to the surgery. Important surgical tasks included: opening and closing patients' operative site, dissecting tissue, removing tissue, harvesting grafts, transplanting tissue, implanting devices and placing invasive lines).

For surgeries in which residents would perform important parts of the surgery, discussion was encouraged to include:

- That physicians who were in approved post graduate residency training programs would perform portions of the surgery, based on their availability and level of competence;

- That it would be decided at the time of the surgery which residents would participate and that the choice of resident would depend on the resident's competence; the knowledge the operating practitioner/teaching surgeon had of the resident's skill set; and the patient's condition; and

- That residents performing surgical tasks would be under the supervision of the operating practitioner/teaching surgeon.)

Review of the Operating Room Record on 1/28/14, indicated that Physicians #13 (an attending physician) and #14 (a surgical resident), along with Physician Assistant (PA) #1, assisted Physician #7 (the operating physician of record) with performing parts of Inpatient #23's, 1/26/14 cardiac surgery.

During interview on 1/28/14 at 11:30 A.M., Inpatient #23 said that "(S)he didn't know that other physicians or staff assisted his/her surgeon to perform the surgery and that (s)he saw a lot of people in the room, but (s)he didn't know who they were or what they did." Inpatient #23 also said "(s)he knew who his/her surgeon was after (s)he saw the surgeon's name on his identification badge."

At the time of giving his/her consent for surgery, Inpatient #23 was not informed that practitioners, other than his/her surgeon of record, would be performing parts of his/her surgery.

2. For Inpatient #22, medical record review on 1/28/14, indicated the 1/3/14 consent for cardiac catheterization, lacked the name of the physician who would be performing the procedure. That section of the consent form was blank.

3. For Outpatient #12, medical record review on 2/3/14, indicated that Physician #5, a physician receiving additional training (a fell owship) in Interventional Radiology, obtained the patient's consent. However, Physician #5 documented his name on the consent form as the operating physician, and not the name of the Operating Physician who actually performed the procedure.

Observation in the Cardiac Catheterization Suite on 2/3/14 at 8:45 A.M., indicated that Physician #5 was not present in the Cardiac Catheterization Operating Room and did not participate in the procedure. Physician #7, also a physician performing a fell owship in Interventional Radiology, performed parts of the patient's procedure with the operating physician. Neither Physician #7's name or the Operating Physician's name was documented on the consent.

**VIOLATION:** *PATIENT RIGHTS: RESTRAINT OR SECLUSION*                    Tag No: A0178

Based on record review and interviews, the Hospital failed to ensure face-to-face assessments were conducted in person, within 1-hour after the initiation of four-point physical restraint for one Inpatient (#24), in a sample of 49 Inpatients and two Outpatients (#2 and #3), in a sample of 13 Outpatients. Findings included:

1. For Inpatient #24, review of Emergency Department (ED) record on 1/27/14, indicated Inpatient #24's Physician Orders/Documentation Restraint Form, dated 3/2/13 at 11:45 A.M., revealed Inpatient #24 was physically aggressive and wrist and ankle restraints were ordered. The Physician Orders/Documentation Restraint Form indicated the standard of care was utilized because of an outburst or imminent physical aggressive, assaultive, or destructive behavior that posed an imminent danger to the patient or others. Above the area where the Physician signed, dated, and timed the Form, was the following statement, "I have conducted a face-to-face assessment of the patient and reviewed the plan of care."

The Form indicated Inpatient #24 was restrained at 12:00 P.M. on 3/2/13, 15 minutes after the Form was signed, with the order and the statement from the physician of having completed the face to face assessment. The form indicated Inpatient #24 remained restrained for 2 hours and 45 minutes. There was no documentation to indicate a face-to-face evaluation was completed within 1-hour after Inpatient #24 was restrained.

2. Outpatient #2's ED record, dated 1/9/14, indicated that at 1:00 P.M., the Physicians' Order/Documentation for Restraint Use Form, indicated the ED Physician signed for the use of a restraint. However, the order was incomplete as it did not indicate the type of restraint to be implemented, the behavior present that warranted use of the restraint, and the alternative measures attempted prior to implementation of the restraint. The Form indicated Outpatient #2 was physically restrained, but no additional information to indicate when he/she was re-assessed or when the restraints were removed. The Physicians' Order/Documentation for Restraint Use Form, indicated that at 1:30 P.M. on 1/9/13, Outpatient #2 was restrained.

The Physician who signed the incomplete Physicians' Order/Documentation for Restraint Use Form, documented that he had conducted a face-to-face assessment of the patient and reviewed the plan of care, 30 minutes prior to when Outpatient #2 was actually physically restrained. There was no documentation of a face-to-face assessment within 1-hour after Outpatient #2 was restrained.

3. Outpatient #3's ED record, dated 1/21/14, indicated that at 1:15 P.M., the Physicians' Order/Documentation for

Restraint Use Form, was signed by the physician. The Form indicated Outpatient #3 was to be restrained with ankle and wrist restraints and was also to receive medication as a restraint. The Physician signed, dated, and timed the Form, below the statement, "I have conducted a face-to-face assessment of the patient and reviewed the plan of care." However, this form was signed 15 minutes before Outpatient #3 was actually restrained. There was no documentation of a face-to-face assessment within 1-hour after Outpatient #3 was restrained.

During interview at 4:30 P.M. on 1/28/14, Surveyor #7 interviewed the ED Nurse Manager (NM). The ED NM said the ED used pre-printed Forms for physicians to write a restraint order. The forms included a statement regarding having completed a face-to-face assessment within one hour after the assessments were conducted.

Surveyor #7 reviewed Inpatient #24, Outpatient #2, and Outpatient #3's ED records with the ED NM. The NM said the physicians' signature, date, and time documented on Order/Documentation Forms was to indicate when the restraint was ordered and was not the documentation the face-to-face assessment being completed after the patient was restrained. The NM was unable to provide documentation that indicated face-to-face assessments were completed within 1-hour of a patient being restrained. The NM said the Form was not being used properly.

**VIOLATION:** *INFECTION CONTROL*                                        **Tag No: A0747**

Based on review of Hospital documents, observations, record review, and interview, the Hospital failed to be in compliance with the Condition of Infection Control specific to: failure to adhere to Infection Control (IC) Standards of Practice, failure to adhere to manufacturer's directions for use (MDFU), failure to provide sanitary environment; failure to adhere to Hospital infection control policies [i.e., handwashing, insertion of intravenous (IV) lines, insertion of central venous catheters (CVC), and medication administration]. Findings included:

1. Observations, staff interviews and review of equipment logs in the Cardiology Clinic at 1:40 P.M. on 1/28/14 and the Neurology Clinic on 1/31/14 at 10:40 A.M., indicated the Hospital failed to ensure the emergency equipment was maintained at an acceptable level of cleanliness, quality and safety.

Please refer to A724.

2. Observations on the Surgical Intensive Care Unit (SICU) on 1/27/14 at 10:10 A.M. and the Pediatric Bone Marrow Transplant Unit (BMTU) on 2/3/14 at 8:30 A.M., indicated unsanitary environmental and IC issues.

Please refer to A749.

3. Observations, staff interviews, review of Hospital documents and policies and procedures, and review of National IC and Operating Room Standards throughout the duration of survey, from 1/27/14 to 2/4/14, indicated the Hospital failed to consistently enforce policies that governed the control and prevention of infection specifically related to documentation of high level disinfection (HLD) logs, hand hygiene, insertion of IVs and CVCs, measures to

123

decrease the risk of ventilator associated pneumonia, medication administration, proper use of surgical attire, and proper use of the surgical hand rub.

Please refer to A749

© 2013 AHCJ — All rights reserved. ⁱ

## 800 WASHINGTON STREET BOSTON, MA 02111

|  | Tag No: |
|---|---|
| **VIOLATION:** *PHARMACIST SUPERVISION OF SERVICES* | A0501 |

Based on records reviewed and interviews, the Hospital failed for two of three Department of Pharmacy Employees (Pharmacist #1 and Pharmacist #2), to ensure that each pharmacist requiring a license and or certification for the practice of pharmacy, had verification of a registered, valid and current pharmacy license to ensure and promote the highest standards of professional practice, as required by State laws, and Hospital Policies and Procedures.

The Hospital's Department of Pharmacy Policy and Procedure regarding Verification of Employee Licensure, Registration and Certification, dated, 8/1/14, indicated that the Department of Pharmacy was responsible to obtain proof of licensure and certification when applicable from all personnel pertaining to his/her job title such as pharmacist, pharmacy technician or pharmacy intern.

The State Law for the Commonwealth of Massachusetts, Board of Registration in Pharmacy 4.02: Personal Registration Expiration and Renewal indicated the following:

(1) All personal registrations shall expire on December 31st of each even-numbered year and shall be renewed prior to January 1 of the following year if the registrant intends to continue his or her practice of pharmacy.

(2) A registrant who has not renewed his or her personal registration before the date of its expiration may renew such registration upon payment of an annual license fee, applicable back license fees, and a late fee

as established by the Commissioner of Administration and Finance under Massachusetts General Law c. 7, 3B.

(3) Any practice of pharmacy by a registrant after the expiration of his or her personal registration shall constitute the unlicensed practice of pharmacy and shall be subject to any and all penalties established for such unlicensed practice of pharmacy.

The Hospital's Human Resources Policy and Procedure titled Performance Review, dated February 2002, for all employees, indicated performance reviews were conducted at least annually for employees to provide a formal record of an employee's job performance.

Pharmacist #1's personnel file, reviewed on 2/22/17, indicated an annual performance appraisal was conducted on 3/14/16 that indicated Pharmacists #1's primary source licensure verification was up-to-date; however, continued review of the file indicated Pharmacist #1 did not have a valid and current license to practice pharmacy.

The Surveyor interviewed the Director of Employee Relations at 1:00 P.M. on 2/21/17. The Director of Employee Relations said she received a telephone call from the Director of the Pharmacy who reported that Pharmacist #1 did not renew her license before December 2014 and did not have a current and valid license to practice pharmacy. The Director of Employee Relations said, when the lapse in license renewal was identified, the employee was sent home from work and the incident was reported to the Massachusetts Board of Registration in Pharmacy.

Pharmacist #2's personnel file was reviewed on 2/22/17 and indicated that his last performance appraisal was dated 2008. There was no current performance appraisal and no current verification of a valid current license to practice pharmacy.

The Surveyor interviewed the Chief Medical Officer at 2:00 P.M. on 2/22/17. The Chief Medical Officer said that a current performance appraisal and verification of a current license to practice pharmacy should have been in the file.

vii

**TUFTS MEDICAL CENTER**

800 V

BOST

VIOLATION: *FACILITIES, SUPPLIES, EQUIPMENT MAINTENANCE*

Tag N

Based on observations, staff interviews and review of equipment logs, the Hospital failed to ensure the emergency equipment was maintained at an acceptable level of quality and safety in the Cardiology and Neurology clinics. Findings include:

1. On 1/28/14 at 1:40 P.M., a tour of the Outpatient Cardiology Clinic on 6 South was conducted. During inspection of the clinic's code cart, the suction machine canister was observed to have a significant coating of dust on the top cover. The suction machine had no suction tubing in place from the suction inlet of the machine to the center suction port of the suction canister. Additionally, review of the code cart checklist revealed that the suction machine was not listed on the checklist for staff to ensure that it functioned properly.

The Director of Clinical Services, who was present during the tour, said on 1/28/14 at 1:45 P.M., that the Hospital would add the suction machines to the code cart checklists so that staff in each of the outpatient clinics would check them regularly to ensure that they functioned properly.

2. On 1/31/14 at 10:45 A.M., a tour of the Outpatient Neurology Clinic on the 12th floor of the Biewend Building was conducted. During inspection of the code cart, it was observed that the suction machine, when turned on by the Clinic Nurse Manager, did not function properly. Review of the code cart checklist revealed that the suction machine was not checked by staff to ensure that it functioned properly. The Clinic Nurse Manager had another staff member immediately call down to the biomedical equipment department to bring a replacement suction machine to the clinic.

Interview with the Director of Clinical Services, who was present at the time, said on 1/31/14 at 11:00 A.M., that the Hospital would add the suction machines to the code cart checklists so that staff in each of the outpatient clinics would check them regularly to ensure that they functioned properly and were available for use in the event of a "code blue" (emergency).

**VIOLATION:** *INFECTION CONTROL OFFICER RESPONSIBILITIES*                                      **Tag N**

Based on observations of the environment of care, staff interviews, review of the Hospital's policies/procedures, review of the Centers for Disease Control (CDC) and Prevention Infection Control (IC) Standards for Hand Hygiene, review of the Association of periOperative Registered Nurses (AORN) Standards and Recommended Practices, review of the Hospital's Exposure Control Plan, review of Hospital disinfection logs, and review of manufacturer's directions for use (MDFU), the Hospital failed to consistently ensure staff adherence to Infection Control Standards for 2 of 3 Nonsampled Patients (NS #1, NS #2) and 5 Inpatients (#4, #9, #31, #32, #33), from a sample of 49 Inpatients. Findings included:

1. The Hospital failed to ensure that entries into the high level disinfection (HLD) logs were complete, contained accurate temperature readings, and followed MDFU.
HLD is a cleaning process that should destroy all microorganisms, except for bacterial spores, used to reprocess semi-critical items (items that contact mucous membranes or non-intact skin) in the Endoscopy Unit.

Surveyor #5 interviewed Endoscopy Technician (Endo Tech) #1 in the Reprocessing Area at 11:10 A.M. on 1/29/14. Endo Tech #1 said HLD was done using an automated endoscope reprocessor (AER). According to the MDFU, the temperature of the HLD solution must reach a minimum of 25 degrees centigrade in order to be effective in a 5 minute AER cycle. Endo Tech #1 said she took the temperature reading from the AER machine's visual monitor and entered the results into the HLD log. Review of the HLD log indicated multiple entries of temperatures less than 25 degrees centigrade, which did not meet the minimum temperature to ensure HLD in the

AER had occurred.

Surveyor #5 conducted a random sampling of seven log entries that failed to meet the temperature requirements, and correlated the readings with the AER results tape. The readings were found to meet the required temperature parameters. Endo Tech #1 said she entered the temperature manually into the log and was uncertain of the minimum temperatures required for use of the HLD solution.

Despite the AER reaching the minimum temperature as required, the manual log did not consistently reflect an acceptable temperature. Endo Tech #1 said she did not routinely check the tapes to ensure the temperature requirements were met.

2. The Hospital failed to adhere to the policy to prevent Ventilator Associated Pneumonia (VAP) for two of three mechanically ventilated Inpatients (NS #1, NS #2).

According to the Hospital policy titled "Prevention of Ventilator Associated Pneumonia," patients who were mechanically ventilated were to be positioned with the head of the bed at a 30-45 degree angle, unless medically contraindicated. Maintaining the patients' beds at this level assists with prevention of aspiration and encourages full expansion of the lungs.

Observations in the Surgical Intensive Care Unit (SICU), on 2/4/14 at 9:20 A.M., Surveyor #5 observed two inpatients receiving mechanical ventilation. The head of the bed for NS #1 was observed in a 24 degree position and the head of the bed for NS #2 was observed in a 27 degree position.

3. The Hospital failed to consistently adhere to the Hospital's Exposure Control Plan, for transport of medical waste.

The Surveyor interviewed the Supervisor of the Central Processing Department (CPD) at 9:00 A.M. on 1/29/14. The Supervisor said the hospital used large red and white bins to transport body parts. The Supervisor said the transport bins were returned to the CPD for reprocessing. The transport bins lacked any biohazardous labels.

Review of the Hospital's Bloodborne Pathogen Exposure Control Plan indicated biohazardous labels must be affixed on containers/bags that transport blood or body parts or other potentially infective material.

4. The Hospital failed to consistently maintain equipment or the patient's environment at an acceptable level of safety and quality.

Surveyor #5 toured the Surgical Intensive Care Unit (SICU) with the Nurse Manager at 10:08 A.M. on 1/27/14. Surveyor #5 observed Patient Rooms #10 and #5. The Patient Rooms had visibly soiled floors; the areas under the hand-hygiene dispensers had areas of dark discoloration and soiling. In Patient Room #5, the base of the IV pole was visibly soiled with areas of dark debris. The seat of the chair in Room #5 had a long slit in the upholstery so the chair would not be able to be effectively disinfected between patients.

Surveyor #5 interviewed the Environmental Services Worker (ESW #1) at 10:40 A.M. on 1/27/14. ESW #1 said she was assigned to the SICU 40 hours per week and that the "special project " team conducted a deep cleaning 1-2 times per year.

Surveyor #5 interviewed the Director of Hospitality in the SICU at 10:45 A.M. on 1/27/14, who provided patient satisfaction data, including room cleanliness from the latest quarterly report (ending 11/30/13). However, no responses from the SICU had been returned and included in the data. The Director of Hospitality said the SICU was the next unit scheduled for a deep cleaning.

5. The Hospital failed to monitor a Patient food refrigerator for 11 of 28 days.

Surveyor #5 toured the Pediatric Bone Marrow Transplant (BMT) Unit at 8:25 A.M. on 2/3/14 and interviewed the Nurse Manager (NM). The BMT, NM said the patient rooms were equipped with a room refrigerator. The BMT, NM said the temperature of the refrigerators was monitored daily while the room was occupied. According to the BMT, NM, Room #5 had been occupied continuously since 1/6/14. The Refrigerator Log for Room #5 indicated temperature entries for 11 of the 28 days, 17 days were not recorded.

6. The Hospital failed to provide equipment that could be disinfected between patients.

Surveyor #5 toured the Pediatric Bone Marrow Transplant (BMT) Unit at 8:25 A.M. on 2/3/14 and interviewed the Nurse Manager (NM). The BMT NM said the unit cared for patients up to 21 years of age. The BMT NM said it was a rare instance that a patient would need to be shaved and an that an electric shaver was available for patient use. The BMT patient would not be permitted to use a safety razor because of the risk of bleeding. The BMT NM said the electric shaver would be cleaned with a bleach wipe between patients.

However, review of the MDFU of the electric shaver during the unit tour, indicated the MDFU did not include directions for cleaning. Thus, the electric shaver was not designed for multiple patients' use. Additionally, there was no Hospital policy specific to use of an electric shaver.

7. CDC IC Standards for Hand Hygiene required hand hygiene to be performed prior to and after patient contact, prior to and after contact with the patient's environment, and prior to donning gloves and after glove removal.

For Inpatient #4, observation of medication administration at 10:45 A.M. on 1/27/14, on Unit Proger 5, indicated Registered Nurse (RN) #1 failed to adhere to CDC IC Standards for Hand Hygiene as follows:

-Once in Inpatient #4's room, RN #1 handled the bed controls to adjust the level of the bed and also adjusted the patient's pillow. RN #1 failed to perform hand hygiene before and after the above activities.

-Using a hand-held scanner, RN #1 scanned the bar code on each medication and on the patient's identification bracelet. With now-contaminated hands, RN #1 opened Inpatient #4's oral medication packets and put the medications into a medication cup. RN #1 failed to perform hand hygiene before opening the medications.

-Inpatient #4's nurse call button fell on the floor. RN #1 picked the call button up off the floor and placed it back on Inpatient #4's bed. The RN failed to perform hand hygiene, as required.

-With now-contaminated hands, RN #1 removed a pair of gloves from the clean glove box and donned the gloves. RN #1 failed to perform hand hygiene before donning the gloves, as required. RN #1 then administered the medication Heparin (helps prevent blood clots) by the subcutaneous (sc-below the skin) route, to Inpatient #4.

8. For Inpatient #9, observations on 1/27/14 between 11:25 A.M. and 12:20 P.M., Surveyor #5 and Surveyor #7 observed Inpatient #9's central venous catheter (CVC) being removed and another CVC inserted into Inpatient #9's internal jugular vein.

The Surveyors observed Physician #1 fail to follow acceptable standards of hand hygiene during the removal and

re-insertion of Inpatient #9's CVC. The Surveyors observed Physician #1 wash his hands prior to entering

Inpatient #9's room. The Surveyors observed Physician #1 change his gloves repeatedly during the procedures;

don new gloves, including sterile gloves; frequently obtain clean and sterile supplies from the clean central line

supply cart; and remove gloves, which were visibly contaminated with blood. The Surveyors observed that, with

the exception of when he first entered Inpatient #9's room, Physician #1 did not perform hand hygiene, in

accordance with IC Standards of practice (e.g., prior to each time he accessed the central line supply cart and

before each time he donned and after each time he removed gloves).

9. For Inpatient #32, observations in the Pre-operative Holding Area on 1/29/14 at 8:30 A.M., indicated that RN

#7 failed to adhere to CDC IC Standards for Hand Hygiene as follows:

After performing hand hygiene and donning clean gloves, RN #7 touched Inpatient #32's over-the-bed table and

changed it to a lower height. In preparation to insert an intravenous (IV) line, RN #2 applied a tourniquet to the

patients left forearm and placed a clean barrier (Chux) under Inpatient #32's left hand.

RN #7 then opened clean supplies [sterile IV catheter (Angiocath), sterile sponges, Tegaderm, alcohol wipe], held

Inpatient #32's left hand, inserted the IV and connected the IV tubing.

RN #7 failed to remove the gloves and perform hand hygiene before and after adjusting the height of the patient's

over-the-bed table, before and after touching the patient's skin to apply the tourniquet, and before opening the

clean and sterile IV supplies.

RN #7 inserted Inpatient #32's IV with potentially cross-contaminated gloves.

10. For Inpatient #33, observations in Operating Room (OR) #2, at 9:05 A.M. on 1/29/14, indicated that both RN

#6 and Physician #10, donned gloves without first performing hand hygiene. RN #6 then failed to perform hand hygiene after removing the gloves.

11. Review of SaniCloth HB disinfectant wipes' MDFU on 1/29/14, indicated that the surface being disinfected must "remain visibly wet for 10 minutes," in order for effective disinfection of that surface to occur.

Observations in OR #2, on 1/29/14 at 9:40 A.M., between surgical cases, indicated that Anesthesia Technician (AT) #1, failed to follow MDFU. AT #1 used only one SaniCloth HB wipe to disinfect the anesthesia machine, anesthesia cart, anesthesia medication administration pump, and heart monitor leads. The above items were ineffectively disinfected as they were only visibly wet for approximately one and not 10 minutes.

12. For Inpatient #31, observations in OR #2 at 9:45 A.M. on 1/29/14, indicated the following:

a. While opening sterile supplies in order to set-up the sterile surgical table, Surgical Technologist (ST) #1 dropped a sterile package of sterile surgical gloves on the floor. ST #1 then picked-up the gloves and placed them on top of another package of sterile gloves and a sterile gown. The OR Clinical Nursing Director immediately took the gloves and gown and threw them in the trash. The OR Clinical Nursing Director confirmed that sterile items dropped on the floor are no longer sterile and that by placing the dropped, now-contaminated gloves on top of other sterile items, contaminated the items. The OR Clinical Nursing Director confirmed that ST #1 should have disposed of the dropped package of gloves.

b. Review of AORN Recommended Practice for Surgical Hand Scrub, using an alcohol-based surgical hand rub steps 8 to 10, subsequent to survey on 2/12/14, read:

"(Step 8). Apply the product to the hands and forearms according to the manufacturer's written instructions.

133

(Step 9). Repeat the product application process as directed.

(Step 10). Rub thoroughly until completely dry."

For Inpatient #31, observations in OR #2 on 1/29/14 at 10:22 A.M., indicated that after performing the surgical hand scrub with the alcohol-based surgical hand rub product Avagard, Physician #10 entered the room from the scrub area. While waiting to don the sterile gown and gloves, Physician #10 waved both arms in the air to dry the Avagard.

During the observation, the Clinical Nursing Director of the Operating Room said that arms and hands disinfected with Avagard should not be waved in the air to dry the Avagard. The OR Clinical Nursing Director confirmed that waving disinfected arms and hands in the air created air currents that contained dust and other contaminants that served to contaminate the surgically scrubbed hands and arms.

13. Observations in the OR Suite, in the scrub area outside OR #12, on 1/29/14 at 11:15 A.M., indicated that Physicians #11 and #12 had just completed a surgical scrub with Avagard. Both Physicians were standing at the scrub sinks having a conversation while waving their arms and hands in the air to dry. Physicians #11 and #12 did not rub their arms and hands dry, in accordance with AORN Recommended Practice for Surgical Hand Scrub, using an alcohol-based surgical hand rub.

14. Observations in OR #11, on 1/29/14 at 11:20 A.M., indicated that ST #2 waved his hands and arms in the air after completing a surgical scrub with Avagard. ST #2 failed to rub his arms and hands dry, in accordance with AORN Recommended Practice for Surgical Hand Scrub, using an alcohol-based surgical hand rub.

15. Review of the Central Processing Department (CPD) policy titled "Traffic Control" on 1/29/14 read, "Personnel assigned to decontamination may not move into any other CPD areas unless they don a clean precautions gown after removing the decontamination attire. Personnel from any CPD area may not enter decontamination unless they put on a precautions gown."

Observations in the former Day Surgery CPD area on 1/29/14 at 2:15 P.M,. indicated that Central Processing Technologist (CPT) #1 was working in the decontamination side of CPD. After removing the personal protective equipment (PPE-impervious gown, gloves), CPT #1 entered into the clean side of CPD. CPT #1 failed to wear a clean precautions gown over her scrub suit before entering the clean CPD area, as required by Hospital policy.

During the observation, the Director of Clinical Operations said that CPT #1 failed to follow Hospital policy.

Additionally, review of CPT #1's Training and Assessment Listing on 1/29/14, indicated that the CPT had completed "Attire and Traffic Pattern" training on 7/12/13.

16. During interview, in the clean area of the former Day Surgery CPD, on 1/29/14 at 2:15 P.M., CPT #1 said high level disinfection (HLD) was done using an automated endoscope reprocessor (AER). CPT #1 said manufacturer's directions for use (MDFU) required the temperature of the HLD solution to reach a minimum of 25 degrees centigrade in order to be effective, in a 5 minute AER cycle. CPT #1 said she tested the disinfectant (Rapicide OPA/28) to ensure it met an effective strength and the proper temperature, before processing each endoscope. CPT #1 said she documented the results of each test on the Disinfectant Efficacy Monitoring Log.

Review of the Disinfectant Efficacy Monitoring Log, dated from 1/3/14 to 1/29/14, on 1/29/14, indicated the following:

-CPT #1 failed to consistently document the minimum recommended concentration of the Rapicide OPA/28 on the log. The Disinfectant Efficacy Monitoring Log for 1/3/14 through 1/29/14, indicated pass or fail monitoring. However, the log didn't discern if the AER cycle or the Rapicide OPA/28 sterilant had passed or failed. Therefore, it was unable to be determined if the Rapicide OPA/28 concentration was at a strength to effectively disinfect the endoscopes or if it needed to be replaced.

-CPT #1 failed to document an efficacy result (Pass/Fail) on the Disinfectant Efficacy Monitoring Log for the following days: 1/7/14 at 9:20 A.M.; 1/9/14 at 4/26 P.M.; 1/9/14 at 4:45 P.M.; 1/10/14 at 3:41 P.M.; 1/14/14 at 8:22 P.M.; 1/14/14 at 9:40 A.M.; 1/29/14 at 1:06 P.M.; and 1/29/14 at 1:11 P.M.

-CPT #1 documented both pass and fail on the Disinfectant Efficacy Monitoring Log for the following days: 1/9/14 at 9:00 A.M.; 1/9/14 at 12:10 P.M.; 1/15/14 at 11:20 A.M.; and 1/24/14 at 1:45 P.M. Therefore, it was unable to be determined if the efficacy of the sterilant was a pass or a fail.

**VIOLATION:** *ADMINISTRATION OF DRUGS* Tag N

**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**

Based on observations, review of Hospital policies and procedures, medical record reviews, and staff interviews, the Hospital failed to ensure that medications were administered accurately, in accordance with the written orders of the practitioner responsible for the patient's care, in accordance with accepted standards of practice, and in accordance with the Hospital's medication administration policies, for 8 Inpatients (#4, #6, #7, #8, #9, #12, #25, and #49) from a total sample of 49 Inpatients. Findings included:

1. For Inpatient #49, Registered Nurse (RN) #11 was observed preparing Inpatient #49's 9:00 A.M. medications on 1/28/14 at 9:40 A.M., on the North 6 Unit. Included with the Patient's 9:00 A.M. medications was an order for

the anticoagulant Heparin 5,000 units subcutaneously (sc), to be given every 12 hours. RN #11 was observed

drawing up the Heparin, using a needle and syringe, from a vial of Heparin containing 5,000 units per 1 ml.

(milliliter). RN #11 drew up the Heparin solution into a 1 ml syringe and handed it to the surveyor to inspect. The

syringe, as observed by Surveyor #12, contained only 0.9 ml of Heparin (4,500 units) instead of the ordered dose

of 5,000 units/1 ml of the medication. The vial of Heparin was examined by Surveyor #12 and found to have

solution remaining in the vial. Surveyor #12 then informed RN #11 that she had not drawn up the entire 5,000

units/ ml of Heparin as ordered, and that she had only 0.9 mls (milliliters) or 4,500 units of Heparin in the syringe.


During interview on 1/28/14 at 9:50 A.M., RN #11 said that she thought she had drawn up the entire vial of

Heparin. RN #11 was then observed inserting the needle into the vial of Heparin, drew out the remaining 0.1 ml

of medication, and administered 1ml of Heparin 5,000 units/ml to the patient.

2. Review of Hospital -Wide Policy #4006 for Patient Care Orders on 2/4/14, indicated the following: "Range

medication orders: these orders are discouraged and should only be written when necessary. Parameters must be

included to indicate the appropriate choice of a dose within the prescribed range."

A. For Inpatient #4, a patient with diagnoses that included [DIAGNOSES REDACTED].M. on 1/27/14, on Unit

Proger 5, indicated the following:

Review of the physician's orders for Inpatient #4, on 1/27/14 read:

"Labetolol (lowers blood pressure), 10 to 20 milligrams (mg) IV (intravenously), q (every) 4 hours prn (as

needed) for a systolic blood pressure (SBP) greater than 140."


The above order did not identify specific parameters to guide the nurse when to administer 10 mg or 20 mg of

Labetolol. During interview at 10:00 A.M. on 1/27/14, the Professional Development Manager said, "Judged on

the last dose of Labetolol, the RN would determine if the patient's blood pressure was too low or if the Labetolol

didn't have any effect. The nurse would then decide which dose to administer."

-"Dilauded (relieves pain) 0.5 to 1.5 mg, IV, q 2 hours prn for pain, moderate to severe."

The above order did not identify specific dosing parameters to guide the nurse when to administer 0.5 mg., 1.0

mg, or 1.5 mg of Dilaudid. During interview at 10:00 A.M. on 1/27/14, the Professional Development Manager

said, "Based on the patient's pain relief after the last dose of Dilaudid, the RN would decide which dose to

administer." The Professional Development Manager acknowledged this was not within the nurse's scope of

practice.

-Percocet (for pain) had two similar orders: "1 tablet for moderate pain;" "2 tablets for moderate pain, not to

exceed 4 grams in 24 hours." Again, the physician did not identify specific parameters to guide the nurse when to

administer one tablet or two tablets. Both orders were for "moderate pain."

Review of the Medication Administration Record (MAR) for administration of the pain medication Percocet on

1/27/14, read as follows:

"On 1/24/14 at 9:43 P.M., two tablets administered; on 1/25/14 at 4:25 A.M., two tablets administered; on 1/25/14

at 11:50 A.M., two tablets administered; on 1/25/14 at 7:19 P.M., two tablets administered; on 1/26/14 at 2:48

A.M., two tablets administered; and on 1/26/14 at 10:48 A.M., two tablets administered."


Inpatient #4 was consistently administered two tablets of Percocet, although the order also called for "Percocet

one tablet for moderate pain." The Professional Development Manager said that the RN would decide which dose

to administer." The Professional Development Manager acknowledged that this was not within the nurse's scope

of practice.

The Professional Development Manager acknowledged that physicians prescribe medication and their doses and

nurses administer the medications. Nurses do not prescribe medications and their doses.


Review of The Hospital-wide policy titled "Medication Administration and Safety, #4081" on 1/29/14, read:


"Time Critical Medications are those scheduled medications where early or delayed administration of

maintenance doses of greater than 30 minutes before or after the scheduled dose may cause harm or result in

substantial suboptimal therapy or pharmacological effect."

"The 30 minute Time Critical administration rule applies to:

-Medications with a dosing schedule more frequently than every 4 hours;

-Antibiotic medications via the IV route;

-Parkinson medications;

-Immunosuppressive (reduce a patient's ability to fight infection) agents;

-Medications that must be administered apart from other medications (e.g., antacids);

-Certain medications that require administration within a specified period of time (e.g., insulin); and

-Short acting opioids (narcotics)."

For Inpatient #4, medical record review on 1/27/14, indicated the following medications were to be administered

at 9:00 A.M.:


Xanax (anti-anxiety), 0.5 mg, 9:00 A.M.; Tenormin (heart medication), 100 mg, 9:00 A.M.; Colace (stool

softener), one tablet q 12 hours; Pepcid (antacid), one tablet, BID; Folic Acid (Vitamin C), one tablet, 9:00 A.M.;

Heparin 5000 units, sc, TID; Ativan (for alcohol withdrawal) 1.5 mg, q 4 hours.

All the above medications were not administered to Inpatient #4 until 10:45 A.M. on 1/27/14. During interview at

11:15 A.M. on 1/27/14, the Professional Development Manager said that medications (except those that met the

30 minute requirement), were to be administered within one hour before or after the scheduled dose.


According to Hospital policy, the Pepcid and Ativan (both on the 30 minute administration list), were

administered one hour and 25 minutes late and the remaining medications (Xanax, Colace, Tenormin, Folic Acid,

and Heparin), were administered 45 minutes after the one hour limit.

B. For Inpatient #6, a patient with diagnoses that included [DIAGNOSES REDACTED]

-Ampicillin, 3 grams (gm), IV, q 6 hours (12:00 A.M., 6:00 A.M., 12:00 P.M., 6:00 P.M.);

-Heparin 5,000 Units, sc, q 8 hours (12:00 A.M., 8:00 A.M., 4:00 P.M.); and

-KCL (potassium chloride) 10 milliequivalents (meq), IV, q 1 hour for 4 doses (the start date and time was

documented as 1/27/14 at 2:00 A.M.).

Review of the Medication Administration Record on 1/27/14, indicated that the above medications were not

administered in accordance with Hospital policy and physician orders, as follows:

-The 6:00 A.M. Ampicillin 3 gm, IV was not administered until 9:15 A.M. on 1/27/14, two hours and 45 minutes

late. Hospital policy required IV antibiotics to be administered within 30 minutes, before or after the scheduled

dose.

-The 8:00 A.M. Heparin 5000 Units, sc was not administered until 9:15 A.M., 15 minutes late. Hospital policy

required medications to be administered within one hour before or after the scheduled dose.


-The following refers to the physician's order for KCL, 10 meq, q 1 hour for 4 doses, to start 1/27/14 at 2:00 A.M.

Hospital policy required medications with a dosing schedule more frequently than every 4 hours, to be

administered within 30 minutes before or after the scheduled dose.


The 2:00 A.M. dose was not given until 4:18 A.M., one hour and 48 minutes late.

The 3:00 A.M. dose was not given until 4:56 A.M., one hour and 26 minutes late.

The 4:00 A.M. dose was also recorded as being given at 4:56 A.M., the same time as the 3:00 A.M. dose.

The 5:00 A.M. dose was not given until 6:26 A.M., 54 minutes late.


Review of a nurse's note, dated 1/27/14, indicated that the Ampicillin was late being administered because the

KCL was being administered through the patient's only IV.

Consultation with the Department's Consultant Pharmacist, subsequent to survey on 2/6/14, indicated that

Ampicillin and KCL are compatible medications and could be administered simultaneously.

3. Inpatient #7 was admitted to the Hospital in 1/2014 with diagnoses including abdominal pain, hemicolectomy

(bowel resection) and intra-aortic balloon pump (a surgically implanted device that provides artificial heart compressions).

Review of the physician orders revealed that there were 2 different orders for Dilaudid. The orders were as follows:

-Dilaudid 0.5 mg intravenous every 2 hours as needed for pain

-Dilaudid 1 mg intravenous every 2 hours as needed for pain.

The orders for the medication failed to indicate the parameters under which each dose of the medication should be given.

During interview on 1/28/14 at 10:15 A.M., Registered Nurse (RN) #9 confirmed that the two orders were administered as written and further said that it was the nurse's decision which order to follow.

4. Inpatient #8 was admitted to the Hospital in 1/2014, with diagnoses including abdominal abscess and fistula and pelvic ischium osteo[DIAGNOSES REDACTED] (infection of pelvic bone).

Review of the physician orders revealed that there were 2 different orders for Dilaudid. The orders were as follows:

-Dilaudid 2 mg oral tab every 3 hours as needed for pain

-Dilaudid 4 mg oral tab every 3 hours as needed for pain.

The orders for the medication failed to indicate the parameters under which each dose of the medication should be given.

During interview on 1/28/14 at 10:30 A.M., RN #9 confirmed that the two orders were administered as written and further said that it was the nurse's decision which order to follow.


5. For Inpatient #9, observation by Surveyor #5 and Surveyor #7 on 1/27/14 between 11:25 A.M. and 12:20 P.M., revealed Inpatient #9's central venous catheter (CVC) being removed and another CVC inserted into Patient #9's internal jugular vein. Prior to the removal of the catheter, at approximately 11:45 A.M., Surveyor #5 and Surveyor #7 heard Physician #1 verbally order Fentanyl (pain medication) 50 micrograms to be administered to

Inpatient #9 and observed RN #2 administer the Fentanyl intravenously, to Inpatient #9.

Review of Inpatient #9's Physicians' Orders, the next day on 1/28/14, indicated there was no order written on 1/27/14 for the bolus of Fentanyl and no documentation of the medication having been administered to Inpatient #9. After surveyor inquiry on 1/28/14, a late entry for the Fentanyl was entered into the electronic medical record. Surveyor #7 interviewed the Professional Development Manager, the Manager of the Surgical Intensive Care Unit (SICU), and the Director of Informatics at approximately 8:20 A.M., on 1/28/14. The Professional Development Manager, SICU Nurse Manager, and the Director of Nursing Informatics said it was the expectation the staff document all medications administered to patients, and confirmed there was no record of Nurse #2 administering Fentanyl 50 micrograms intravenously to Inpatient #9 on 1/27/14.

6. Inpatient #12 was admitted to the Hospital in 1/2014 with diagnoses including colon inertia (slow metabolism) and re-feeding syndrome (occurs when a previous malnourished patient is fed a high carbohydrate diet).

Review of the physician orders on 1/28/14 read:

"Morphine 1-2 milligrams (mg) IV (intravenously) q (every) 4 hours prn (as needed) for pain for 7 days." The order had a start date of 1/27/14 and a stop date of 2/3/14.

The order for the above medication did not include parameters indicating the appropriate dose within the prescribed range for treating varying levels of pain.

During interview on 1/29/14 at 9:45 A.M., Registered Nurse #13 indicated that it was up to the nurse to decide the dosage of morphine within the prescribed range to treat the patient's pain.

7. For Inpatient #25, medical record review on 1/28/14, indicated the following:

Review of the Medication Administration Record (MAR) on 1/28/14, indicated the patient had two separate

orders for Oxycodone (relieves pain) as follows:

"Oxycodone 5 mg (1 tablet) orally, every three hours as needed for pain, and Oxycodone 10 mg (2 tablets) orally, every three hours as needed for pain."

The physician's order did not identify specific dosing parameters to guide the nurse when to administer 1 or 2 tablets of Oxycodone.

**VIOLATION:** *ORGANIZATION OF NURSING SERVICES*                                                              Tag N

Based on review of two of two credentialing files for Nurses Practicing in the Expanded Role [Certified Registered Nurse Practitioner (CRNP) #1 and Certified Registered Nurse Anesthetist (CRNA) #1], the Hospital failed to ensure that Nursing Administration provided adequate supervision and evaluation of the clinical activities which occurred within the responsibilities of the Nursing Services. Findings include:

1. Standards of Practice as set forth in the Code of Massachusetts Regulations (CMR) that governed the practice of Nurses practicing in the Expanded Role, 244 CMR 4.00, specified that "all nurses practicing in an expanded role shall practice in accordance with written guidelines developed in collaboration with and mutually acceptable to the nurse and the appropriate medical staff and nursing administration staff of the institution employing the nurse."

"A nurse practicing in an institution may not practice in an expanded role until:

a. The Governing Body, including the medical staff and nursing administrative staff, formally review and approve the guidelines under which the nurse proposes to practice; and

b. A physician is designated to provide medical direction as is customarily accepted in the specialty area."

2. Review of CRNA #1's and CRNP #1's credentialing files on 2/3/14, indicated approval of each nurse's clinical practices, in writing, from their Supervising Physician, their Department Chair  and each nurse. However, there was no evidence of any approval from Nursing Administration for the clinical practices requested by the two

Nurse candidates. In addition, there was no evaluation of their clinical activities which also occurs within the responsibilities of the Nursing Services.

3. During an interview with the Chief Nursing Officer (CNO) Jinks on 2/3/14 at approximately 2:00 P.M., the CNO said she did not approve the guidelines for the above nurses, who were practicing in the expanded role. The CNO said she was not aware she had to approve the guidelines.

**VIOLATION:** *MEDICAL RECORD SERVICES*                                                                                  Tag N

Based on staff, patient/family interviews, and medical record reviews, the Hospital failed to ensure that all patients medical record entries were complete, dated, timed, and authenticated in written or electronic form, by the person(s) responsible for providing or evaluating the service provided, for 4 (#6, #22, #23, #38), of 49 Inpatients and 1 (#12), of 13 Outpatients. Findings include:

1. For Inpatient #6, medical record review on 1/27/14, indicated that although the Intra-operative Record was signed by Registered Nurse (RN) #14, the date and time of the entry was not documented.

2. For Inpatient #22, medical record review on 1/28/14, indicated that the following consents for Cardiac Catheterization lacked the name of the operating physician or the date and/or time of the patient/family's signature as follows: for 11/29/13, the time of the patient's signature was not documented; for 12/26/13, no time or date of the patient's signature was documented; for 1/3/14, the consent lacked the name of the operating physician; for 1/10/14, no time of the patient/family signature was documented; and for 1/22/14, no time of the patient/family signature was documented.

During interview in the Cardio-Thoracic Intensive Care Unit (CTU), on 1/28/14 at 9:30 A.M., the Clinical Nursing Director confirmed that the above Cardiac Catheterization Consent Forms lacked a place for the time of the patient/family signature to be documented.

3. For Outpatient #12, medical record review on 2/3/14, indicated that the Consent for Cardiac Catheterization lacked the time the patient signed the consent.

4. Review of the Medical Staff Bylaws on 1/29/14 read as follows: "Medical Student notes should be read and

144

constructively critiqued and then co-signed on the same day with a brief addendum. Medical student admission notes as the sole admission note are not acceptable."

During interview at 10:45 A.M. on 1/28/14, Physician #9 said that Hospital policy required Residents to supervise and co-sign all medical students' medical record entries. Physician #9 said that teams, comprised of Attending Physicians, residents, interns and medical students, were developed and that medical students were under the direct supervision of Residents.

5. For Inpatient #23, medical record review on 1/28/14, indicated that medical record entries regarding Inpatient #23's daily progress, written by Medical Student #1, were not co-signed by a Resident, as required by Hospital policy. The entries were made on 1/21/14, 1/22/14, 1/23/14, and 1/24/14.

During interview at 10:45 A.M. on 1/28/14, Physician #9 confirmed that the above medical record entries were not co-signed by a supervising resident, as required.

Additionally, Inpatient #23's surgical consent lacked the time of the patient's signature.

6. For Inpatient #38, observation on 1/29/2014 at 10:22 A.M., revealed that RN #8 inserted a peripherally inserted central catheter (PICC) line (a catheter which is inserted into a vein and ends at the upper chest vein near the heart for the purpose of providing hydration and nutrition).


Review of the medical record indicated that the Informed Consent Form for the PICC Line was dated 1/27/2014 at 5:00 P.M. and authorized another Nurse, RN #12, for the procedure. The consent was signed by the Patient's Mother.

Interview with Inpatient #38's Mother on 1/30/2014 at 2:15 P.M., indicated that RN #8 contacted her by telephone to notify her that another attempt would be made by her to insert the PICC line. During interview, Inpatient #38's Mother said that she consented to the procedure.

Review of the medical record indicated that RN #12 failed to document the failed attempts to insert the PICC line along with relevant clinical information about the procedure.

**VIOLATION:** *CONTENT OF RECORD - INFORMED CONSENT*

Based on review of documentation, interviews and review of Hospital Policy, the facility failed to ensure that staff followed Hospital Policy Guidelines for obtaining telephone consent for the insertion of a Peripherally Inserted Central Catheter [PICC line]. Findings include:

1. For Inpatient #38, observation on 1/29/2014 at 10:22 A.M., revealed that Registered Nurse (RN) #8 inserted a PICC- line (a catheter which is inserted into a vein and ends at the upper chest vein near the heart for the purpose of providing hydration and nutrition).

Review of the medical record indicated that the Informed Consent Form - Consent to insert the PICC Line was dated 1/27/2014 at 5:00 P.M. (two days prior to this procedure) and authorized by another Nurse, RN #12, for the procedure. The consent was signed by the Inpatient 38's Mother.

Interview with Inpatient #38's Mother on 1/30/2014 at 2:15 P.M., indicated that RN #8 contacted her by telephone to notify her that another attempt to insert the PICC line would be made by RN #8. During interview, Inpatient #38's Mother said that she consented to the second procedure. However, RN #8 failed to document the telephone consent, obtain a witness to monitor the conversation, and sign the form.

Review of the Hospital-Wide Policy titled "Informed Consent", part IV, section on Telephone Consent, indicated that "if consent from an individual other than the patient was required and that person was available only by telephone, consent may be obtained by telephone. In the case of telephone consent, a witness must monitor the telephone conversation between physician and the individual authorized to consent on behalf of the patient and sign the form."

Review of the medical record indicated that documentation of the telephone consent was not documented and witnessed, as required by Hospital Policy.

**VIOLATION:** *PATIENT RIGHTS: INFORMED CONSENT*                                                    Tag ℕ

Based on record review and staff interview, the Hospital failed to:

a. Activate the health care proxy for 1 of 2 incapacitated Inpatients (#29); and

b. Notify the Probate and Family Court Department of a change in the Rogers Treatment Plan for 1 Inpatient (#2), from a total of 49 inpatients.


Findings include:

1. For Inpatient #29 the Hospital failed to activate the patient's Health Care Proxy. The Health Care Proxy was completed prior to Inpatient #29's admission and a copy was placed in Inpatient #29's medical record.

Inpatient #29 was admitted to the Hospital in 1/2014, with diagnoses including cerebral vascular accident (CVA-stroke) and failure to thrive.

Upon arriving at the Emergency Department, a nurse's note indicated the family had reported that Inpatient #29 did not recognize them and was experiencing shortness of breath. Inpatient #29 was admitted to the hospital for "further evaluation and workup of this change in mental status, shortness of breath and failure to thrive."

On 1/27/14, the patient's daughter and the physician signed a consent for the insertion of PEG (a percutaneous endoscopic gastrostomy, a tube surgically inserted into the stomach for liquid nourishment), which was to be inserted later that week.


According to documentation in the medical record, Inpatient #29 had not regained his/her ability to make informed health care decisions. The Hospital did not activate the Health Care Proxy as required by Massachusetts State Law.

During interview on 1/29/14 at 9:20 A.M., Registered Nurse #12 said that the Health Care Proxy had not been activated prior to the administration of the PEG tube, although Inpatient #29 had been deemed unable to make informed decisions.

147

2. For Inpatient #2, the Hospital failed to obtain a copy of the Rogers Monitor Treatment Plan (a court approved treatment order for the use of antipsychotic medications) to ensure that the court approved treatment orders were implemented.

Record review on 1/27/14, indicated that Inpatient #2 was admitted to the Hospital during 12/2013, with a diagnosis of schizophrenia. Further record review indicated that Inpatient #2 had a Legal Guardian with a Rogers Monitor Treatment Plan, which indicated the dosage and dose range of antipsychotic medications which was not in Inpatient #2's medical record.

On 1/27/14 at 11:30 A.M., Registered Nurse #5 said she was unaware Inpatient #2 had a Rogers Treatment Plan and did not know what antipsychotic medications were to be administered to Inpatient #2. After surveyor inquiry, on 1/27/14 at 11:50 A.M., Registered Nurse #5 said the Rogers Treatment Plan, which indicated the dosage and dose range of antipsychotic medications, was not in Inpatient #2's record as required.

Review of current Physicians' Orders on 1/27/14, indicated that Inpatient #2 had orders for Clozapine (antipsychotic medication) 600 milligrams (mg) at bedtime and Risperdal (antipsychotic medication) 4 mg at bedtime.

Review of the 1/27/14 Medication Administration Record (MAR), indicated that Inpatient #2 received Clozapine 600 mg at bedtime and Risperdal 4 mg at bedtime, from 1/24/14 to 1/26/14.

On 1/27/14 at 11:45 A.M., Registered Nurse #15 said Inpatient #2 received Clozapine and Risperdal at bedtime and was unaware that Inpatient #2 had a Rogers Treatment Plan.

On 1/27/14 at 2:30 P.M., Unit Manager #4 said he did not know why Inpatient #2's Rogers Treatment Plan was not in the record as required and was unaware of the antipsychotic medications Inpatient #2 could receive under the Rogers Treatment Plan.

After Surveyor #3's inquiry, the Hospital obtained Inpatient #2's Rogers Treatment Plan from the Legal Guardian. On 1/28/14, review of Inpatient #2's recently acquired Rogers Treatment Plan, dated 12/4/13, indicated Inpatient #2 was to receive the antipsychotic medication, Clozapine, with a dosage and dose range of 300 - 600 milligrams a day. The Rogers Treatment Plan did not indicate that Inpatient #2 could receive an alternative and/or any additional antipsychotic medication.

Further review of the 1/2014 MAR, indicated, after Surveyor #3's inquiry, the hospital obtained a physician's order on 1/27/14, to discontinue Risperdal 4 mg at bedtime.

On 1/28/14 at 9:30 A.M., Unit Manager #4 and Registered Nurse #5 said after reading Inpatient #2's Rogers Treatment Plan, Inpatient #2 should not have received the antipsychotic medication Risperdal from 1/24/14 to 1/26/14, because the antipsychotic medication was not indicated in the Rogers Treatment Plan. The only medication Inpatient #2 could receive under the Rogers Treatment Plan was Clozapine. In addition, Unit Manager #4 and Registered Nurse #5 said in order to change the Rogers Treatment Plan and add another antipsychotic medication (Risperdal), the Legal Guardian would have to present the new antipsychotic medication to the Court.

On 1/28/14 at 9:49 A.M., Social Worker #1 said he thought that the medical students working on the psychiatric unit were responsible to obtain the Rogers Treatment Plan from inpatients' Legal Guardians and place the Plan in the inpatients' records. Social Worker #1 also said there was no assigned staff person responsible for obtaining a Rogers Treatment Plan and placing the legal document in the inpatients' records. Social Worker #1 was not aware if Inpatient #2's Legal Guardian was notified of the new antipsychotic medication.

**VIOLATION:** *OPERATIVE REPORT*                                                                 Tag N

Based on medical record review and interview, the Hospital failed to ensure that all Brief Operative Notes

described the techniques, findings, and tissues removed or altered, for 3 (#4, #6 and #30) of 5 surgical Inpatients from 49 Inpatients and 1 surgical Outpatient (#13) of 13 Outpatients reviewed. Findings included:

1. For Inpatients #4 and #6, medical record review on 1/27/14, indicated that the Brief Operative Note lacked the findings and techniques of the inpatients' surgeries, as required.

During interview on 1/27/14 at 10:20 A.M., on Unit Proger 5, the Professional Development Manager confirmed the Brief Operative Notes for Inpatients #4 and #6 lacked documentation of the techniques, findings, and tissues removed or altered. The Professional Development Manager also confirmed that the Hospital's Brief Operative Note Form lacked a category for "Findings," under which operating physicians would document the techniques, findings, and tissues removed or altered.

2. For Inpatient #30, medical record review on 1/29/14, indicated that the Brief Operative Note, failed to document the techniques, findings, and tissues removed or altered, as required.

3. For Outpatient #13, medical record review on 2/3/14, indicated that Brief Operative Note, lacked the techniques and findings of the patient's surgery.

During interview, in the Post Anesthesia Care Unit (PACU), on 2/3/14 at 11:30 A.M., the PACU Manager confirmed that the above Brief Operative Note did not document the techniques, findings, and tissues removed or altered during surgery. The PACU Manager acknowledged that the Hospital's Brief Operative Note Form didn't contain a section titled "Findings" in which physicians would document their findings and the tissue removed or altered.

**VIOLATION:** *OPO AGREEMENT*                                                                                    **Tag N**

150

**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**

Based on record review, review of the Hospital's death register and Organ Procurement Organization Policy, and staff interviews, the Hospital failed to ensure that timely notification (within one hour) of a patient's death to the organ bank was conducted consistently for 3 of 3 death records (Inpatients #43, #44, #45) from a total of 49 inpatients reviewed. Findings included:

On 1/29/14 at 1:15 P.M., the Hospital Relations Coordinator from the organ bank was interviewed regarding the Hospital's timely referral rate. The coordinator said that the goal for timely referrals was 100 %. Following a decline in timely referral rates (74% in March 2013 and 74 % in May 2013), the Coordinator said that a training session was provided by the organ bank in August 2013, to clinical staff and anyone involved in death reporting or referral to the organ bank. Review of the training session revealed "All patient deaths need to be reported immediately to the Admitting Office." The training session also educated staff that "The reason for this is that the Hospital was required by federal law to report all patient deaths to the (contracted organ bank) within one (1) hour of death so that they could determine if there was a potential for tissue donation."

The Organ Bank Coordinator (OBC) explained that all deaths were to be reported to the organ bank. She explained that the unit where the patient expired was required to report to the Hospital Admitting Department, and in turn, the Admitting Department was required to notify the organ bank of the patient's death. The coordinator from the organ bank further explained that Unit Coordinators were typically the individuals on the unit who notified the Admitting Department when a patient expired. Because Unit Coordinators didn't work the night shifts, the OBC explained, timely reporting to the Admitting Department was not always achieved. As a result, timely notification to the organ bank often went beyond the one hour timely notification requirement.

1. For Inpatient #44, review of the Death Register on 1/30/14, revealed that Inpatient #44 expired on [DATE] at

4:50 A.M. The Admitting Department listed the time of referral to the organ bank as 6:15 A.M., 25 minutes over the one hour requirement.

2. For Inpatient #45, review of the Death Register on 1/30/14, revealed that Inpatient #45 expired on [DATE] at 5:19 P.M. The Death Register documented that the organ bank was not notified of the patient's death until 7:38 P.M., one hour and 19 minutes over the one hour requirement.

3. For Inpatient # 43, review of the Death Register on 1/30/14, revealed that Inpatient #43 expired on [DATE] at 3:11 P.M. There was no documented evidence in the Death Register that the Hospital Admitting Department notified the organ bank of the patient's death.

Registered Nurse (RN) #12, a Unit Educator, was interviewed on 1/31/14 at 9:10 A.M., regarding the Unit Coordinator Forum that was held on 8/20/13, to educate staff regarding timely notification to the Admitting Department following a patient's death. RN#12 said that the Unit Coordinators were instructed by her that the Admitting Department must be notified of a patient's death within one hour of death. RN#12 also said that she recognized that allowing the Unit Coordinators an hour to report a patient death to the Admitting Department might delay timely notification to the organ bank.

The Q.M. (Quality Management) RN was interviewed on 1/30/14 at 3:30 P.M., regarding the Hospital's Organ Procurement Organization policies. The Q.M. RN said that she recognized that the Hospital was not compliant with their policy that required timely notification to the organ bank within one hour of death. She said that she would address this through the Hospital's Quality Management Department.

The Hospital failed to ensure that timely notification, within one hour of death, was carried out per the requirement and the Hospital's Organ Procurement Organization Policy.

**VIOLATION:** *MEDICAL STAFF*                                                                 Tag N

Based on observation, record review and interviews the Hospital failed to have an organized Medical Staff that was responsible for the quality of medical care provided to one Inpatient (#1) in a total sample of 49 inpatients, that resulted in a significant decline in Inpatient #1's neurological status. Findings include:

1. The Hospital was found to be in Immediate Jeopardy from 1/6/14 to 1/24/14, related to the conditions of Patient Rights and Medical Staff. The Hospital failed to ensure staff followed policies and procedures regarding proper patient positioning for central line removal. As a result, Inpatient #1 suffered an air embolism (air entry into the bloodstream), cardiac arrest, and subsequent severe neurologic compromise (brain damage).

2. Review of the Central Venous Catheter (CVC) Policy and Procedure on 1/24/14, clearly defined the number of central line insertions (fifteen) that must be monitored by a supervising physician. However, the policy did not specify the number of observations or oversights required for the removal of a central line by Interns (PGY1-post grad year one out of medical school) and Residents (PGY2 and beyond).

3. During interview on 1/24/14 at 11:10 A.M., the Medical Director of the Medical Intensive Care Unit (MICU) and the Chief Medical Officer said that the current training for removal of a central line for Interns and Residents was incorporated into the basic course for central line insertion. However, the training did not include any hands-on training in the Simulation Lab for central line removal.

4. The Hospital's Corrective Action Plan (CAP) regarding the training and procedure for central line removal was not fully implemented at the time of the Complaint Survey on 1/24/14. The parts of the CAP not fully implemented included:

a. Facility-wide re-education for hospital clinicians on Reducing the Risk of Air Embolism Associated with a CVC.

b. Updating of the Hospital's Central Line Insertion Training Program to incorporate the central line removal segment into a hands-on experience and incorporate CVC removal questions into a written test.

c. Utilizing the Simulation Lab for removal training for first year medical residents.

d. Implementing the central line removal competency sign-off similar to the insertion competency.

**VIOLATION:** *NURSING CARE PLAN*                                                                     **Tag N**

**\*\*NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY\*\***

Based on record review, staff interview, and review of Hospital policy, the Hospital failed to ensure the care plan was current for 1 Outpatient (#11) in a total sample of 13 Outpatients and 1 Inpatient (#6) in a total sample of 49 Inpatients.

1. For Outpatient #11, the Hospital failed to ensure Outpatient #11's mental health treatment care plan was updated and current.

Record review on 1/30/14, indicated that Outpatient #11 had been receiving outpatient mental health services since 2005. Review of the outpatient mental health treatment care plans indicated that Outpatient #11's last care plan was dated 8/12/12.

According to the outpatient mental health progress notes, Outpatient #11 was last seen at the outpatient mental health service on 9/19/13. Further review of the progress notes indicated that Outpatient #11 was moving to another state. Outpatient #11's mental health treatment care plan was not updated or reviewed since 8/12/12.

On 1/30/14 at 11:00 A.M., Outpatient Therapist #1 said he had failed to update and revise Outpatient #11's mental health treatment care plan since 8/12/12. Outpatient Therapist #1 said it was the Hospital's policy to review treatment plans every quarter and once a year and he could not explain why he did not update Outpatient #11's mental health treatment care plan.

2. For Inpatient #6, the Hospital failed to ensure that the patient's problem list was updated and current.

Medical record review on 1/27/14, indicated that Inpatient #6 was admitted on [DATE] for surgery that included an abdominal hysterectomy (removal of uterus) and removal of the left ovary and tube.

Review of Inpatient #6's problem list, (the basis of a patient's care plan), on 1/27/14, indicated the following

154

problems. all dated 11/29/13:

-Obstructive [DIAGNOSES REDACTED] (obstructive jaundice - a condition in which there is blockage of the

flow of bile from the liver. This results in an overflow of bile and its by-products

into the blood. Bile contains Bilirubin. Bilirubin is yellow, and gives the characteristic yellow appearance of

jaundice in the skin, eyes, and mucous membranes);

- Ascites (accumulation of fluid in the abdominal cavity);

- Postmenopausal bleeding;

-Congestive heart failure (heart failure causing an accumulation of fluid in the lungs);

- Nutritional deficiency (unspecified); and

- Anemia (low red blood cell count).

During interview on 1/27/14 at 5:00 P.M., the Professional Development Manager said that the problem list was

that of the patient's previous admission and had not been updated this admission, as required. Also, the problem

of uterine bleeding was no longer current, as Inpatient #6 had a total hysterectomy and a left ovary and tube

removal on 1/22/14, the day of this hospital admission.


**VIOLATION:** *INFORMED CONSENT*                                                                      **Tag N**


Based on medical record review, and patient and staff interviews the Hospital failed to obtain a properly executed

consent for 2 (#22, #23) of 49 Inpatients and 1 (#12) of 13 Outpatients undergoing invasive procedures. Findings

included:

1. For Inpatient #23, the Hospital failed to ensure the patient received a fully informed consent, in order for the

patient to make an informed decision regarding his/her 1/26/14 surgery.

(A well informed consent process would include discussion that physicians, other than the operating practitioner,

including but not limited to residents, would be performing important tasks related to the surgery. Important

surgical tasks included: opening and closing patients' operative site, dissecting tissue, removing tissue, harvesting

grafts, transplanting tissue, implanting devices and placing invasive lines).

For surgeries in which residents would perform important parts of the surgery, discussion was encouraged to include:

- That physicians who were in approved post graduate residency training programs would perform portions of the surgery, based on their availability and level of competence;

- That it would be decided at the time of the surgery which residents would participate and that the choice of resident would depend on the resident's competence; the knowledge the operating practitioner/teaching surgeon had of the resident's skill set; and the patient's condition; and

- That residents performing surgical tasks would be under the supervision of the operating practitioner/teaching surgeon.)

Review of the Operating Room Record on 1/28/14, indicated that Physicians #13 (an attending physician) and #14 (a surgical resident), along with Physician Assistant (PA) #1, assisted Physician #7 (the operating physician of record) with performing parts of Inpatient #23's, 1/26/14 cardiac surgery.

During interview on 1/28/14 at 11:30 A.M., Inpatient #23 said that "(S)he didn't know that other physicians or staff assisted his/her surgeon to perform the surgery and that (s)he saw a lot of people in the room, but (s)he didn't know who they were or what they did." Inpatient #23 also said "(s)he knew who his/her surgeon was after (s)he saw the surgeon's name on his identification badge."

At the time of giving his/her consent for surgery, Inpatient #23 was not informed that practitioners, other than his/her surgeon of record, would be performing parts of his/her surgery.

2. For Inpatient #22, medical record review on 1/28/14, indicated the 1/3/14 consent for cardiac catheterization, lacked the name of the physician who would be performing the procedure. That section of the consent form was blank.

3. For Outpatient #12, medical record review on 2/3/14, indicated that Physician #5, a physician receiving additional training (a fellowship) in Interventional Radiology, obtained the patient's consent. However, Physician #5 documented his name on the consent form as the operating physician, and not the name of the Operating Physician who actually performed the procedure.

156

Observation in the Cardiac Catheterization Suite on 2/3/14 at 8:45 A.M., indicated that Physician #5 was not

present in the Cardiac Catheterization Operating Room and did not participate in the procedure. Physician #7,

also a physician performing a fell owship in Interventional Radiology, performed parts of the patient's procedure

with the operating physician. Neither Physician #7's name or the Operating Physician's name was documented on

the consent.

**VIOLATION:** *PATIENT RIGHTS: RESTRAINT OR SECLUSION*                                                     **Tag N**

Based on record review and interviews, the Hospital failed to ensure face-to-face assessments were conducted in

person, within 1-hour after the initiation of four-point physical restraint for one Inpatient (#24), in a sample of 49

Inpatients and two Outpatients (#2 and #3), in a sample of 13 Outpatients. Findings included:

1. For Inpatient #24, review of Emergency Department (ED) record on 1/27/14, indicated Inpatient #24's

Physician Orders/Documentation Restraint Form, dated 3/2/13 at 11:45 A.M., revealed Inpatient #24 was

physically aggressive and wrist and ankle restraints were ordered. The Physician Orders/Documentation Restraint

Form indicated the standard of care was utilized because of an outburst or imminent physical aggressive,

assaultive, or destructive behavior that posed an imminent danger to the patient or others. Above the area where

the Physician signed, dated, and timed the Form, was the following statement, "I have conducted a face-to-face

assessment of the patient and reviewed the plan of care."

The Form indicated Inpatient #24 was restrained at 12:00 P.M. on 3/2/13, 15 minutes after the Form was signed,

with the order and the statement from the physician of having completed the face to face assessment. The form

indicated Inpatient #24 remained restrained for 2 hours and 45 minutes. There was no documentation to indicate a

face-to-face evaluation was completed within 1-hour after Inpatient #24 was restrained.

2. Outpatient #2's ED record, dated 1/9/14, indicated that at 1:00 P.M., the Physicians' Order/Documentation for

Restraint Use Form, indicated the ED Physician signed for the use of a restraint. However, the order was

incomplete as it did not indicate the type of restraint to be implemented, the behavior present that warranted use

157

of the restraint, and the alternative measures attempted prior to implementation of the restraint. The Form indicated Outpatient #2 was physically restrained, but no additional information to indicate when he/she was re-assessed or when the restraints were removed. The Physicians' Order/Documentation for Restraint Use Form, indicated that at 1:30 P.M. on 1/9/13, Outpatient #2 was restrained.

The Physician who signed the incomplete Physicians' Order/Documentation for Restraint Use Form, documented that he had conducted a face-to-face assessment of the patient and reviewed the plan of care, 30 minutes prior to when Outpatient #2 was actually physically restrained. There was no documentation of a face-to-face assessment within 1-hour after Outpatient #2 was restrained.

3. Outpatient #3's ED record, dated 1/21/14, indicated that at 1:15 P.M., the Physicians' Order/Documentation for Restraint Use Form, was signed by the physician. The Form indicated Outpatient #3 was to be restrained with ankle and wrist restraints and was also to receive medication as a restraint. The Physician signed, dated, and timed the Form, below the statement, "I have conducted a face-to-face assessment of the patient and reviewed the plan of care." However, this form was signed 15 minutes before Outpatient #3 was actually restrained. There was no documentation of a face-to-face assessment within 1-hour after Outpatient #3 was restrained.

During interview at 4:30 P.M. on 1/28/14, Surveyor #7 interviewed the ED Nurse Manager (NM). The ED NM said the ED used pre-printed Forms for physicians to write a restraint order. The forms included a statement regarding having completed a face-to-face assessment within one hour after the assessments were conducted. Surveyor #7 reviewed Inpatient #24, Outpatient #2, and Outpatient #3's ED records with the ED NM. The NM said the physicians' signature, date, and time documented on Order/Documentation Forms was to indicate when the restraint was ordered and was not the documentation the face-to-face assessment being completed after the patient was restrained. The NM was unable to provide documentation that indicated face-to-face assessments were completed within 1-hour of a patient being restrained. The NM said the Form was not being used properly.

**VIOLATION:** *INFECTION CONTROL*                                                                           Tag N

Based on review of Hospital documents, observations, record review, and interview, the Hospital failed to be in co

specific to: failure to adhere to Infection Control (IC) Standards of Practice, failure to adhere to manufacturer's dire

environment: failure to adhere to Hospital infection control policies [i.e., handwashing, insertion of intravenous (I\

(CVC), and medication administration]. Findings included:

1. Observations, staff interviews and review of equipment logs in the Cardiology Clinic at 1:40 P.M. on 1/28/14 ar

indicated the Hospital failed to ensure the emergency equipment was maintained at an acceptable level of cleanline

Please refer to A724.

2. Observations on the Surgical Intensive Care Unit (SICU) on 1/27/14 at 10:10 A.M. and the Pediatric Bone Marr

A.M., indicated unsanitary environmental and IC issues.

Please refer to A749.

3. Observations, staff interviews, review of Hospital documents and policies and procedures, and review of Nation

the duration of survey, from 1/27/14 to 2/4/14, indicated the Hospital failed to consistently enforce policies that go

specifically related to documentation of high level disinfection (HLD) logs, hand hygiene, insertion of IVs and CV

associated pneumonia, medication administration, proper use of surgical attire, and proper use of the surgical hand

Please refer to A749

© 2013 AHCJ — All rights reserved. [viii]

### 800 WASHINGTON STREET BOSTON, MA

**Dec. 6, 2013**

## TUFTS MEDICAL CENTER 02111

**VIOLATION:** *MEDICAL STAFF ACCOUNTABILITY*                    **Tag No:** A0347

**\*\*NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY\*\***

Based on record review and interviews, the Attending Surgeon did not ensure that the contrast he ordered

and intended to give was the contrast he actually administered to one (Patient #1) of six patients reviewed

related to the placement of a Baclofen pump (an infusion pump used to give medication to control muscle [DIAGNOSES REDACTED]), from a total sample of 10 records.

Findings include:

The Attending Surgeon's Operative Report, dated 11/6/13 indicated Patient #1 was taken to the Operating Room for placement of an intrathecal (first of three membrane spaces covering the spinal cord and brain) catheter to support a Baclofen pump.

The Surveyor interviewed the Attending Surgeon at 8:45 A.M. on 11/19/13. The Attending Surgeon said he did not remember a label or remember reading a label on the syringe that contained the contrast dye which he administered intrathecally to Patient #1 during the placement of a Baclofen pump.

**VIOLATION:** *SURGICAL SERVICES*        **Tag No: A0940**

Based on observations, record review and interviews the Hospital failed to ensure the Condition for Surgical Services was met.

Findings include:

1.) The Hospital was found to be in Immediate Jeopardy, on 11/21/13, related to Surgical Services due to failure to follow policies and procedures for verbal orders for Patient #1 when a surgeon gave Patient #1 the wrong contrast dye that was for intrathecal (first of three membrane spaces covering the spinal cord and brain) use. This medication error caused the patient to suffer from seizures, decline in overall condition and expire the next day. An immediate corrective action plan to prevent any surgeon from ordering and administering the incorrect contrast dye as well any incorrect medications and failing to ensure staff followed an established policy for verification of verbal orders given by a surgeon during surgery for all medications ordered during surgery was not implemented until 12/2/13.

Please refer to A-942 and A-951

2) The Hospital initiated the following corrective actions that were implemented and in place as of 12/2/2013:

a) The Operating room staff must write verbal orders for all medications ordered by the surgeon in the operating room and present the written verbal order to the OR pharmacy in order to have the medication filled. The verbal order must specify the procedure being done, if not the order will not be filled.

b) Only use ionic contrast for gastrointestinal/genito-urinary procedures. The hospital will decide next week to discontinue the use of all ionic contrast dyes.

c) Ionic contrast dyes are available in the Pyxis medication delivery system. A hard stop has been installed with a warning to the user that must be acknowledged before staff can access the contrast.

d) Education of physicians, pharmacists and nursing took place immediately and has been ongoing on medical orders, verification processes in the OR and medication safety.

The Immediate Jeopardy was removed as of 12/6/2013 but the Condition of Surgical Services remains out of compliance.


**VIOLATION:** *OPERATING ROOM SUPERVISION*        **Tag No:** A0942


**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY****

Based on record review and interview the Hospital failed to ensure the operating room was effectively supervised because the contrast solution ordered by the Attending Surgeon was not the correct contrast dye administered for one (Patient #1) of ten patients. Findings include:

The Surveyor interviewed the Attending Surgeon at 8:45 A.M. on 11/19/13. The Attending Surgeon said he gave a verbal order for Omnipaque (a contrast dye) during Patient #1's surgery.

The Surveyor interviewed the Circulating Nurse at 11:10 A.M. on 11/19/13. The Circulating Nurse said the Attending Surgeon requested Omnipaque during Patient #1's surgery. The Circulating Nurse said she told the Attending Surgeon that she believed the Omnipaque was not carried in the satellite Operating Room Pharmacy. The Circulating Nurse said when she asked the Pharmacist for the Omnipaque, the

161

pharmacist said "we don't carry Omnipaque, we carry this" indicating a medication labeled "MD-76" and handed her two 50 milliliter bottles of MD-76. The Circulating Nurse said she brought the two bottles of MD-76 to the operating room and showed a bottle of MD-76 to the Attending Surgeon and said "this is what we have". The Circulating Nurse said the Attending Surgeon said "just put it on the table".

Observation of the Operating Room Pharmacy on 11/19/13, at approximately 9:50 A.M., indicated the label of a vial of MD-76 read as followed: "not for intrathecal use". Intrathecal refers to the first of three membrane spaces covering the spinal cord and brain.

The Manufacturer's Warning label indicated the following: SEVERE ADVERSE EVENTS have occurred with INADVERTENT INTRATHECAL ADMINISTRATION. These serious adverse reactions include: death, convulsions, cerebral hemorrhage, coma, paralysis, [DIAGNOSES REDACTED], acute renal failure, cardiac arrest, seizures, rhabdomyolysis, hyperthermia, and brain edema. Special attention must be given to insure that this drug product is not administered intrathecally.

The Attending Surgeon's Operative Report, dated 11/6/13, indicated a catheter was placed into Patient #1's intrathecal space and the contrast was injected twice via the catheter.

The Perioperative Nursing Record, dated 11/6/13, indicated that 0.5 milliliter (ml) of a 50 ml vial of MD-76 was administered by the Attending Surgeon intravascularly, which was incorrect; the contrast was administered intrathecally, which is contraindicated for this dye.

Nursing notes and physician progress notes, dated from 11/6 - 11/8/13 indicated the following: Patient #1 awoke from surgery in severe pain, was displaying jerky, spastic type movements and began to have seizures; Patient #1 was treated for his/her symptoms and became less responsive, then unresponsive and additional advanced interventions were declined based on Patient #1's wishes. The treatment for Patient #1 was changed to comfort measures and Patient #1 expired the next day.

**VIOLATION:** *OPERATING ROOM POLICIES*                **Tag No:** A0951

Based on observation, record review and interviews the Hospital failed to ensure the staff followed an

established policy for verbal orders given by a surgeon during surgery.

Findings include:

Patient #1's physician orders, dated 11/6/13-11/8/13, indicated there was no documented order for the contrast requested by the Attending Surgeon.

The Hospital's policies and procedures related to Safe Administration of Medication indicated that telephone and verbal orders shall be managed in accordance with Hospital policy #4006 Patient Care Orders.

The Hospital's policy #4006, Patient Care Orders indicated the following: verbal and telephone orders may be given to a registered nurse; the policy applies to all clinical and administrative staff; all orders for medications, treatments, laboratory tests, consultants, activity levels, and diets must be clearly written; the clinician receiving the order will immediately document the order in writing and will read back the order as written, the telephone order read back (TORB) and or verbal order read back (VORB) may be documented as a means of communication that this process has been completed; the verbal and/or

telephone order shall include the ordering Practitioner's name credentials and a medication order is complete when it contains the drug name, dose strength and/or concentration, route and/or dosage form and dosing frequency.

The Association of Perioperative Registered Nurses (AORN) standards indicate the use of verbal orders should be limited but when necessary, hospitals should provide mechanisms to ensure accuracy and safety such as 1.) the order is recorded in the patient record according to facility policy as soon as feasible 2.) the nurse performs a read back of the written order by verbally reading the order digit by digit and spelling out the medication name and 3.) allowing only licensed staff to receive verbal orders. Before administration of any medication a re-verification process should include a review of the product label for the medication name, strength and expiration date. This should be done in conjunction with review of the written medication order to confirm correct medication.

The Surveyor interviewed the Professional Development Manager at approximately 8:30 A.M. on

11/20/13. The Professional Development Manager stated that during surgery there are different professional practices for verbal orders and said the practice at Tufts Medical Center was for the circulator nurse to verbally confirm the order with the surgeon, obtain the requested medication/solution, bring it to the operating room and perform a visual confirmation with the scrub person. The Professional Development Manager said the circulator nurse would then document the drug/solution that was administered by the surgeon in the intra-operative record.

Despite the documented administration of MD-76, there was no documented order in the clinical record for the administration of MD-76 and no read back verification of the order with the physician per Hospital policy.

Although, the Hospital conducted a huddle to discuss and provide re-education regarding operating room safe medication practices, no policy changes were designed to assure the achievement and maintenance of high standard of medical and nursing practice and patient care regarding verbal medication orders during surgery by a surgeon to prevent any re-occurrence.

© 2013 AHCJ — All rights reserved. [ix]

**TUFTS MEDICAL CENTER**          **800 WASHINGTON STREET BOSTON, MA 02111**          **Nov. 27, 2012**

**VIOLATION:** *INFECTION CONTROL*          **Tag No:** A0747

Based on observations, interviews, review of the Hospital's policies/procedures, immediate use sterilization logs, Operating Room (OR) Environmental Services Master Schedule, OR Terminal Cleaning Checklists, personnel files and interviews, the Hospital failed to consistently ensure proper cleaning of equipment, a sanitary environment and staff adherence to infection control policies and procedures to prevent transmission of infections and communicable diseases for 2 (#1, #2) of 10 patients reviewed and that terminal cleaning in 21 of 21 ORs was consistently performed. Please refer to A749 for

the specific deficient practices observed in support of the condition level non-compliance.

**VIOLATION:** *INFECTION CONTROL OFFICER RESPONSIBILITIES*          **Tag No:** A0749

Based on observations, interviews, review of the Hospital's policies/procedures, immediate use

sterilization logs, Operating Room (OR) Environmental Services Master Schedule, OR Terminal

Cleaning Checklist, personnel files and interviews, the Hospital failed to consistently ensure an

acceptable level of infection prevention practice for 2 (#1, #2) of 10 patients reviewed and that terminal

cleaning was consistently performed.

Findings included:

1. Observations in operating room (OR) #4, from 10:00 A.M. to 11:15 A.M. on 11/26/12, included:

a. The flat, plastic board used to transfer patients to and from the OR bed was stored directly on the floor

behind the patient entrance to the room.

b. According the Association of Perioperative Registered Nurses (AORN) Perioperative Standards and

Recommended Practices, Recommended Practices for Aseptic Practice IV.5 reads, "All items should be

delivered to the surgical field in a manner that prevents nonsterile objects or people from extending over

the sterile field. Skin is a source of bacteria microscopic skin cells are constantly shedded. Therefore,

maintaining distance from the sterile field decreases the potential for contamination when items are

passed from a nonsterile area to a sterile area."

Certified Surgical Technologist (CST) #1 and Registered Nurse (RN) #4 were observed reaching over the

sterile table approximately five times each, while delivering sterile supplies (e.g., gloves, gown) to the

sterile OR table.

c. RN #4 failed to consistently maintain CDC Infection Control Standards of Practice. RN #4 failed to

don clean gloves when providing direct care to Patient #2 in the OR as follows:

-Touched Patient #2 to position the patient for the procedure;

-Removed the patient's hospital gown;

-Touched the patient's legs and feet to apply SCD (sequential compression device) boots on the patient's

legs. SCD boots are used to prevent formation of deep vein blood clots.

-After completing the above tasks, RN #4 took gloves from the clean glove box without first performing

hand hygiene.

RN #4 failed to adhere to Hospital policy and AORN Standards of Practice.

Additionally, in preparation for the insertion of the urinary catheter and the surgical skin prep, the RN#4

removed the safety strap from the patient and the strap fell to the floor. After the catheter was inserted and

the surgical prep was completed, the RN picked the safety strap from the floor and placed it on the

patient. The RN failed to disinfect the strap before placing it on the patient, approximately 10 inches from

the surgical field.

d. Review of the Hospital's Surgical Services Policy titled Surgical Shave Prep indicated that a shave prep

should be done as close to the surgical procedure as possible in an area outside the OR.

AORN Perioperative Standards and Recommended Practice for Aseptic Practice IV.b.2, reads, "Hair

removal should be performed the day of surgery in a location outside the OR."

Observations in OR #4, on 11/26/12, at approximately 11:00 A.M., after Patient #2 was anesthetized,

indicated that Physician #4 shaved a significant amount of hair from the operative site on the patient's

abdomen. [Observation in the preoperative holding area indicated the OR staff had an opportunity to

remove hair from the patient's operative site outside the OR as observation indicated the Patient had been

in the Preoperative Holding Area for approximately 30 minutes prior to entering the OR.]

e. Observations in OR #4 on 11/26/12 at approximately 11:10 A.M., indicated that Physician #3 failed to

wear required personal protective equipment (PPE), i.e., gloves, before examining the patient's lower

abdomen and groin area as required by CDC Infection Control Standards of Practice.

Immediately after examining the patient, Physician #3, opened a sterile indwelling urinary catheter set, donned sterile gloves and catheterized the patient. The physician failed to perform hand hygiene before donning sterile gloves and catheterizing the patient.

2. Observations in OR #19, on 11/26/12 at approximately 11:40 A.M. indicated the following breeches in Infection Control Standards of Practice for Patient #1 and the manufacturer's directions for use, as follows:

a. In preparation for insertion of an arterial line (A-line), Physician #1 donned clean gloves, opened a sterile A-Line insertion kit, removed the Chloro-Prep (an antiseptic) applicator and prepped the patient's skin at the line insertion site. The Physician only prepped the area for approximately 10 seconds. Review of the Manufacturer's directions for use (DFU) on 10/26/12, read as follows:

"Use repeated back and forth strokes of the sponge for approximately 30 seconds. Completely wet the area with the antiseptic. Let dry for 30 seconds."

b. RNs #5 and #6 had set up a sterile surgical table (#1) for Patient #1's scheduled case and then RN #5 went on break. Certified Surgical Technologist (CST) #2 relieved the RN#5 for his break. To make room for a second sterile (surgical table #2), CST #2 moved surgical table #1 to a distance of approximately 3 to 4 inches from the wall.

Review of AORN Standard for Aseptic Practice V.3. subsequent to survey on 11/28/12, indicated that a distance of 12 inches should be maintained from a sterile field (e.g., surgical table #1). By moving the sterile surgical table close to the unsterile wall, the CST increased the risk for cross-contamination of the sterile supplies that were on surgical table #1.

3. Observations in the Floating Building Post Anesthesia Care Unit (PACU), from approximately 1:50 P.M. to 2:30 P.M. on 11/26/12, included the following:

According to AORN Standard for Environmental Cleaning in the Perioperative Setting Recommendation I, indicated that the patient should be provided a safe, clean environment.

In an interview during the observations, RN #10 acknowledged that the below identified areas could not be effectively cleaned and disinfected.

-The shelf and drawers along the headwall in PACU recovery bays #1 to #5 were wooden and not smooth, non-porous, washable surfaces.

-The wall, shelves and drawers were painted with scenes and characters familiar to children. (The above bays were primarily used for pediatric patients).

-The paint was chipped off the corners of the wood drawers in recovery bays #3, #4, and #5, exposing the old, bare wood and increasing the risk for bacterial growth and cross contamination.

-The inside of the drawers in these bays were dirty with dust and debris, stained from spillage, and had adhesive tape and adhesive tape residue.

- In PACU Recovery Bay #6, an approximate 8 inch by 4 inch section of the laminate was broken, and hanging off from the counter apron, creating a risk for bacterial growth and cross contamination.

4. Observations in the Floating Building OR (the main OR), at approximately 8:30 A.M., on 11/27/12, indicated the hospital failed to consistently follow it's policy for immediate-use sterilization, an abbreviated cycle of sterilization for surgical items that are required on short notice (formerly know as "flash sterilization."). Findings include:

a. Observation of the immediate-use sterilization logs and sterilizer tapes for 4 of 6 sterilizers reviewed (#3, #4, #5, and #6), indicated approximately 35 immediate-use sterilization cycles had been performed from 10/26/12 to 11/27/12. According to the hospital policy, documentation of the patient's name, the reason for sterilizing the instrument(s), the general contents of the load and the signature of the operator of the sterilizer were to be entered into immediate-use sterilization logs. Of the 35 sterilizer run cycles, only 18 (53%) met the documentation requirements. Of the cycles that were run, 8 were not entered into the log. Instead, the strips were tucked into the log book holder.

b. According to current Association of Perioperative Registered Nurses (AORN) guidelines, documentation of the reason for immediate-use sterilization is also necessary to determine the validity of

using immediate-use sterilization.

5. Observations in the Sterile Central Core of the OR from approximately 9:15 A.M. to 10:00 A.M. on 11/26/12, included the following:

a. An electronic piece of OR equipment, the coagulation machine, was secured to its base with approximately 3 feet of 3 inch tape.

b. Eleven pieces of tape, indicating the 11 ORs (e.g., OR 1, OR 2, OR 3) , were taped to the wire rack located immediately next to Sterilizer #4. The Central Processing Department (CPD) Manager #1 said the staff used the pieces of tape, on an ongoing basis, to identify the room to which the contents of the sterilizer should be returned. Tape residue was observed on the wire rack, used to store sterile and clean OR supplies. Infection Preventionist (IP) #1 said tape residue harbors bacteria and doesn't permit effective disinfection of equipment. The OR Manager said the staff utilize this process with all six OR sterilizers.


6. During interviews with RNs #4, #7, #8, #11, and CST #2 between 10:30 A.M. and 3:00 P.M., the RNs and CST all said the lack of cleanliness of the Perioperative Suite was a major issue. For example:

a. RN #4 said she found blood on the wall in OR #4, first thing in the morning of 11/27/12. No cases had been performed in the room since the previous day.

b. CST#1 said she found a bloodied drape clip on the OR table drape holder in OR #2 on the 11/27/12. No cases had been performed in the room since the previous day.

7. Review of the Hospital Policy/Procedure titled Terminal Cleaning and Disinfecting of Operating Rooms on 11/27/12, every OR was to be terminal cleaned every 24 hour period if the room had been opened and used for a surgical case. Based on the findings identified above, point a and b, terminal cleaning of the ORs (2 of 21) was not consistently performed.

a. The Environmental Services Department's (ESD) OR Master Schedule for the second and third shifts indicated that 2 ESD staff were scheduled the second shift and 3 ESD staff were scheduled the third shift Monday through Friday to terminally clean 21 OR rooms. The schedule indicated that 2 of the 3 ESD

staff scheduled on the third shift were also scheduled to carry out duties in other areas of the Hospital as well as the OR. The schedule indicated that one ESD staff was scheduled the third shift Saturday and Sunday to clean the OR areas.

b. Surveyor #2 interviewed the ESD Director on 11/26/12 at 3:15 P.M. with Senior Risk Manager #2 present. The ESD Director said that terminal cleaning was done 5 nights a week in the secondary OR and 6 nights a week in the main OR. The ESD Director said that during the 2nd shift, the ESD staff were responsible for starting terminal cleaning in those OR rooms that were finished for the day. The ESD Director said that on the 3rd shift, there were 3 ESD staff assigned to do terminal cleaning, but 2 of the 3 ESD staff could be pulled to clean other areas of the Hospital. The ESD Director said that a fourth ESD staff was scheduled for the third shift twice weekly to perform extra cleaning duties.

c. Surveyor #2 interviewed one of the third shift ESD staff assigned to the OR on the third shift on 11/28/12 at 7:30 A.M. with Senior Risk Manager #2, the OR Clinical Director, the ESD Director and the Hospitality Director present. The ESD staff identified himself as the ESD Supervisor and said it was his job to check and ensure that terminal cleaning was performed and completed. The Supervisor said he looked at each OR room to ensure that cleaning was completed.

d. The ESD Director said that the ESD staff performing the terminal cleaning was supposed to complete the OR Terminal Cleaning Checklist and the ESD Supervisor was supposed to check that terminal cleaning was completed and sign the Checklist.

e. Surveyor #2 reviewed the OR Terminal Cleaning Checklists, dated 10/18/12 to 11/24/12, and determined that the OR Terminal Cleaning Checklists were not completed to indicate terminal cleaning was carried out for the following dates/rooms:

i. Checklists were not completed for any of the 23 OR rooms on 10/20/12, 10/27/12, 10/29/12, 10/31/12, 11/1/12, 11/3/12, 11/5/12, 11/10/12 and 11/23/12.

ii. Checklists were not completed for certain OR rooms on the following dates: 10/22/12 OR Suites 1, 3 and 16-23; 10/23/12 OR Suite #19; 10/24/12 OR Suites 12 and 13; 10/31/12 OR Suites 10 and 13-23;

11/8/12 OR Suites 16, 17, 19 and 22; 11/15/12 OR Suites 16 to 23; 11/20/12 OR Suites 16-23; and

11/22/12 OR Suite 19.

f. Surveyor #2 reviewed the Main OR Terminal Cleaning Sheet which described task steps to be taken to

clean specific areas of the OR. The task steps were coded as Spacecare QL (SCQL), which referred to the

task steps to clean a workroom and Spacecare

MB (SCMB), which referred to the task steps to cleaning an OR room and included terminal cleaning.

g. Surveyor #2 reviewed the educational files for 14 ESD staff which included names identified on the

OR Terminal Cleaning Checklists and determined that although the 14 ESD staff were trained in SCQL,

they were not trained in SCMB.


**VIOLATION:** *OPERATING ROOM POLICIES*            **Tag No:** A0951


Based on observations and interview, the Hospital failed to ensure that staff implemented policies for

aseptic and sterile technique, disinfection procedures, and proper technique during the surgical skin prep.

Findings included:

1. Observations in OR #4, on 11/26/12, from 10:00 A.M. to 11:15 A.M., indicated that RN #4 and

Certified Surgical Technologist #1 failed to adhere to AORN Standards of Care regarding the

maintenance of a sterile field. Both staff reached over the sterile surgical table to dispense sterile supplies

to the table.

Please refer to A749.

2. Observations in OR #4 at approximately 10:30 A.M. on 11/26/12, and in OR #19 at approximately

11:45 A.M., indicated that staff failed to adhere to AORN Standards of Aseptic Practice and

manufacturer's directions for use when performing the shave prep and skin prep for Patient's #1 and #2.

Please refer to A749.

**VIOLATION:** *PRE-ANESTHESIA EVALUATION*                    **Tag No:** A1002

Based on medical record review and staff interview, the Hospital failed to ensure that Anesthesia Services were delivered in a manner that was consistent with recognized standards for anesthesia care regarding formulating the plan for anesthesia and anesthesia consent, for 1 (Patient #2) of 10 patients reviewed. Findings included:

1. According to review of a Hospital policy, subsequent to survey on 11/28/12, entitled "Center for Preoperative Assessment (CPA) Operating procedure" the Anesthesia Nurse Practitioners (NP), "see patients in the CPA under the direct supervision of an attending anesthesiologist. The NPs educate patients with respect to possible anesthetic options and the risks and benefits of each. The NPs do not formulate the anesthetic plan or consent the patient for anesthesia."

2. In an interview on 11/27/12 at approximately 10:15 A.M., the Chief of Anesthesia said that an attending anesthesiologist and an anesthesia resident were scheduled in the CPA daily, (Monday through Friday). The Chief of Anesthesia also said that the Anesthesia NPs in the CPA, performed the anesthesia assessment and under the direct supervision of the anesthesiologist. The Chief of Anesthesia additionally said that through consultation with the scheduled Anesthesiologist, an initial anesthesia plan is developed. On the day of surgery, a CPA Patient Visit Checklist is completed and signed by the attending anesthesiologist to indicate that he/she approved the anesthesia plan, consented, and cleared the patient for anesthesia. He said NPs were not qualified to administer anesthesia and could not formulate an anesthesia plan or obtain an anesthesia consent.

3. Medical record review for Patient #2, on 11/26/12, indicated that the Preoperative Anesthetic Evaluation completed by the NP included (but was not limited to): Patient History and Review of Systems; Physical exam; Anesthesia Plan; and Consent. NP #1 then electronically signed and dated the form, indicating that she completed all the above. The form was not signed by a physician, as required. Additionally, the CPA Patient Visit Check list, was completed and signed by NP #1, on 11/20/12 at 10:08

172

A.M., indicating that she consented and cleared the patient for anesthesia. The Chief of Anesthesia said that the NP should not have signed the form and that the CPA Patient Visit Checklist should have been completed by the anesthesiologist scheduled in the CPA on that day.

© 2013 AHCJ — All rights reserved. ˣ

| | 800 WASHINGTON STREET BOSTON, MA | |
|---|---|---|
| **TUFTS MEDICAL CENTER** | **02111** | **March 6, 2012** |

**VIOLATION:** *PROGRAM DATA, PROGRAM ACTIVITIES*                    **Tag No:** A0283

Based on medical record review, physician and staff interview, PGY1 Resident did not follow Hospital Policy and evaluate one of one Patients, Patient #1, in a timely manner after the PACU Registered Nurses reported bleeding at the donor site following a skin graft surgery on 01/20/12. The PACU Registered Nurses did not follow the chain of command and promptly notify a nursing supervisor that the surgical residents did not come to evaluate Patient #1 after multiple text messages were sent.

Findings include:

Refer to A-0347

Review of the Hospital's Policy for Department of General Surgery Supervision indicated that all PGY1 residents should be in direct communication with the next most senior resident to obtain consultation regarding any clinical changes in a patient's status.

Review of the Archived Messages placed by the nursing staff from PACU to the PGY1 Resident indicated that the PACU RN sent a text message on 01/21/12 at 4:58 A.M., 5:44 A.M., 7:30 A.M, 7:40 A.M. and 9:00 A.M. to request that PGY1 Resident evaluate Patient #1.

PGY1 Resident failed to evaluate Patient #1 in the PACU after nursing staff reported post-surgical bleeding. PGY1 Resident did not follow Hospital Policy and contact a senior resident for consultation. Chief Resident #2 was interviewed in person on 03/05/12 from 12:50 P.M. to 1:10 P.M.. Chief Resident

#2 said that Patient #1 was evaluated by PGY1 Resident at 7:10 A. M and the dressing was reinforced. However, there was no documented evidence that the PGY1 Resident evaluated Patient #1. Chief Resident #2 was informed by the Surveyor that the nursing staff reported that multiple calls were placed and the PGY1 Resident did not come to evaluate Patient #1. Chief Resident #2 said the PGY1 Resident should have gone to PACU to evaluate Patient #1.

The PACU Registered Nurses did not follow the chain of command and notify a nursing supervisor that Patient #1 was not evaluated for bleeding after multiple text messages were sent to the surgical residents and no one responded.


**VIOLATION:** *MEDICAL STAFF ACCOUNTABILITY*                    **Tag No:** A0347


**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**

Based on medical record review and physician interview, the resident physicians did not evaluate one of one Patients, Patient #1, who was bleeding at the surgical donor site harvested from the left thigh following a skin graft procedure on 01/20/12.

Findings include:

Background Information:

Review of the Operative Record indicated that Patient #1 was scheduled for a split thickness skin graft harvested from the donor site of the left anterior thigh to cover an open wound on the right lower leg. Patient #1 had an excision of a [DIAGNOSES REDACTED] located on the right lower leg on 12/30/11. There were two separate skin grafts taken covering the wound on the right lower leg. The donor site was covered with an (clear) Opsite dressing. Surgeon #1 indicated there were no operative complications. The Surgeon was interviewed in person on 03/05/12 from 10:20 A.M. to 11:00 A.M. The Surgeon said Patient #1 had a non-specific bleeding disorder. The Surgeon said the Operating Room (OR) Nurse said that Patient #1's family said DDAVP should be administered to Patient #1 prior to surgery. DDAVP is a

medication administered to patients who have certain bleeding disorders to prevent bleeding. The Surgeon said he made a professional judgment not to administer the DDAVP medication because the surgery was expected to be superficial without compromising any major blood vessels and done under local anesthesia. The Surgeon never ordered the medication DDAVP to be administered. The Surgeon said that there was no spontaneous bleeding during the surgery and it was surprising that Patient #1 started to bleed twelve hours after the surgery. The Surgeon said that Patient #1's bleeding disorder was not well characterized. The Surgeon acknowledged that retrospectively, the DDAVP should have been administered. The Surgeon said the treatment for bleeding is to apply a compression dressing, but skin grafts do not bleed. However, Patient #1 had bleeding at the donor site.

Review of the Archived Messages placed by the nursing staff from PACU to the PGY1 Resident indicated that the PACU RN sent a text message on 01/21/12 at 4:58 A.M., 5:44 A.M., 7:30 A.M, 7:40 A.M. and 9:00 A.M. to request that PGY1 Resident evaluate Patient #1.

PGY1 Resident was interviewed in person on 03/05/12 from 11:44 A.M. to 12:10 P.M. PGY1 Resident said that he was called by the nursing staff in PACU on 01/21/12 between 5 A.M. and 6 A.M. and he was informed there was oozing at the donor site. PGY1 Resident said he informed the nursing staff that he would be over to see Patient #1. However, PGY1 Resident never came to the PACU to evaluate Patient #1 for bleeding at the operative site.

Review of the Senior Resident Progress Note dated 01/21/12 at 9:30 A.M. indicated that the left thigh dressing had 300 to 400 cc's of blood and a clot. The Senior Resident indicated the dressing was removed and there was oozing from several points in the wound. A pressure dressing was applied.

Review of the Rapid Response Code Form dated 01/21/12 at 9:20 A.M. indicated Patient #1 became unresponsive with a sudden drop in blood pressure. Patient #1 responded to two chest compression and the administration of Neo-Synephrine drip to stabilize the blood pressure. Patient #1 was transferred into the Intensive Care Unit.

© 2013 AHCJ — All rights reserved. [xi]

## LEGAL CLAIMS FOR RELIEF

### First CAUSE OF ACTION
*FCA Retaliation*
31 U.S.C. § 3730(h)

**91.** Plaintiff repeats and realleges each of the allegations set forth in the above paragraphs as if fully set forth herein.

92. As set forth in detail above, TMC threatened, harassed and otherwise discriminated against Plaintiff because of his lawful acts involving a potential violation(s) of the False Claims Act by his employer, TMC. By these actions, TMC violated the False Claims Act, 31 U.S.C. § 3730(h) and (M.G.L. c. 149,s 187) and violation (MGL c 305 of the acts of 2008). The law prohibits hospital from charging for these events or seeking reimbursement for SRE related services.

93.     TMC retaliated against Plaintiff, and ultimately fired him, because he refused to engage in practices that led to the presentation of false claims to the United States. Any other ground for dismissing or disciplining Relator was pretextual. Accordingly, TMC discharged, harassed, and discriminated against Relator on account of conduct protected by 31 U.S.C. § 3130(h) and (M.G.L. 149, s. 187) and TMC violations of MGL c 305 of the cats of 2008 (MGL 149 s 187) Prohibits healthcare facilities from terminating, refusing to hire or otherwise retaliating against a healthcare provider who opposes a practice that he or she reasonably **believes a risk to public health** Such conduct constitutes retaliatory conduct in violation of said statute.

94.     Plaintiff has been damaged as a direct result of these illegal actions. He has suffered economic harm, loss of income and future earnings, and emotional injury.

## SECOND CAUSE OF ACTION
*Massachusetts FCA Retaliation*
M.G.L. Ch. 12 § 5J and (MGL 149,s 187) (MGL c 305 of the acts of 2008)

95.     Plaintiff repeats and realleges each of the allegations set forth in the above paragraphs as if fully set forth herein.

96.     As set forth in detail above, TMC threatened, harassed and otherwise discriminated against Plaintiff because of his lawful acts involving a potential violation(s) of the False Claims Act by his employer, TMC. By these actions, TMC violated the Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12 § 5J and also (MGL 149, s 187) and also TMC violations of MGL chapter 305 of the acts of 2008.

97.     TMC retaliated against the Plaintiff, and ultimately fired him, because he refused to engage in practices that led to the presentation of false claims to the United States. Any other ground for dismissing or disciplining Plaintiff was pretextual. Accordingly, TMC discharged, harassed, and discriminated against Plaintiff on account of conduct protected by M.G.L. Ch. 12 § 5J. and (M.G.L 149, s 187) and TMC violations of MGL c 305 of the acts 2008 . Such conduct constitutes retaliatory conduct in violation of said statute.

98.     Plaintiff has been damaged as a direct result of these illegal actions. He has suffered economic harm, loss of income and future earnings, and emotional injury.

## THIRD CAUSE OF ACTION
**Federal False Claims act**
**31 U.S.C.§ 3729(a)(1)(A)**

99.     Plaintiff repeats and realleges the allegations set forth in above paragraphs above as if each were stated herein in their entirety and said allegations are incorporated herein by reference. TMC knowingly presented and caused to be presented false or fraudulent claims to the United States in violation of the False claims Act,31 U.S.C. § 3729(a)(1). This was for substandard care provided by TMC and also Claims submitted for SRE's which was not allowable.

100.The United States paid said claims and sustained damages because of these acts by TMC.

Pursuant to e False Claims Act, 31 U.S.C.§ 3729(a)(1), the United States is entitled to three times the amount of actual damages plus the maximum penalty of $21,562.80 for each and every fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by TMC.

### Fourth Cause of Action

Federal False Claims Act

31 U.S.C. § 3729 (a)(1)(B)

101. Relator restates and re-alleges the allegations and contained in the above paragraphs as each were stated herein in their entirety and said allegations are incorporated herein by reference.

102.TMC knowingly made, used or caused to be made or used false statements to get false or fraudulent claims paid by Government Health Care Programs, and the United States, all in violation of the False Claims, 31 U.S.C § 3729(a)(2).

103. The United States paid said claims and sustained damages because of these acts by TMC. Pursuant to the False Claims act 31 U.S.C. § 3729(a)(1), the United States is entitled to 3 times the amount of actual damages plus the maximum penaltiy of $21,562.80 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by TMC.

104.TMC has wrongfully terminated Plaintiff's employment in retaliation for engaging in activity required by the law and/or for refusing to what the law forbids all in violation of public policy. Plaintiff brought many instances of serious reportable events to the attention of the hospitals administration. There response was it went through root cause analysis but failed to address to report those instances they also failed to take corrective measures. But yet billed for those admissions.

### Fifth CAUSE Of ACTION

Federal False Claims Act/Illegal kickbacks

31 U.S.C§ 3729, *et seq.*

106. Relator repeats and realleges all of the allegations set forth in the above paragraphs set forth fully herein.

107 as described above TMC offered and provided financial inducements to TMC physicians and Eascare in violation of the AKS, 42 U.S.C. § 1320a-7b(b). Eascare kept ambulances parked outside TMC so TMC could gain rapid discharges then therefore gain rapid admissions as a result. TMC also provided equipment to the pulmonary clinic and services to that clinic by employees TMC while performing Pulmonary function tests performed by TMC employees that were being paid by TMC. This was in return for referrals .This was a Kick back Stark 2 Self Referral.

108. By virtue of conduct described above Defendants knowingly presented or caused to be presented, false or fraudulent claims for payment or approval to the United States, in violation of federal law.

109. The United States- unaware of the falsity of records, statements, and claims(i) made, used, or presented, or(ii) caused to be made, used, or presented, by Defendants-paid and continues to pay claims that would not be paid but for defendants conduct as alleged herein.

110. by reason of Defendants conduct, the United States has been damaged, and continues to be damaged, in substantial amount determined at trial.

111 Pursuant to federal law, the united States is entitled to three times the amount of actual damages; plus the maximum penalty of 21,563, for each and every false or fraudulent claims, record, or statement (i) that was made, used, or presented, or (ii) that caused to be made, used, or presented, by defendants after November 2, 2015 as alleged herein.

## SIXTH CAUSE OF ACTION

### Massachusetts False Claims Law

### Mass Gen. Laws. Ch 12§§5B(1)

Relator restates and re-alleges the allegations contained in paragraphs as above as if each were stated herein in their entirety and said allegations are incorporated herein reference.

112. The Defendants knowingly presented and caused to be presented false and fraudulent claims to Government Healthcare programs and the Commonwealth of Massachusetts, all in violation of the Massachusetts false claims Act, Mass Gen. Laws 12, § 5B(1).

113. The Commonwealth of Massachusetts paid said claims and has sustained damages because of the acts by the Defendants.

## SEVENTH CAUSE OF ACTION

### Massachusetts False Claims Law of actual damages

### Mass. Gen. Laws Ch. 12§§ 5A et seq.

114. Realtor restates and re-alleges allegations contained below as if each were stated herein in their entirety and said allegations are incorporated herein reference.

115. The Defendants knowingly made, used and caused to be made and used false statements to get false and fraudulent claims paid by Government Health Care Programs and the Commonwealth of Massachusetts, all in violation of the Massachusetts False Claims Act, Mass. Gen Laws Ch 12§5B(2).

116. The Commonwealth of Massachusetts paid said claims and has sustained damages because of these acts by the Defendants.

117. Pursuant to M.G.L. Ch 12§5B(9), the Commonwealth is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false and fraudulent claim, record or statement made, used presented or caused to be made, used or presented by Defendants.

## EIGHTH CAUSE OF ACTION

### FCA Retaliation

### 31 U.S.C.§3730(h)

118. Relator repeats and re- alleges each of the allegations set forth in Paragraphs below as it fully set forth herein.

119. As set forth in detail below, TMC threatened, harassed and otherwise discriminated against Relator because of his lawful acts involving a potential violation(s) of the false Claims act by his employer, TMC. By these actions, TMC violated the False Claims A, 31 U.S.C. §3730(h)

120. TMC retaliated against Relator, and ultimately fired him, because he refused to engage in practices that led to the presentation of false claims to the United States. Any other ground for dismissing or disciplining Relator was pretextual. Accordingly TMC Discharged, Harassed, and Discriminated against

Relator on account of conduct protected by M.G.L. CH.12. § 5J. Such conduct constitutes Retaliatory Conduct in Violation of said Statute.

111. Relator has been damaged as a result of these illegal actions. He has suffered economic harm, loss of income and future earnings, and emotional injury.

## NINTH CAUSE OF ACTION

### Retaliatory Actions against Health Care providers

### M.G.L. 149 § 187

122 Relator repeats and realleges the allegations set forth fully below as fully set forth herin.

123. Relator is licensed health care provider pursuant to M.G.L Ch. 149§187(a)

124. TMC has taken retaliatory action against Relator in violation of M.G.L. CH. 149 § 187(b).

125 TMC conduct has caused damage to Relator in the form *inter alia,* lost salary, lost benefits and emotional distress.

126. Relator reported what he reasonably believed to be unlawful activity to his Supervisor at TMC

## TENTH CAUSE OF ACTION

TMC submitted False Claims as result of intentionally not Reporting the SRE's and Serious Medication Errors. TMC also was not adhering to Professional Standards of Practice and Federal and State Regulations regarding SRE's and for double billing those same patients. This substandard care was taking place from 2011 to 2018. TMC also upcoded those claims to Cardiac Arrest.

## EVELENTH CAUSE OF ACTION

TMC submitted claims for a Unlicensed Pharmacist and for thousands upon thousands of claims submitted by unlicensed personnel. This was from December 31,2014 to February 7, 2017. Claims were submitted for compounded drugs that the pharmacist had prepared and dispensed. Those drugs included but not limited to Fentanyl, Versed and Flolan Drips.

## TWELVE CAUSE OF ACTION

TMC submitted claims for which they knew were False and ignored Fantasia leaving the Hospital and

driving home. When returning after four hours was submitting claims as if he was there and was

falsifying patient records. TMC was well aware also that Therapist were sleeping on the night shift and

then falsifying records and submitting Claims after they woke up and back timed their entries.

## THIRTEENTH CAUSE OF ACTION

By TMC allowing a Nurse to authorize Eascare Ambulance submitted Claims  for emergent transports of

Patients which really non emergent transports is Liable for those False claims submitted this was from

2009 through November 2016. That nurse had no authority to do so. See Mass health Audit 2012.


Relator spoke up and reported with TMC ,DEA, DOJ, Legal Counsel, Compliance, Risk management,

and Security who had the power to arrest, and who were present. This took place April 2016. This

meeting was related to drug diversion by TMC. Relator reported to DEA DOJ that there were serious

reportable events taking place and not reported but claims submitted for such. Two months later a text

message from Fantasia to Lussier Manager of Respiratory I am working on it it will take time. In response

TMC retaliated against Relator for reporting such activity and thereby breached the implied term of good

faith and fair dealing. This was Protected Activity and Conduct.


127. TMC conduct has caused damage to Relator in the form inter alia, lost  salary, benefits and

emotional distress.

WHEREFORE. Relator, on behalf of the United States of America and the Commonwealth of

Massachusetts, request that this Court:

   (a) Enter Judgment holding Defendants liable for civil penalties of $21,562.80 for each violation of

      the Massachusetts  False Act:

   (b) Enter Judgment holding Defendants liable for civil penalties of $11,000 for each violation of the

      Massachusetts False Claims Act.

   (c) Enter a Judgment against Defendants for three times the amount of damages sustained by the

      United States because of their acts.

(d) Enter a Judgment against Defendants for three times the amount of damages sustained by the Commonwealth of Massachusetts because of their acts.

(e) Award the Relator the maximum percentage of proceeds of action in accordance with 31 U.S.C § 3730 and M.G.L. Ch.12§5F.

(f) Award the Relator his cost and reasonable attorney's fee for prosecuting this action:

(g) With respect to the 31 U.S.C.§ 3730(h) and M.G.L. Ch. 12 §5J, enter judgement against defendants awarding Relator all available damages and relief including, without limitation, two times the amount of back pay he would have earned but for the retaliation, with interest on that award; compensation for all special damages he sustained as a result of harassment and termination; and cost and attorney' fees for prosecuting his retaliation claims.

(h) With respect to M.G.L Ch. 149 §187(b), reinstate the Relator to the same position held before the retaliatory action, or equivalent position;

(3) Reinstate full fringe benefits and seniority rights  to Relator

(4) Compensate Relator for three times the lost wages, benefits and other renumeration, and interest thereon;5 order payment to the Relator reasonable attorneys' fees.

(i) Enter Judgment against Defendants awarding Relator all contractual damages.

(j) Enter Judgment against Defendants awarding Relator damages for Emotional distress;

(k) Enter Judgment against Defendants compensating Relator for lost wages, benefits and other remuneration, and interest thereon

(l) Order Defendants to pay Relator's reasonable litigation costs, reasonable expert witness fees and reasonable attorney fees;

(m) Enter such other relief which the Court finds just and equitable.

Counsel has not been Honest TMC has provided false and misleading statement related to when getting served June 18 2019 verses in reality June 14, 2019

Relator is so glad that TMC brings up Karvelas vs. MWH. Counsel fails to state that Relator testified at Massachusetts State House on numerous occasions for Whistleblower for the healthcare worker and

Patients' Bill of Right. Relaters Story was used as the driving force for those Bills. Proposition 21 universal healthcare was shot down as a result in Massachusetts..  Relator story was used on a National level by Senator Ted Kennedy US Senator of Massachusetts. This done by Dr Linda Buckwalt Chief Neurologist at Mount Auburn Hospital. What counsels to state is that MWH settled out of court in that case.

Counsel also fails that Relator accidently met with Manager of McCarthy, Bouley and Barry who divulged that her law firm was representing the Doctors and Nurses at MWH and that there were a lot of adults and a lot of Babies a lot of Babies. 70 to be precise in 2 years all settled out of court of breaking lawyer privilege. MWH serves Wakefield, Melrose, Lynnfield, Stoneham, and Winchester, fair to say very affluent area's MWH contrary to public assertions MWH has a high rate of death. People at MWH died to socio economic status these people were not dirt balls. 30,000 blood gases that were drawn analyzed and reported and clinical decisions made of which you could not. Think about the Cardiac, Metablolic and Neurological side effects that resulted. Counsel even fails to state the Chief of Surgery at MWH is now removing Tattoo's at the Burlington mall because of Relator's Testimony. Counsel is aware that CEO, VP of the hospital, VP of Nursing, Manager Respiratory all let go by MWH as a result of Relator blowing the whistle. Counsel even states that a 79 y/o women was raped at MWH by a 42 y/o psychological patient and never reported by MWH same TMC has done regarding SRE's.

Counsel even fails to state that 2 people died at TMC in 2011 and 2012 as a result of using defective equipment that was not FDA approved. This equipment was Jury rigged together using a self inflating ambu bag and a ventilator circuit.

It should be noteworthy TMC and MWH are affiliated.

Examples of Relator reported as such May 22nd 2014, 7 y/o boy Caleb Arel, murdered in the hospital not reported but yet billed. Relator reported this to DPH September 2016 this was protected activity and conduct under his license.

On or about Sept, Oct 2015 a 80 y/o women committed suicide room 423 not reported DPH but yet billed for entire admission this was a SRE which is not billable but yet was by TMC

August 2016 A patient received Lasix instead of Flolan has a major MI ends up on a ventilator. This was not reported but yet claims submitted.

On or about Oct 2016 a 42 y/o male with lvad CCU bed 2 after he had a thyroid biopsy he occluded his airway then respiratory arrested  then cardiac arrested no CPR was performed for 15 minutes because cardiology did not answer their pages and when they finally did cpr was started and patient was revived but it was to little to late he was brain dead. The patient ended up on ECMO for a week and but yet was billed 177,000.  The hospital administration did not report or tell the family about this event but yet was billed for entire admission. We as practitioners were beside ourselves that had happened the gentleman was Brain Dead. Plaintiff was outspoken about this event and even spoke to Nurse educator of TMC and Compliance and Risk Management and Lussier and later THJ.

November 9,2016 a patient of doctor Warner does not receive Milranone for a entire operation  ans not reported and Claims submitted for the entire Admission.

I had spoke up very loudly about these instances and the hospital wanted to silence me. The hospital compliance manual states if you see something then say something.

Plaintiff went to CMS 2012 and DPH September 2016 and the OIG in October 2016 I met with DEA DOJ April 2016 and told all. This was protected activity and conduct. I am obligated under my license to report.

Plaintiff used open door policy and reported internally to risk management, compliance officer, Legal counsel, Vp Nursing, VP of Human resources, His Manager, his Assistant Manager, also Supervisors of Nursing, Nursing, Security, AOC administrator on Call, but to no avail no corrective action was taken. see attached CMS Investigation 2012 through September 2018. There were things that went unreported, families were not notified of medical errors medical mistakes and also evidence withheld from Boston Homicide and ADA Dave Deacons. Things were taking place which TMC and its Officers were complicit in to Cover up and Commit Fraud. CMS and DPH were not notified which is mandated by Law. Finally the nurses at TMC went out on Strike in July 2017 because of unsafe work environment. The Compliance Manual states if you see something say something.

As Apollo thirteen stated to Nassau Houston we have a problem here.

There seems to more than just a smoking gun here.

65.　　TMC's conduct has caused damage to Plaintiff in the form of, inter alia, lost salary, lost benefits and emotional distress

66.　　Plaintiff is licensed health care provider pursuant to M.G.L. Ch. 149 § 187(a).

67.　　TMC has taken retaliatory action against Plaintiff in violation of M.G.L. Ch. 149 § 187(b).

68.　　TMC's conduct has caused damage to Plaintiff in the form of, *inter alia*, lost salary, lost benefits and emotional distress

WHEREFORE, Relator, on behalf of the United States of America and the Commonwealth of Massachusetts, requests that this Court:

(a)　Enter judgment holding Defendants liable for civil penalties of $21,562.80 for each violation of the False Claims Act;

(b)　Enter judgment holding Defendants liable for civil penalties of $11,000 for each violation of the Massachusetts False Claims Act;

(c)　Enter a judgment against Defendants for three times the amount of damages sustained by the United States because of their acts;

(d)　Enter a judgment against Defendants for three times the amount of damages sustained by the Commonwealth of Massachusetts because of their acts;

(e)　Award the Plaintiff the maximum percentage of the proceeds of the action in accordance with MGL c 149s 187 c and violations of MGL c 305 of the acts of 2008.

(f)　Award the Plaintiff his costs and reasonable attorney's fees for prosecuting this action;

(g)　With respect to M.G.L. (149 s 187) (b), and violations of MGL c 305 of the acts of 2008　enter judgment against Defendants awarding Plaintiff all available damages and relief including, without limitation, two times the amount of back pay he would have earned but for the retaliation, with interest on that award; compensation for all special damages he sustained as a result of harassment and termination; threats, slander,

186

Bullying, Defamation intimidation Hippa violation of his medical Record and costs and reasonable attorneys' fees for prosecuting his retaliation claims;

(h)  With respect to M.G.L. Ch. 149 § 187(b), reinstate the Plaintiff to the same position held before the retaliatory action, or to an equivalent position; (3) reinstate full fringe benefits and seniority rights to the Relator; (4) compensate the Plaintiff for three times the lost wages, benefits and other remuneration, and interest thereon; and (5) order payment to the Plaintiff by the TMC of Plaintiff's reasonable costs, and attorneys' fees.

(i)  Enter judgment against Defendants awarding Relator all contractual damages;

(j)  Enter judgment against Defendants awarding Plaintiff damages for emotional distress;

(k)  Enter judgment against Defendants compensating Plaintiff for lost wages, benefits and other remuneration, and interest thereon; and

(l)  Order Defendants to pay Plaintiff reasonable litigation costs, reasonable expert witness fees and reasonable attorneys' fees; and

(m)  Enter such other relief which the Court finds just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNT**

John karvelas RRT

Dated: December 29, 2019     *132* Collins st Danvers Mass 01923

Email vinnieboomba 58@yahoo.com

1-978-304-0634

John Karvelas
132 Collins st
Danvers Mass 01923
978-304-0634

---

[i] http://www.nlrg.com/legal-content/the-lawletter/bid/95672/civil-procedure-pleading-a-plausible-claim-in-federal-court-the-proper-application-of-the-plausibility-requirement

[ii] https://www.gibsondunn.com/2019-mid-year-false-claims-act-update/

[iii] http://www.hospitalinspections.org/report/25845

[iv] http://www.hospitalinspections.org/report/19313

[v] http://www.hospitalinspections.org/report/19312

[vi] http://www.hospitalinspections.org/report/19310

[vii] http://www.hospitalinspections.org/report/19311

[ix] http://www.hospitalinspections.org/report/19309

[x] http://www.hospitalinspections.org/report/19308

[xi] http://www.hospitalinspections.org/report/19307