# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JOHN KARVELAS,
UNITED STATES OF AMERICA,
COMMENWEALTH OF MASSACHUSETTS

CIVIL ACTION NO.: 1:18-cv-11260-LTS

*Plaintiffs,*

v.

TUFTS SHARED SERVICES, INC. d/b/a
TUFTS MEDICAL CENTER, INC.

*Defendants.*

## RELATORS' APPEAL OF DISMISSAL OF THE ABOVE CAPTIONED CASE BY THIS COURT AND MEMORANDUM OF LAW IN MOTION NOT TO DISMISS THE COMPLAINT

**INTRODUCTION** -------------------------------------------------------------1

**FACTUAL BACKGROUND**-----------------------------------------------------2


**ARGUMENT**-----------------------------------------------------------------3

I.   STANDARD OF REVIEW-------------------------------------------------3

II.  PLANTIFF HAS PROVEN BEYOND A REASONABLE DOUBT  FACTUAL
CLAIMS  AGAINST TMC AND ITS ADMINISTRATION AND EMPLOYEES FOR
LEGAL RELIEF.

III. PLAINTIFF CLEARLY STATES A LEGAL CLAIM FOR RELIEF AGAINST TMC
AGAINST TUFTS SHARED SERVICES INC. d.b.a. TUFTS MEDICAL CENTER INC
AND ITS ADIMINSTRATORS AND EMPLOYEES.

IV. COUNT 1 SHOULD NOT BE DISMISSED BECAUSE PLAINTIFF CLEARLY
STATES A LEGAL CLAIM FOR RELIEF UNDER THE FALSE CLAIMS ACT
RETALIATION UNDER 31 U.S.C.§3730(H) AND DISCRIMINATION------------------4

RELATOR CLEARLY PROVES ADEQUATLEY ALLEGE THAT HE WAS
RETALIATED AGAINST FOR ENGAGING IN PROTECTED ACTIVITY AND
CONDUCT AND WAS THERFORE DISCRIMINATED AGAINST FOR
REPORTING…………………………………………………………………5

VI. COUNT 2 SHOULD NOT BE DISMISSED  FOR SAME REASONS SET FORTH.
EXHIBITS AND AFFIDAVITS PROVE ALL THAT TMC FAILED TO REPORT AND

SUBMITTED FALSE CLAIMS WHICH IS NOT ALLOWABLE.

VII THIS COURT ALLOWED RELATOR TO AMEND THE COMPLAINT AND COUNT 3 THROUGH 13 SHOULD NOT BE DISMISSED SET FORTH FOR COUNT 1.

VIII RELATOR CLEARLY STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED. UNDER MGL 305 c OF THE ACTS 2008 AND CMS REGULATIONS.

a.  Plaintiff clearly alleges adequately that he was engaged in protected conduct and activity when reporting internally and externally……………………………… ..5

i.  Duplicate billing for services…………………………………………………..6

ii  Billing for services……………………………………………………………7

claim

iv. Services requiring a licensed respiratory therapist……………………………..9

v.  Alleged ambulance kickbacks………………………………………………..10

vi. False claims were submitted for Serious Reportable Events and Failure to Report and omissions left out when submitting those claims.
…………………………………………………………………………………..11

vii SERIOUS REPORTABLE EVENTS (SRE) Through MGL, chapter c 305 of the Acts of 2008. The law prohibits hospitals for charging for these events or seeking reimbursement for SRE- related services updated 2011……..…………………….12

viii CMS letter related to SRE's dated to State Medicaid Agencies outlining the authority of State Medicaid agencies to deny payment for selected hospital-aquired conditions but because TMC intentionally failed to report and gained reimbursement for such therefore were false claims.

ix

ix   Relators Disclosure Statement and Exhibits…………………..........................................14

b.  Plaintiff proves beyond a reasonable doubt that TMC knew he was engaged in protected conduct and activity for reporting. TMC knew when relator was reporting to CMS 2012, DEA DOJ on 4/2016, DPH and compliance on 10/ 9/16 internally also from 2012 through  10/28/16 and 11/9/16 to Physician who's patient was effected by a serious medication error . Relator also reported to compliance on 10/9/1016 what had happened and charges submitted for such.

c.  Plaintiff proves beyond a reasonable doubt that he was retaliated against for reporting internally and externally, where there was a **imminent danger to the Public under  public under ( MGL.c. 149,s 187)**  TMC violated the  TMC violated the False Claims Act, 31 U.S.C. § 3730(h) and MGL. C. 149,s 187 and violation of (MGL. 305 c of the acts of 2008,……………....................................................................15

d.   Plaintiff has proven beyond a reasonable doubt that TMC was covering up wrong doing and failed to report and submitted false claims for such which the law prohibits hospitals for charging for these events or seeking reimbursement for SRE related services. Relator also proves beyond a reasonable doubt that TMC

intentionally made false and misleading statements to Federal

investigators……………………………….....................................................16

e.  Relator clearly states a Claim upon which Relief can be Granted………………17

f.  Relator proves beyond a reasonable doubt that TMC submitted False Claims to

CMS for SRE's  related services and provides a letter issued to Medicaid Director

outlining the authority of State Medicaid Agencies to deny payment for selected

hospital acquired conditions dated 7/31/2008……………………………………...18

g.  Relator was called into Boston Homicide (BPD) March of 2017 as a result of his

complaint filed with DPH in 9/16. This was a result of a SRE that TMC did not

report this was related to the murder of a child inside TMC. It was divulged by

BPD Detectives Jack Callahan and Rich Daley TMC withheld the toxic screen of

the child at that time and also crucial evidence in that case. In which False Claims

had been submitted to CMS for reimbursement  dating back to May 22,

2014……………………………………………………………………………….19

h.  From 2012 to 2018 Respiratory charges were entered and claims submitted for

reimbursement for services provided to patients after SRE's occurred and TMC

knew or should have known was not allowable……………………………………20

i.  Relator has clearly shown that his termination and his reporting to DEA

DOJ,DPH, Compliance of TMC, Legal Counsel of TMC, Security, Risk

Management, CNO Jinks, Dr Warner, Lussier Manager of Respiratory, and HR

was pretextual in nature. The text message from Lussier to Fantasia and back and

forth when you going to get rid of jack and the response was, I am working on it. This was after relator had reported the SRE's and submitting claims for such...................................................................................................21

j. Relator has shown well within pleadings that he has proven beyond a reasonable doubt that what was **Materiality.** TMC implied false certification of liability and not being in Compliance of Participation and Violation of the Rules of Participation which govern Medicare reimbursement. TMC has submitted False Certifications for not reporting SRE's. It should be duly noted that TMC did not Report or tell the families what happened to their loved ones. **Emphasis Added.** Therefore TMC submitted false claims for such. First TMC was in violation of the condition of payment on meeting statutory or regulatory requirements at issue. Second the Government would have denied payment if it had know of the violations. And third was TMC violations substantial or Minor. Supreme Courts decision Universal Health Services v. United States ex rel. Escobar, 136 S. Ct 1989 (2016) implied certification theory of liability, in process gave renewed emphasis to the concepts of materiality and governments knowledge under the FCA. TMC by their intentional omissions and TMC makes representations in submitting claims but omits its violations of statutory, regulatory or contractual requirements, those omissions can be a basis for liability if they rendered the defendant's representations misleading with respect to the goods or services provided [2] but precisely when such omissions can be the basis for liability.. Relator also sites United States ex.rel. Lemon v Nurses to Go Inc 924 F. 3d 155 ( ,

Fifth Circuit 2019). Applying each of its articulated Escobar factors in turn, the Fifth circuit began addressing conditions of payment. Conditions of payment on a requirement is" certainly probative evidence of materiality id"( quoting United States ex rel. Rose v. Stephens institute 909 F 3d 1012,1020 (9th Cir.2018). Because the Medicare statute expressly noted that payment can only be made if the certification, face to face encounter and plan of care requirements that defendants allegedly violated were met. The court held that the defendants' allegedly fraudulent certifications that they had complied with statutory and regulatory requirements violated the government's express conditions of payment. Id. This was the same as TMC Respiratory not providing treatments while Relators coworkers slept and submitting claims as if they had and falsifying patient medical records back dating and timing patient records. This was the same as when coworker Fantasia was leaving the hospital driving to Freetown abandoning patients and neglecting his patients for his dogs, then when returning would then back date back time falsify his charting and then submit charges for such. TMC knew or should have known this was taking place since he received a warning on the first occasion and then did it again on 5 different occasions with the knowledge of management. These charges were submitted when in fact they did not take place face to face. TMC knew this was happening  or should have known.

k.  Relator has proven beyond a reasonable doubt that as a result of TMC half truths and omissions submitted false claims for such. This was in relation to failure to

report SRE's and submitting claims which TMC  knew or should have known was

not allowable.

l.   TMC submitting claims for a pharmacist that was not licensed but as a result of

TMC omissions when they knew or should have know led to false claims

submitted for such from 12/31/14 to 2/7/17 as result of TMC noncompliance

was substantial. Or minor Id. at 163. Citing Escobar, the court noted that a

violation is material either when a reasonable person would "attach importance"

to the noncompliance or when the defendant knew or reason to know that false

representation's  recipient would attach importance to it, even though a

reasonable person would not. Id.

## RELATORS DISCLOSURE STATEMENT

Relator John Karvelas (hereinafter "Relator"), AS PRO SE Counsel of Record has,

served Disclosure Statements upon the United States of America pursuant to the

Federal False Claims Act, 31 U.S.C. § 3730(b)(2), and upon the Commonwealth

pursuant to Mass. Gen. Laws Ch. 12, § 5C (3). This Disclosure Statement is now being

filed with the Court.

Relator incorporates herein by reference the facts and allegations contained in his

Complaint and generally will now repeat that information here. Contained herein is

relevant additional information concerning: (I) the Relator; and (II) Billing Records.

(III) Complaints filed with CMS and DPH  documents involving investigations at TMC

2012 through 2018 which show that SRE's were taking place and SRE's were not being

reported and are referred to be Criminal for not doing so, and where False claims were submitted for not reporting under a SRE.

Relator will clearly show that TMC was not in Compliance with the Rules and Regulations that govern the Rules of Medicare. Also will show tufts was in violation conditions of Participation and false Certifications.

(IV) Relator is also providing signed notarized affidavits of coworkers of TMC.

(V)  Relator is providing Rules of Regulations and Standards and the Reporting requirements which is not billable.

(VI) Relator is concurrently providing a CD-ROM containing various documents referenced herein. Relator does not have in possession the CD ROM already provided to the US attorney and the Commonwealth and respectfully request that the US attorney turn over to this Court at this time.

(VII) Realtor is now handing in exhibits and evidence which is a bit over whelming and sad that of which was truly happening at TMC.

(VIII) Relator called CMS, DPH, OIG, DEA,DOJ prior to losing his job and had submitted complaints verbally and in writing from 2012 through 2016 . Relator was not privy to what CMS or DPH had been investigating or what CMS or DPH had divulged who submitted the complaints.

(VIIII) Relator did not know what they were investigating on the Day shifts and who they were interviewing. Since Relator worked night shift 7pm to 7am Relator did know they had in fact acted on his complaints, this was all kept in silence nobody divulged.

(X) Relator is providing a MWH copy of his Deposition of Hallmark Health vs

Karvelas where MWH settles out of court with Relator in that case.

(XII) Relator is providing, The audit of OIG of TMC which shows double billing related to cardiac implants and Audit of MASS Health Ambulance Eascare patient transfers of pediatric patients which were false claims were billed as emergent verses non emergent and DEA Settlement with TMC related to drug diversion September 2016.

(XII) Relator is providing CMS Investigations from 2012- 2018 which clearly shows failure to report under a SRE but yet claims had been submitted prior to discovery of the event.

(XIII) TMC admits that they hired a private eye to sit in front of relator's house and relators sources house John Roche this was admitted in Boston Municipal Court in the case of Roche vs TMC. Lussier also admitted that she was not aware of bullying that was taking place at TMC when she was the biggest abuser. See Exhibit card of John Mcmahon investigative services.

(XIV) TMC Admits in Boston Municipal Court 4/6/2018 that relator had reported prior to losing his job that TMC was not in Compliance with the Condition of Participation in Medicare Programs. This shows that if fact TMC Knew that Relator had Reported.

**Disclosure Statements**

Documents provided on the CD-ROM are named and arranged in the following topical file folder

  I.  **RELATOR:  Resume;**

## II. BILLING RECORDS:

The following data relates to the allegations in the complaint. In this disclosure statement the patient's proper name is used, whereas the complaint identifies these individuals by initials only. It should be duly noted. Relator met CNO Jinks January 21, 2016 and Reported SRE's taking place and being threatened with a gun, and something was wrong with the Pharmacy and Claims Submitted for such.

February 22, 2017 Relator meets with VP of HR and again restates all and states something is wrong with the Pharmacy. On each occasion relator handed in a written statement related to what was happening to the Patients and the wrong doing and double billing, Hippa Violation and false Claims being submitted as a result. He spoke verbally about a lot but TMC would not allow him to record these conversations of him reporting.

### Duplicative Billing:

**(a)   January 22, 2017**

For patient Ava Folson, TMC billed five "asthma pathway" charges (56402250) at $450 each, on January 22, 2017, and then a sixth on January 23, 2017. *See* **Exhibit 1** at p.5.

**(b)   February 8, 2017**

For patient Paul Cragin, TMC billed for adult High Frequency Oscillatory Ventilation ("HFOV") first-day (service code 56401598) at $795, and an adult subsequent-day ventilator charge (56402128) at $471, *on the same day.* See Exhibit 1 at p.5.

For patient James Goshen, TMC billed *thirty* internal transport charges (service code 56402829) *on one day* for a total charge of $14,250. These internal transport charges are for moving a patient around inside the hospital for example a

patient might be moved on a portable breathing machine between the ICU to the CT Scan machine. A patient might be moved once or twice in a day but it is inconceivable that a patient would undergo 30 chargeable internal transports in a single day. *See* **Exhibit 1** at p.6.

**(c)    February 9, 2017**

For patient Sau Tang, TMC billed *twelve* adult subsequent-day ventilator charges (56402128) at $471 each, *on the same day* for a total charge of $5,652. *See* **Exhibit 2** at p.2.

For patient Luanne Barile, TMC billed an adult first-day high flow cannula charge (56401768) at $587, an adult first-day ventilator charge (56402110) at $795, *and* an adult B1PAP first-day charge (56402802) at $344 even though these three modes of treatment are no complimentary but alternatives. *See* **Exhibit 2** at p4.

For patient Grazia Sciavone, TMC billed *two* adult first-day ventilator charges (56402110) at $795 each. *See* **Exhibit 2** at p.4.

**(d)    February 13, 2017**

For patient Scott Garrity, TMC billed an adult nitric oxide first-day charge (56402888) at $7,619 *and* a nitric oxide one-unit-per-hour charge (56402870) at $299 on the same day. *See* **Exhibit 3** at p.3.

For patient Gerald Freedman, TMC billed an adult nitric oxide first-day charge (56402888) at $7,619 *and* a nitric oxide one-unit-per-hour charge (56402870) at $299 on the same day, *and* billed for two adult subsequent-day ventilator charges (56402128) and one adult HFOV subsequent day charge (56402799) at $471 each, on the following day, February 14, 2017. *See* **Exhibit 3** at p.7.

For patient Richard Carrington, TMC billed an adult first-day ventilator charge (56402110) *on each of two consecutive days* – February 13 and 14, 2017 – at $795 each. *See* **Exhibit 3** at p.8.

**(e)    February 14, 2017**

For patient Abdel Missah Habib, TMC billed *two* adult subsequent-day ventilator charges (56402128) at $471 each, on the same day. *See* **Exhibit 3** at p. 2.

For patient William Scott, TMC billed two adult subsequent-day ventilator charges (56402128) at $471 each, on the same day. *See* **Exhibit 3** at p.6.

For patient Janet Chhor, TMC billed an adult first-day ventilator charge (56402110), at $795, *and* an adult subsequent-day ventilator day charge (56402128) at $471, both on the same day. *See* **Exhibit 3** at p.9.

**(f)   February 21, 2017**

For patient Baby Girl Andrade, TMC billed two neonatal
Nasal Intermittent Positive Pressure Ventilation ("NIPPV")
subsequent day charges (56401661) at $471 each. *See* **Exhibit 4**
at p.1.

For patient Baby Boy Joachim, TMC billed two
pediatric/neonatal subsequent day Continuous Positive
Airway Pressure ("CPAP") charges (56402365) at $344 each. *See*
**Exhibit 4** at p.7.

For patient Wayne Perkins, TMC billed two Heated
Trachestomy Collars ("HTC") first-day charges (56402063)
at $417 each. *See* **Exhibit 4** at p.13.

For patient Shek Long Yau, TMC billed two adult BIPAP
first-day charges (56402802) at $344 each. *See* **Exhibit 4** at p.13.

**(g)   February 22, 2017**

For patient *BP*, TMC billed *three* adult BIPAP first-day
charges (56402802) at $344 each. *See* **Exhibit 5** at p.6.

**(h)   February 23, 2017**

For patient Scott Allen, TMC billed two adult subsequent-
day ventilator day charges (56402128) at $471 each. *See*
**Exhibit 5** at p.1.

For patient John Roberge, TMC billed two adult first-day
ventilator charges (56402110) at $795 each. *See* **Exhibit 5** at p.9.

## Billing for Services Not Provided

The following are examples, of cases where there was billing for services not

provided:

(a)   On February 9, 2017, in respect of patient Bernard
Pizura a patient admitted with a diagnosis of
cardiogenic shock NEMC billed for the application
of continuous positive airway pressure ("CPAP").
However, on review of the Daily Non-Invasive
Ventilator Census, no values are recorded of his

response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask. *See* **Exhibit 6** at p.1.

(b)     On February 9, 2017, in respect of patient Michael Eldridge a patient admitted with a diagnosis of COPD exacerbation NEMC billed for the application of non-invasive bi-level positive airway pressure ("NIV BPAP"). However, on review of the Daily Non-Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask. *See* **Exhibit 6** at p.1.

(c)     On February 9, 2017, in respect of patient William Carroll a patient admitted with a diagnosis of acute respiratory distress, NEMC billed for the application NIV BPAP. However, on review of the Daily Non-Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask. *See* **Exhibit 6** at p.1.

(d)     On February 21, 2017, in respect of patient Patrick Blades, a patient admitted with a diagnosis of a perforated lung, NEMC billed for non-invasive ventilation. However on review of the Daily Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask. *See* **Exhibit 7** at p.2.

(e)     On February 9, 2017 in respect of patient Charles Eastman, a patient admitted for the intubation of a balloon pump, NEMC billed for invasive ventilation. However on review of the Daily Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient

is non-compliant i.e. refuses to wear the breathing mask. *See* **Exhibit 8** at p.1.

(f) On February 9, 2017 , in respect of patient Roland Kittredge a patient admitted with a diagnosis of aortic stenosis, NEMC billed for invasive ventilation. However, on review of the Daily Invasive Ventilator Census, no values are recorded of his response. This means that the treatment was not rendered, which is typically because the patient is non-compliant i.e. refuses to wear the breathing mask. *See* **Exhibit 8** at p.2

(g) Relator is also providing a letter from DPH received June 21, 2017 related to a SRE involving a child that TMC submitted false claims for such and did not report to DPH and evidence was with held to BPD and it clearly states that it was criminal not only civil what was taking place by TMC. Relator personally took care of this child on May 22 2014 when he was poisoned by his mother and died that evening on May 22, 2014 and Relator submitted charges for initial day ventilator and parameter changes and code blue times 2 charges not knowing what really happened to this child until August 2016 which relator reported to DPH in September 2016. Relator in April 2016 divulged to DEA DOJ of this Event. See Exhibit 9 and 9a card of Jed Nitzberg of DEA.

(h) Realtor in April 2016 also reported to DOJ the falsifications of Patient records and false claims submitted for such. See Exhibit 10 card of Jed Nitzberg DEA DOJ.

(i) Relator also at this time reported that his coworker Fantasia who was written up on a prior occasion by then manager Curro for leaving the hospital and back dating and times as if he was there and submitted false claims for such. See Exhibit 11 recording of Roche already handed in on prior to the clerks office.

(j) Relator spoke to DEA DOJ April 2016 and at that same time reported that something was wrong

with the pharmacy medications were not touching patients. See Exhibit 12 CMS investigation 2/22/2018 this shows where thousands of false claims submitted from 12/31/2014 to 2/7/2018 for medications dispensed by that Pharmacist. See Exhibit 12. TMC did not disclose conduct to OIG that TMC employed an individual that it knew or should have known was not licensed as a pharmacist and therefore was excluded from participation in Federal health care programs. **This was for allegedly violating the civil monetary penalties law. This was also in Violation of MGL 305 c of the acts of 2008 and and CMS regulations regarding SRE's and to deny payment for selected hospital acquired conditions. See Exhibits 19 and 20. P 2 #7 7A.**

(k)     Relator also reported that Fantasia threatened relator with a gun if he did not keep his mouth shut about falsification of patient records, abandonment, neglect, false claims being submitted for such. See Exhibit 13 affidavit TMC Security officer.

(l)      DEA warned relator after meeting with him April 2016 and on the next day informed relator that Fantasia not only owns 1 gun he owns 12 and to stay a away from him he is a accident waiting to happen. See Exhibit 14

(m)     Relator took care of many patients where many SRE's took place and false claims submitted and not reported one in particular in mind is the patient in room 10 MICU who got a air embolism and was neurologically effected ( a vegetable)  not reported and false claims submitted for such. Relator took care of this patient for 3 weeks and submitted charges which led to false claims being submitted as a result not knowing what really happened to this patient. TMC did not report this SRE  to DPH or CMS. Relator did go to the Director of the MICU after this event took place and reported it when discovering about what really happened to the patient 2 weeks later after this event took place.  See Exhibit 30 p17. Charges were entered for initial ventilator and subsequent ventilator for each day, parameter changes,

internal transports to ct scan,, the patient was upcoded to cardiac arrest, anoxic brain injury, from pancreatitis.

(n) DPH warned TMC and CMS warned TMC that these events were mandatory serious reportable events and claims should not be submitted for such. But TMC never reported those events and upcoded those patients and submitted false claims under cardiac arrest and anoxic brain injury. See exhibit 16 and 17.

(o) Relator has provided affidavits of Wayne Whitney which shows relator had been reporting all the way back to 2011 see Exhibit 21 dated April 2016. This was prepared after Whitney and former manager of respiratory met with relators counsel and Roche spoke to counsel on the phone about what was going on at TMC and the retaliation relator endured and the false claims being submitted for failure to report SRE's and the billing documents that were the last step before claims were submitted. This is contrary to TMC assertions.

(p) Relator provides a affidavit of Jack Roche of what was going on at TMC involving compliance and HR and Lussier and Kelly as a result of relator reporting and rules and regulations changed as a result of sleeping on the job falsification of patient records and submitting false claims for such. This also shows that relator was pretextual in nature See Exhibit 22

(q) Relator provides a affidavit of Tom Kilroy that there was a Hippa Violation on relators Medical record in response to his reporting. See Exhibit 23

(r) Relator provides a affidavit by security that there was a altercation between coworker Fantasia and Relator, on or about 12/14 that is when Fantasia his coworker had threatened relator for reporting what he was doing the same as when he got terminated from St Elizabeths  Hospital for doing the same on October 27, 2014. This was was when Fantasia was bringing a gun in TMC and stated I

own a gun. See Exhibit 24.

(s)   By Relator reported to DEA DOJ in April 2016
which TMC Legal Counsel and Risk Management,
Security, Compliance, who were present clearly
shows protected activity and conduct. This beyond
a reasonable doubt shows that relator was
Retaliated against, and discriminated against for
reporting and that could lead to a FCA action. At
this time TMC was on Notice. See Exhibit 10

(t)   Relator provides evidence from 3/ 2012-through
9/2018 which clearly shows that TMC failed to
report SRE's and had already submitted false
claims for such after being caught to fail to report
SRE's and that Relator had been speaking up for a
long time and reporting about all these events and
not reporting SRE'S and submitting false claims
for such TMC did not like that relator had done so
and had been retaliating and discriminating
against the relator and making false accusations
about him for doing so for a long time. The patient
was always relator top priority. See Exhibits 15
TMC **VIOLATION** INFECTION CONTROL.
**VIOLATION** INFECTION CONTROL OFFICER
RESPONSIBILITIES, **VIOLATION** OPERATING
ROOM POLICIES, **VIOLATION** OPERATING
ROOM POLICIES, p 6 **VIOLATION** PRE
ANESTHESIA EVALUATION. See exhibit P6.

(u)   Post  Wayne Whitney Affidavit of 4/2016. On or
about June or July 2017. Wayne Whitney and
Former Manager of TMC, Joeseph Curro met with
Relator and Relators Attorneys in a Motel
Conference Room of a nearby motel in Danvers
Curro And Whitney admitted to counsel that
events were taking place and false claims were
submitted for such it was also acknowledged that
Relator had been reporting these events and TMC
knew. Curro at this time stated that the daily
billing sheets were the last step before claims were
submitted by the billing department. Curro did
not know when admitting this, that, this was in
reference to false claims being submitted for such.
This is contrary to TMC assertions. See Exhibit 21

Whitney Affidavit.

(v)     A internal confidential email came out from the
        nurse manager of the NICU related to therapist
        not assessing patients and not checking on
        patients every 2 hours as is hospital policy, but yet
        false claims had been submitted for such as if they
        had seen their patients and had been falsifying
        patient records back dating and back timing
        patient charts while they were sleeping. This
        shows that this was happening all the way back to
        2011. See Exhibit 18. Email from nurse manager
        NICU and Response from then Manager Howard.
        See Exhibit 18

(w)     Audit of Mass health of Eascare ambulance shows
        that TMC was condoning that a nurse authorized
        emergent false claims to be submitted when in
        reality they were non emergent. She had no
        authority to do so.This audit is 2012-2013See
        Exhibit 17 p 9.

(x)     See DEA DOJ settlement with TMC dated 9/2016
        shows settlement with DOJ related to drug
        Diversion after relator was interviewed by DOJ in
        4/2016 and TMC does not divulge to DEA or DOJ
        that a pharmacist was not a pharmacist from
        12/31/2014 to 2/7/2017 and false claims were
        submitted for such. Exhibit 25. Also see exhibit 19
        p3 7A. any instance of care ordered or provided by
        someone impersonating a pharmacist or other
        licensed healthcare provider is not Billable see
        CMS investigation. See Exhibit 19 p1 and p2 DPH
        related to SRE's.

(y)     A internal confidential email sent out March 28,
        2011 shows relators coworkers were sleeping on
        the job and falsifying patients and submitting false
        claims as if they in fact had checked on their
        patients and assessed their patients. Exhibit 18

(z)     A letter to CEO Wagner and CNO Jinks related
        Nurses at TMC going out on Strike as a result of
        how unsafe it was at TMC. It clearly states that
        TMC should live up to its own words and dedicate
        itself to its patient and staff. See exhibit 13 this was

signed by 4 state senators and 9 state representatives. See Exhibit.13 p 1 and p2.

(aa) Hospital news letter clearly states that when the ABG lab was billing for ph pco2 po2 hco3 BE and saturation on top of electrolytes it clearly states glucose or arterial blood gases **key word is or** but TMC was billing for both. Emphasis added see Exhibit 26

(bb) Letter to OIG dated March 10, 2016 TMC admits they were double billing Medicare on all claims totaling 118,000. This was signed by Chief compliance officer Cara Merski who relator had reported to 2014-2016. See Exhibit 27.

(cc) Investigation by CMS dated 12/6/2013 after patient expired and 2 weeks after false claims were submitted for a SRE which is not allowable but was. CMS investigates this incident. This incident occurred on 11/6/2013 and investigated on 11/19/13. See Exhibit 28 p 2. This involved Carolyn Carcerano. Relator helped his coworker with this patient and his coworkers had submitted charges for this patient not knowing what had happened to this young lady.

(dd) TMC was found in Violation of MEDICAL STAFF ACCOUNTABILITY 1 TMC was found to be in immediate Jeopardy on 11/21/13 FOR FAILING TO TAKE CORRECTIVE MEASURES. 3 weeks after this Women had died and False Claims had already been submitted for her admission. TMC was also found to be in VIOLATION OF SURGICAL SERVICES TMC 4 was found in VIOLATION OF OPERATING ROOM SUPERVISION 4 TMC was found in VIOLATION OF OPERATING ROOM POLICIES See Exhibit 28 p1 p 2 p3

(ee) Exhibit 29 shows that TMC was allowing Eascare to submit false claims as a result of nurses at TMC authorizing Eascare to bill non emergent as emergent. These pediatric transports were to Fransican hospital and New England Pedicare. See Mass Health Audit. See Exhibit 17 p 6 and p 9 these also included the NICU transports and PICU

transports. This resulted in false claims to be submitted as a result. The hospital news letter clearly states a respiratory therapist will only go out when needed for PICU patients. This changed at the direction of CNO in 2011 or face discipline and Bill $475 per transport this was happening from 2011 to November 2016. This contrary to TMC assertions. See exhibit

(ff)   It should be duly noted that 2 patients Coded in the MRI suite as a result of using a ventilator circuit connected to a Ambu self inflating bag. to ventilate a patient in 2012 and 2013 was not reported and was not FDA approved and claims submitted for such. See Exhibit 19 p2 2B. also see CMS Investigation 2012-2018 This shows these events were not reported but False Claims Submitted.

(gg)   It should be duly noted that the following SRE's did not get reported and claims submitted for such. 1 Caleb Arel May 22, 2014 poisoned by his mother not reported to DPH or CMS poisoning is Assault and double billed. See exhibit 19 p 1 and 20 p1 related to SRE'S DPH CMS notifications. See exhibit 9 and Exhibit 19 p 3. 7D.

(hh)   On or about September 2015 A 17 y/o boy TMC first Ecmo Pedi experiment is accidently decannulated and dies Lussier was incharge of this program relator reported this serious event to then manager Curro who immediately went to risk management. But this incident was not reported and TMC submitted claims for such. See Exhibit 40 Roche Email.

(ii)   A 80 y/o Russian women commits Suicide in Room 423 by putting a plastic bag over her head and suffocates herself and cardiac arrests on or about October 2015. See DPH CMS suicide not billable Boston Homicide was called in but deemed a suicide. It was not reported to DPH or CMS and claims submitted for such See Exhibit 19 p 2. 3C.

(jj)   A patient in CTU receives Lasix instead of Flolan

has a heart attack which is a serious Medication Error and not billable not reported to DPH or CMS August 2016. But claims submitted for such and double billed See Exhibit 19 p 2. 4A.

(kk)   On or about  October 24 2016 a patient with a LVAD respiratory arrest then cardiac arrest no CPR was performed for 15 minutes as a result of cardiology not answering there pages. Relator took the phone call when finally answering their pages the patient was in CCU bed 2 ended up on ECMO for a week and false claims submitted ECMO cost 177,000 for 1 week and billed for a Ventilator each day parameter changes and trips to CT scan for a week this was not reported to DPH or CMS but claims submitted for such. See Exhibit 19 p 2. 1 E.

(ll)    4 Dr Warner's patient who had open heart surgery November 9, 2016 who did not receive Milranone during his entire operation and was Claims submitted for the entire admission. This patient had a heart attack as a result Relator reported this to Dr Warner that morning when he returned to TMC that  morning to who went to Risk Management immediately and relator lost his job less than to 2 days later for reporting as a result. Risk management notified Lussier when she found out that relator had reported this incident relator lost his job less than 48 hours later. Relator always stated there was a cover up taking place at TMC from 2012 to 2018. See exhibit 19 p 2 4a. It should be duly noted that Dr England stepped down as Chief of Anesthesia as a result of this incident. False claims were submitted for such for the entire admission emphasis added.  This SRE does not appear in CMS or DPH investigations and shows cover up. This was a Serious Medication error. See exhibit 19 p 2. 4A and exhibit 20 p 1. Emphasis added.

(mm)   CNO Jinks had a statement Read in Boston Municipal court that stated that Relator had reported internally Prior to relator losing his job on November 11, 2016. Her statement eloquently

stated Relator had reported that TMC was not in compliance with Medicare Rules and Regulations and Standards. The case against relator brought by TMC was dismissed.

(nn)   Exhibit 30 shows that patients were receiving colonoscopies with contaminated scopes. The patients were not notified that they should be tested for Hep A, Hep B, Hep C, or HIV as a results and false claims were Submitted for these procedures and not reported to CMS or DPH. Exhibit 30 also shows patients were not being medicated properly. That were serious medication errors taking place. See  p 2 VIOLATION INFECTION CONTROL OFFICER RESPONSIBILTY  SEE P 7-VIOLATION ADMINISTRATION OF DRUGS P 7-P 11  See P 11 VIOLATION MEDICAL RECORD SERVICES See p11- p13 See p 17 -18 VIOLATION MEDICAL STAFF TMC was found to be in immediate Jeopardy from 1/6/14 to 1/24/14 for not taking corrective measures and not reporting to CMS or DPH. It should be duly noted that Relator went to the Director of the medical intensive care unit 2weeks after this incident occurred and per DPH and CMS this incident is not billable but was and false claims submitted for such . see Exhibit 19 p 1 p 2 and p 3. This patient was upcoded to cardiac arrest  and severe neurological compromise (brain damage). P 18 shows VIOLATION: NURSING CARE PLAN p 19 VIOLATION OF NURSING SERVICES See p 19- p21. P 21 shows VIOLATION PATIENT RIGHTS OR SECLUSION see p 21-p 22. See p 22-23 VIOLATION INFECTION CONTROL.

(oo)   Exhibit 29 is Eascare settlement agreement with the OIG for non emergent transports to and from TMC involving the NICU and PICU teams which were billed as emergent. This settlement was for 255,768.14 on March 31, 2017.

(pp)    Exhibit 34 p1 from the TMC webs site dated 2014 for the PICU clearly states that the Pediatric/Neonatal Transport Team composition is determined on the **acuity** of the patient and can

include Nurses, Respiratory Therapist, Paramedics and EMTs for pediatric transports, with the addition of Neonatal Critical care fellows who did not always go out on transport with the Neonatal Critical Team. a Respiratory Therapist will only go out on transport if per the TMC news letter 2009. This is contrary to TMC assertions and in fact respiratory was submitting false claims $ 475 per transport when not needed or face discipline for not doing so this was at the direction of CNO Jinks in 2011. This took place 2011 to 2018.

(qq)    Exhibit 26 p1 shows that the abg lab and on while respiratory was on transport would run a poc abg when in reality all they wanted was electrolytes and glucose and TMC then would submitted claims for both panels even though one of those test were not ordered or needed.  TMC news letter clearly states, that  the new program allows the transport team to measure blood Glucose or arterial blood gases the **KEY word is OR emphasis  added.** but it should be duly noted that this was happening in the hospital since 2011. See Exhibit 21  Whitney affidavit.

(rr)    Exhibit 33 is about a SRE that occurred on 1/20/12. This investigation was the Result of relator calling CMS and complaining what took place and how the patient was harmed. On 3/6/2013. 1 year and 3 months later after false claims had already been submitted for such which is not allowable . CMS investigates this incident at TMC and finds the following violations which were in fact true that Relator had reported. CMS VIOLATION PROGRAM DATA, 2 PROGRAM DATA ACTIVITIES. A patient coded as a result of a resident not answering pages for 4 hours on 1/21/2012 the patient cardiac arrested, revived and admitted to the ICU and false claims were submitted for this patients admission. Respiratory entered charges for this event and care of this patient which is not allowable per CMS and DPH rules. See Exhibit 19, and 20 p 1. The patient was upcoded from skin graft to Cardiac arrest as a result. False claims were submitted for this

patient's entire admission. The acts of 305 of 2008
the law prohibits hospitals from charging for these
events or seeking reimbursement for SRE related
services.

(ss)     Exhibit 31 dated July 28,2017 the report titled,
Death in Restraints dated 1/1/17-7/26/17.
Indicated while side rails and two- point  soft
wrist restraint. This shows cover up the surveyor
interviewed Senior Risk Manager #2 at 11:15 am
on 7/27/17 Senior Risk Manager said the Hospital
did not report to CMS patient death while in
restraints.  As of  a result of not reporting false
claims were submitted see exhibit 19 and 20 p 1 of
exhibit 19 p 3 #5 D. patient death or serious injury
associated with the use of physical restraints or
bedrails while being cared for in a healthcare
setting. See exhibit 19 #4 p p 2 patient death or
serious injury with a medication error (e., errors
involving the wrong drug, wrong dose wrong
patient, wrong time, wrong rate, wrong
preparation, or wrong route of administration
(updated 2011).

(tt)      Exhibit 36 clearly shows patients were being
placed in restraints without physician orders. See
p 1. VIOLATION PATIENT RIGHTS: RESTRAINT
AND SECLUSION.

(uu)     EXHIBIT 37 dated 9/18/2018  Clearly shows that a
elderly nursing home  patient was sexually
assaulted had a finger inserted into (Patient # 14)
anus by a Clinical care technician # 3 on 1/10/18
some  9 months after CMS investigates and after
false claims had already been submitted see
exhibit 19 p 1 and p 4, 7 c Sexual abuse /assault on
a patient or staff member within or on grounds of
a healthcare setting on a patient   it also shows that
a patient was physically assaulted and from date
patient # 1 was assaulted by a nurse Liam RN #1
on 8/15/17 but both incidents were not reported
and CNO Jinks was now interim CEO at TMC and
she is a mandated reporter same as Relator but
failed to do so. This shows cover up by Jinks. This
was in VIOLATION    CMS shows VIOLATION

PATIENT RIGHTS. 2 VIOLATION PATIENT RIGHTS: CARE IN A SAFE SETTING 3 VIOLATION: PAATIENT RIGHTS: FREE FROM ABUSE/ HARRASEMENT AND VIOLATION PROGRAM SCOPE, PROGRAM DATA VIOLATION: EMERGENCY SERVICES POLICIES

(vv)    Exhibit 38 is a internal confidential Email from Steve Rosenberg who relator went to October 24,2016 who relator reported to the Double billing. This exhibit shows all that we as therapist had only received a video to watch related to billing.

The exhibits show that these were not bald assertions but were in fact true. This is contrary to statements made by TMC assertions and proves false statements made by TMC on the above dates. These events ranged from the above SRE events and false claims that had already been submitted for such after those patient deaths or Discharge. This was not allowed under the rules and regulation of DPH and CMS. See exhibit 19 p1 and exhibit 20 p 1 These patients had cardiac arrested, Code Blue was called, all these Patient's ended up on ventilators billed by respiratory initial and subsequent ventilator and also parameter changes and transports to Cath Scan and were double billed and false claims submitted for such in violation of DPH and CMS Regulations. See exhibit 19 p1 It should be Duly noted that this is proven after these events occurred and was documented and investigated by CMS and DPH months later or even years later after relator had reported. This was after Relator had complained and reported internally and to outside governmental agencies.

It should be duly noted that following Serious reportable events that plaintiff had complained about internally and not reported, do not appear in CMS investigations. Relator being licensed Respiratory Therapist is a mandated reporter under his license. The following incidents SRE incidents are as follows #1 April 28, 2012 Steven Perez shot outside TMC dies and as a result of no OR team available and dies # 2. Caleb Arel May 22, 21014. # 3 a 80 y/o Russian women commits suicide in RM 423 October 2014 BPD gets called in because it is considered a crime scene relator had to sign a piece of paper that he was the first responder. # 4 Two patients die in MRI as a result of using patient equipment not FDA approved for use in the manner for such 2012 and 2013. # 5 On or about October 2015 TMC first pediatric Ecmo needlessly dies as a result of being decannulated Lussier was in charge of the ECMO program relator reported this serious event to then manager Curro who immediately went to Risk management and reported this incident. See Email from Roche Exhibit 40. # 6 a patient

receives lasix instead of Flolan on or about August 2016 ends up on a
ventilator for a week.  #7 on or about October 17 2016 A patient in CCU
#2 with a LVAD who had a thyroid biopsy respiratory arrested then
cardiac arrested no CPR was performed on this patient for 15 minutes as a
result of Cardiology not answering there pages, this patient ended up on a
ventilator for 1 week and ECMO and not reported or the family told and
care removed and dies. It was 2 weeks later as a result of this SRE that the
signs were pulled down no CPR on LVAD patients after relator reported
to the Nurse Educator regarding this event. # 8 November 9, 2016 Dr
Warner's patient does not receive Milranone during that patient's entire
open heart surgery. Relator reports this and loses his job less 48 hrs later.
DR Warner went to Risk management after relator reported this incident.
Coworker Jack Roche one week later, was asked if he was the Jack that
reported to DR Warner by the respiratory staff.

Plaintiff's complaint contains sufficient factual matter, accepted as true, to
state a claim for relief that is  plausible on its face.'" *Ashcroft* v. *Iqbal,* 556
U.S 662, 678 ( 2009) (quoting Bell Atl. Corp. v Twombly, 550 U.S. 544, 570
(2007). A claim has "facial plausibility" when the plaintiff pleads factual
content that allows the court to draw reasonable inference that the
defendant is liable for the misconduct alleged." Id.  This "plausibility"
standard is not akin to a probability requirement,' but it asks for more than
a sheer possibility that that a defendant acted unlawfully." Id.

The Supreme Court has specifically indicated that determining whether a
complaint states a plausible claim for relief under this standard is "a
context- specific task that requires the reviewing court to draw on its
judicial experience and common sense," Id at 679.

The Second Circuit has decided that it is not the district court's task in
reviewing a motion to dismiss to decide between two plausible inferences
that may be drawn from factual allegations in the complaint. A court
ruling on such a motion may not properly dismiss a complaint that states
plausible version of events merely because the court finds a different
version more plausible." **Anderson News, LLC. v. Am. Media. Inc, 680
F.3d 162, 185 (2d Cir. 2012 ). Cert. denied, 133 S. Ct. 846 (2013).** Thus [t] he
question at the pleading stage is not whether  there is a plausible
alternative to plaintiffs theory; the question is whether there are sufficient
factual allegations to make the complaint's claim plausible." *Id.* at 189.  The
Second Circuit's formulation of the appropriate question recognizes that
because the plausibility standard is lower than the  probability standard,
there may therefore be more than one plausible interpretation  of a
defendants words, gestures, or conduct. Consequently, although an  does
not mean that the plaintiff's allegation that the conduct is not culpable is
not also plausible."*Id* 189-190.

Even after *Twombly* and *Iqbal*, in determining whether a complaint states a claim that is plausible, the court is required to proceed' on the *assumption that all the [ factual]* allegations in the complaint are true[,'] [e]ven if their truth seems doubtful." Id. at 185 ( courts emphasis) (quoting *Twombly,* 550 U.S. at 556). because the plaintiff in entitled to the benefit of the doubt, "it is not the province of the court to dismiss on the basis of the court's choice among plausible alternatives", rather, " the choice between or among plausible interpretations of evidence will be a task for the factfinder," assuming that plaintiff "can adduce sufficient evidence to support its factual allegation." *Id.* at 190. Under the reasoning of the Second Circuit plaintiff has provided sufficient facts to create a plausible scenario for holding the defendant liable for the conduct alleged. Plaintiff has shown beyond a reasonable doubt what was Material, Particular, and Plausible

The Supreme Court's decision in Universal Health Services v United States ex. Rel. Escobar, 136 S. Ct. 1989 (2016) the landmark decision that addressed the implied certification theory of liabilty, and in process gave renewed emphasis to the concepts of materiality and government knowledge under the FCA.

1. The FIFTH CIRCUIT APPLIES ESCOBAR IN ANALYZING

   MATERIALITY

In the United States ex. Rel. Lemon v. Nurses To Go Inc. 924 F. 3d 155 ( 5th Cir.2019), the Fifth Circuit, reviewing a districts court's dismissal of claims, engaged in a thorough application of Escobar, articulating  three non-exhaustive "factors" for determining materiality. First , the court asked whether the government expressly condition on payment on meeting statutory or regulatory requirements at issue. Second , the court considered whether the government would have denied payment if it had known of the violations, a factor which the court referred to as government enforcement." And third, the court asked whether the defendants, noncompliance was substantial or minor. In Lemon, the relators alleged that a hospice provider submitted claims affirming it had complied with various Medicare statutory  and regulatory requirements, Id at 157. They also alleged that the hospital billed for ineligible services and patients, such as billing for already deceased patients. Id. at 157-158.

 Applying each of its articulated Escobar factors in turn, the Fifth Circuit began addressing conditions of payment. The court acknowledged that Escobar held that violating a requirement which is labeled a condition of payment does not alone" conclusively establish materiality. Id at 161. Nevertheless conditioning payment on a requirement is certainly probative evidence of materiality." Id ( quoting united States ex. Rel. Rose v. Stephens Institute, 909 F 3d 1012, 1020 (9th Cir. 2018).

Because the Medicare statute expressly noted that payment can only be made if the certification, face to face encounter, and plan of care requirements that the defendants allegedly violated were met, the held that the defendants' allegedly fraudulent certifications that they had complied with the statutory and regulatory requirements violated the governments express conditions of payment. Id

Second, the court turned to government enforcement Id at 161-62. Here the relators alledged in their complaint that HHS OIG had previously pursued enforcement actions against other hospice providers that had committed violations similar to the defendants' alleged violations—namely submitting bills for ineligible services and patients and failing to conduct the required certifications Id. at 162. Because of these past enforcement actions, the Court held that the relators here had created a reasonable inference that the government would have denied payment had it known of the defendants violations. Id. the Court found additional support for this conclusion in the Sixth Circuit's holding in United States ex. Rel. Prather v. Brookdale Senior Living Communities, Inc. 892 F3d822 (6th Cir. relators to alleged specific government prosecutions for claims similar to relators. Id.

Th, the Fifth Circuit analyzed whether the noncompliance was substantial or minor. Id at 163. Citing Escobar', the court noted that a violation is material either when reasonable person would "attached importance" to the noncompliance or when the defendant knew or had reason to know that the false representations recipient would attach importance to it, even though a reasonable person would not. Id. because the court had determined in its government enforcement analysis that the government would have denied payment had it known of defendants violations, the court therefore held that government would have attached importance to the violations. Id. thus , the relators had satisfied the third factor, showing that the noncompliance was substantial. Id. given all three factors were satisfied, the court held that relators had sufficiently alleged material violations to survive motion to dismiss.Id.

It should be duly noted that TMC and Eascare had already prior been investigated by Mass Health, OIG, and DEA DOJ and made settlement agreements with the government in 2016. But these violations were taking place from 2009 to 2017. TMC or Eascare did not adhere to those agreements or Notify them of such violations. TMC did not notify DEA or DOJ that a pharmacist was not a Pharmacist from 12/31/14 to 2/7/17 and claims were submitted for such and further drugs were being diverted.

Exhibit 33 is from a CMS investigation related to a SRE that occurred on

1/20/12. On March 6, 2012 3 months later, this CMS Investigation took place after relator Reported it to CMS. This was after claims had been submitted for reimbursement.

CMS Violation PROGRAM DATA, PROGRAM DATA ACTIVITIES. A patient coded as a result of a resident not answering pages for over 4 hours on 1/21/2012 . the patient cardiac arrested, revived and admitted to the ICU and false claims submitted for the entire admission. This patient was upcoded from Skin Graft to Cardiac arrest. False claims were submitted for this patients entire admission.  See Exhibits19 and 20 CMS and DPH rules that forbid seeking reimbursement for such. See Exhibit 33 CMS investigation.

Exhibit 31 dated July 28, 2017 shows TMC was in VIOLATION PATIENT SAFETY  2 patients were overdosed with Fentanyl and 1 had an adverse event while in restraints and while the other patient died while in restraints. See p1,p2, p 3,

TMC also failed to report this to CMS OR DPH and false claims had already been submitted for such for these patient admissions.  TMC also failed to take immediate corrective action. See Exhibit 19 p1, p 2,p3.


TMC is trying to use plausible Deniability as a excuse that they did not know relator had reported. TMC also states that they did not know who threatened relator with a gun if he did not keep his mouth shut. TMC also states that relator did not know about the billing department that is not the case. TMC states these were bald assertions. TMC has made false statements to this court that were served on June 18 2019 when in reality they were served on June 14, 2019. Relator has only received by first class mail notification that Counsel Bruce Singal was representing TMC and he was filing for a extension. TMC does not dispute there were Serious reportable events taking place and failed to report and submitted claims for such emphasis added.

As relator has stated there seems to be more than just a smoking gun here.

As Apollo thirteen stated to Nassau, Houston we have a problem here.

As a married man never wants to here these 4 words from his wife, Itold you so.

2/27/20

John karvela RRT

132 Collins St Danvers Ma.

1-978-304-0634

Email vinnieboomba58@yahoo.com